# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK
### CASE NO.: 1:24-cv-5008

| | |
|---|---|
| MARIO CHALMERS, SHERRON COLLINS, JASON TERRY, RYAN BOATRIGHT, DEANDRE DANIELS, ALEX ORIAKHI, VINCENT COUNCIL, ROSCOE SMITH, MATT PRESSEY, EUGENE EDGERSON, AARON BRAMLETT, JASON STEWART, GERARD COLEMAN, JUSTIN GREENE, RON GIPLAYE, AND JAMES CUNNINGHAM, individually and on behalf of themselves and all others similarly situated,<br><br>   Plaintiffs,<br><br> v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION a/k/a NCAA; TURNER SPORTS INTERACTIVE, INC.; PAC-12 CONFERENCE; BIG TEN CONFERENCE, INC.; BIG TWELVE CONFERENCE, INC.; SOUTHEASTERN CONFERENCE; ATLANTIC COAST CONFERENCE; and BIG EAST CONFERENCE, INC.,<br>   Defendants. | **COMPLAINT**<br>**CLASS ACTION**<br>**(Jury Trial Demanded)** |

## INTRODUCTION

1.   On April 7, 2008, the Kansas Jayhawks and Memphis Tigers men's basketball teams were matched in the NCAA national championship game at the Alamodome in San Antonio, Texas.   The Jayhawks were down by nine points with 2:12 left in the game before mounting an incredible comeback.   Down 63-60 with only 10.8 seconds left, Kansas inbounded the ball in their backcourt to Sherron Collins, who dribbled up the right side of the court and passed to Mario Chalmers behind the three-point line.   With barely any room to shoot and 3 seconds left in the game, Chalmers launch one of the most iconic shots in the history of men's college basketball – "Mario's Miracle" – that tied the score and sent the game into overtime, where the Jayhawks went on to beat the Tigers and win the national title by a score of 75-68.

2.   Since that day, "Mario's Miracle" has been replayed countless times for commercial purposes in live television broadcasts, advertisements, online videos, and other forms of media.   For example, on the NCAA.com website, users can today watch various videos of "Mario's Miracle," including "Remember That Time?   Mario's miracle;"

"The Mario Chalmers buzzer beater, from every angle;" and "NCAA Video Vault: Mario Chalmers' CLUTCH 3-pointer, from every angle."[1]

3.      Defendant National Collegiate Athletic Association ("NCAA") and its partner Turner Sports Interactive, Inc. ("TSI") use these videos of "Mario's Miracle" for a commercial purpose.  Upon information and belief, the NCAA and TSI earn commercial advertising revenues from the views of these videos, and the NCAA men's basketball tournament, now officially known as "March Madness" – which the generates close to $1 billion in annual revenue for the NCAA, and with broadcast rights worth nearly $20 billion over the next decade[2] – is promoted by the NCAA and its partners through the countless replays of legendary March Madness moments like "Mario's Miracle."

4.      Mario Chalmers, Sherron Collins, and other members of the 2008 Kansas Jayhawks National Championship men's basketball team

---

[1]      https://www.ncaa.com/video/basketball-men/2014-01-30/remember-time-mario-chalmers-shot-kansas-memphis-self-calipari; https://www.ncaa.com/video/basketball-men/2020-04-30/mario-chalmers-buzzer-beater-every-angle;      https://www.ncaa.com/news/basketball-men/article/2022-02-25/ncaa-video-vault-mario-chalmers-epic-3-pointer-forces-overtime-help-kansas-win (all last visited June 29, 2024).

[2] Associated Press, *NCAA Generates Nearly $1.3 billion in Revenue for 2022–23*, ESPN.com,      Feb.      1,      2024,      https://www.espn.com/college-sports/story/_/id/39439274/ncaa-generates-nearly-13-billion-revenue-2022-23.

have been paid nothing by the NCAA or its partner TSI for the continued use of their names, images and likenesses in promoting and monetizing March Madness. The same is true for thousands of former NCAA athletes across all sports whose names, images, and likenesses are continuing to be displayed for commercial purposes by the NCAA, its member conferences, and its partners such as TSI.

5.     Plaintiffs Mario Chalmers, Sherron Collins, Jason Terry, Ryan Boatright, DeAndre Daniels, Alex Oriakhi, Gerard Coleman, Vincent Council, Roscoe Smith, Matt Pressey, Eugene Edgerson, Aaron Bramlett, Jason Stewart, Justin Greene, Ron Giplaye, and James Cunningham ("Plaintiffs") are former elite NCAA student-athletes. Plaintiffs include members of the 1997, 2008, 2011 and 2014 NCAA Champion Men's Basketball teams, whose names, images and likenesses have been put on display by Defendants since their decorated collegiate athletic careers.

6.     The NCAA and its co-conspirators, including without limitation, the Big East Conference ("Big East"), Pac-12 Conference ("Pac-12"), Big Ten Conference ("Big Ten"), Big Twelve Conference ("Big 12"), Southeastern Conference ("SEC"), Atlantic Coast Conference

("ACC") and TSI, their affiliates, parents, predecessors, successors and assigns, have systematically and intentionally misappropriated Plaintiffs and similarly situated class members' publicity rights—including their names, images, and likenesses—associated with their athletics competition and championship play, reaping scores of millions of dollars from Plaintiffs and similarly situated class members' participation in competition.

7.   Defendants have used the images and videos of Plaintiffs and similarly situated class members to advertise for Defendants' commercial purposes without the players' consent and while paying them nothing.

8.   In 2021, the United States Supreme Court noted that the NCAA "enjoy[s] monopsony [(*i.e.*, buyer-side monopoly)] power in the market for student-athlete services, such that its restraints can (and in fact do) harm competition." *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 90 (2021).  The NCAA admitted as much in its briefing for *Alston*. *Id.* at 86.

9.   The NCAA has for decades leveraged its monopoly power to exploit student-athletes from the moment they enter college until long after they end their collegiate careers. The NCAA has conspired with

conferences, colleges, licensing companies, and apparel companies to fix the price of student-athlete labor near zero and make student-athletes unwitting and uncompensated lifetime pitchmen for the NCAA.

10.    Since the founding of our country, use of a person's image in an advertisement without valid consent has been illegal.

11.    "[T]he NCAA is not above the law." *Id.* at 112 (Kavanaugh, J., concurring).

12.    Ultimately, the NCAA is an admitted monopolist that has unreasonably and illegally utilized its monopoly power to pay nothing to the people whose names, images, and likenesses it uses without their consent in support of its multibillion-dollar enterprise.

13.    This conduct constitutes:

      a.  Unreasonable restraint of trade,

      b.  Illegal monopolization,

      c.  Tortious misappropriation of publicity rights, and

      d.  Unjust enrichment.

14.    The NCAA's illegal profit scheme is carried out through various partners and co-conspirators, some of whom are named as Defendants here.

15.   Plaintiffs, on behalf of themselves and all others similarly situated, now seek reasonable compensation for the appropriation of their names, images, and likenesses by the NCAA, it member conferences, and their partners and co-conspirators.

16.   Furthermore, since the NCAA's illegal conduct continues to this day—notwithstanding the clear notice of the unlawfulness of its behavior provided by *Alston* and an increasing number of cases throughout the country—it needs to be stopped by way of a permanent injunction.

## PARTIES AND JURISDICTION

17.   The parties in this litigation are the Plaintiffs, former NCAA athletes, the NCAA, its member conferences, TSI, and the co-conspirators that have misappropriated their publicity rights.

*The Plaintiffs*

18.   **Mario Chalmers**, originally from Alaska, matriculated at the University of Kansas from 2005 to 2008, was a member of the 2008 NCAA Championship Kansas Jayhawks men's basketball team, where he was a the Most Outstanding Player of the 2008 NCAA Division I men's

basketball tournament. Mr. Chalmers now presently resides in Spring Lake, North Carolina.

19.     **Sherron Collins**, originally from Chicago, Illinois, played basketball for Kansas from 2006-2010, and was a member of the 2008 NCAA Men's Basketball Championship team. Mr. Collins presently resides in Lawrence, Kansas.

20.     **Jason Terry**,  originally from Seattle, Washington, enrolled at the University of Arizona from 1995 to 1999, where he was a member of the 1997 NCAA Championship Arizona Wildcats men's basketball team, as well as the teams that made the Sweet Sixteen in 1996 and the Elite Eight in 1998, and was named Pac-10 Player of the Year and selected to the All-Conference First Team his senior year. Mr. Terry now resides in Salt Lake City, Utah.

21.     **Ryan Boatright**, originally from Illinois, matriculated at the University of Connecticut from 2011 to 2015, was a member of the 2014 NCAA Championship UConn Huskies men's basketball team, where he was named to the 2014 All-Final Four team. Mr. Boatright presently resides in Arizona.

22.    **DeAndre Daniels**, originally from California, enrolled at the University of Connecticut from 2011 to 2014, was a member of the 2014 NCAA Championship UConn Huskies men's basketball team, where he was named to the 2014 NCAA All-Tournament East Region team. Mr. Daniels now presently resides in Crandall, Texas.

23.    **Alex Oriakhi,** originally from Massachusetts, attended the University of Connecticut from 2009 to 2012, and was a member of the 2011 NCAA Championship UConn Huskies men's basketball. Mr. Oriakhi transferred to the University of Missouri for his senior season 2012 to 2013. Mr. Oriakhi presently resides in Dallas, Texas.

24.    **Vincent Council,** originally from New York, New York, attended and played men's basketball at Providence from 2009 to 2013. Mr. Council presently resides in Brooklyn, New York.

25.    **Matt Pressey,** originally from Dallas, Texas, attended and played men's basketball at the University of Missouri from 2010-2012. Mr. Pressey presently resides in Frisco, Texas.

26.    **Roscoe Smith,** originally from Baltimore, Maryland, played basketball at the University of Connecticut from 2010-2012 and was a member of the Huskies' 2011 NCAA Championship men's basketball

team. Mr. Smith finished his career at the University of Nevada, Las Vegas, for the 2013-2014 season. Mr. Smith presently resides in Buckeye, Arizona.

27.   **Eugene Edgerson**, originally from New Orleans, Louisiana, enrolled at the University of Arizona from 1996 to 2001, where he was a member of the 1997 NCAA Championship Arizona Wildcats men's basketball team, as well as the teams that made the Elite Eight in 1998 and played Duke in the 2001 final. Mr. Edgerson now resides in Tucson, Arizona.

28.   **Aaron Jordan ("A.J.") Bramlett**, originally from Albuquerque, New Mexico, enrolled at the University of Arizona from 1995 to 1999, where he was a member of the 1997 NCAA Championship Arizona Wildcats men's basketball team, as well as the teams that made the Sweet Sixteen in 1996 and the Elite Eight in 1998. Mr. Bramlett now resides in Albuquerque, New Mexico.

29.   **Jason Stewart**, originally from Gardena, California, enrolled at the University of Arizona from 1995 to 1999, where he was a member of the 1997 NCAA Championship Arizona Wildcats men's basketball team, as well as the teams that made the Sweet Sixteen in

1996 and the Elite Eight in 1998. Mr. Stewart now resides in San Diego, California.

30.     **Gerard Coleman,** originally from Massachusetts, attended and played men's basketball at Providence and Gonzaga from 2010 to 2014. Mr. Coleman presently resides in Boston, Massachusetts.

31.     **Justin Greene,** originally from Brooklyn, New York, attended and played men's basketball at Kent State from 2008-2012. Mr. Greene presently resides in Columbus, Ohio.

32.     **Ron Giplaye,** originally from Lowell, Massachusetts, attended and played men's basketball at Providence from 2010-2012, and then attended and played men's basketball at East Tennessee State from 2012-2015. Mr. Giplaye presently resides in Chicago, Illinois.

33.     **James Cunningham,** originally from Oklahoma, attended and played men's basketball at Arizona State from 1994-1996 and then attended and played men's basketball at the University of Tulsa from 1996-1998. Mr. Cunnigham presently resides in Argyle, Texas.

*The Defendants*

34.     **NCAA** is an unincorporated association with more than 1,100 member schools, conferences, and other organizations across the United

States, Puerto Rico, and parts of Canada. It is headquartered in Indianapolis, Indiana.

35.   The NCAA has member schools and a member conference based in New York. Accordingly, it is a citizen of New York. *See Staggs v. Nat'l Collegiate Athletic Ass'n*, No. 18-CV-1981, 2018 WL 4092104, at *1 (S.D. Cal. Aug. 28, 2018) ("Citizenship of an unincorporated entity such as NCAA is determined by the citizenship of all of its members." (citing *Carden v. Arkoma Assoc.*, 494 U.S. 185, 195–96 (1990))).

36.   **Big East Conference, Inc. ("Big East")** is a Delaware registered not-for-profit corporation, with its principal place of business located at 655 Third Avenue, Suite 711 New York, New York 10017. The Big East is a multi-sport collegiate athletic conference, and a formal "conference member" of Defendant NCAA's Division I. Defendant Big East participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged class members, and will continue to damage class members unless enjoined.

37.   **Pac-12 Conference ("Pac-12")** is an unincorporated association, with its principal place of business located at 12647 Alcosta Boulevard, 5th Floor, San Ramon, California 94583. The Pac-12 is a multi-

sport collegiate athletic conference, and a formal "conference member" of Defendant NCAA's Division I. Defendant Pac-12 participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged class members, and will continue to damage class members unless enjoined.

38. **Big Ten Conference, Inc. ("Big Ten")** is a nonprofit corporation, organized under the laws of Delaware, with its principal place of business located at 5440 Park Place, Rosemont, Illinois 60018. The Big Ten is a multi-sport collegiate athletic conference, and a formal "conference member" of Defendant NCAA's Division I. Defendant Big Ten during the Class Period participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged class members, and will continue to damage class members unless enjoined

39. **Big 12 Conference, Inc. ("Big 12")** is a nonprofit corporation organized under the laws of Delaware, with its principal place of business located at 400 East John Carpenter Freeway, Irving, Texas 75062. The Big 12 is a multi-sport collegiate athletic conference, and a formal "conference member" of Defendant NCAA's Division I.

Defendant Big 12 during the Class Period participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged class members, and will continue to damage class members unless enjoined.

40.    **Southeastern Conference ("SEC")** is an unincorporated association, with its principal place of business located at 2201 Richard Arrington Jr. Boulevard North, Birmingham, Alabama 35203-1103. The SEC is a multi-sport collegiate athletic conference, and a formal "conference member" of Defendant NCAA's Division I. Defendant SEC during the Class Period participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged class members, and will continue to damage class members unless enjoined.

41.    **Atlantic Coast Conference ("ACC")** is an unincorporated association with its principal place of business located at 620 South Tryon St., Suite 1200, Charlotte, North Carolina 28202. The ACC is a multi-sport collegiate athletic conference and a formal "conference member" of Defendant NCAA's Division I. Defendant ACC during the Class Period participated in the collusive restraint of trade and other violations of law

alleged in this Complaint, has thereby damaged class members, and will continue to damage class members unless enjoined.

42.    The Big East, PAC 12, Big Ten, Big 12, SEC, and ACC are collectively referred to herein as the "Conferences."

43.    **TSI** is a Domestic Profit Corporation organized under Georgia law. Defendant TSI is a subsidiary of Warner Bros. Discovery which is a multinational mass media and entertainment conglomerate with over 41 billion in revenue in 2023. Its registered agent is CT Corporation System, 289 S. Culver St., Lawrenceville, GA 30046. Its principal office is located at 1050 Techwood Drive, NW, Atlanta, GA 30318.

44.    In this complaint, reference to "Defendants" without further definition refers to all defendants, collectively and individually, and to their affiliates or subsidiaries. Allegations that defendants engaged in an act or transaction mean that the defendant engaged in the act or transaction by or through its officers, directors, agents, employees, or representatives who were actively engaged in the management, direction, control, or transaction of the defendant's business or affairs.

*Jurisdiction and Venue*

45.   The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), as this action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

46.   The Court also has jurisdiction over this matter under 28 U.S.C. § 1332(d) in that this is a class action in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some of the members of the proposed class are citizens of a state different from Defendants.

47.   The Court has personal jurisdiction over Defendants because *inter alia*, they: (a) transacted business throughout the United States, including this District; (b) participated in organizing intercollegiate athletics contests, marketing, promoting, licensing or selling merchandise throughout the United States, including this District; (c) had substantial contacts with the United States, including this District; and (d) were engaged in an illegal anticompetitive scheme that was directed at and had the intended effect of causing injury to persons

16

residing in, or doing business throughout the United States, including this District.

48.    In addition, the NCAA engages in substantial activity within New York, including by retaining member institutions in the state, hosting events in the state, including Division I Basketball Tournament games, and enforcing its rules on New York institutions, including state universities.

49.    The Court has personal jurisdiction over the Conferences and TSI, because the Conferences and TSI have minimum contacts with this District and they have, as an agent of the NCAA and otherwise, engaged in substantial activity within New York, including by licensing NCAA footage and images of individuals, teams, and events within New York, creating archival footage and images of residents and citizens of the State, and offering footage and images for view, sale or license to citizens and residents of New York, and thus conspired to harm and did harm citizens and residents of New York and this District.

50.    Venue is appropriate because Defendants reside, are found, have agents, and transact business in this District as provided in 28 U.S.C. § 1391(b) & (c) and in Sections 4 and 12 of the Clayton Act, 15

U.S.C. §§ 15 and 22. In addition, one of the Plaintiffs resides in this District.

<em>The Co-Conspirators</em>

51.     Various persons, firms, corporations, organizations and other business entities, known and unknown, have participated as unnamed co-conspirators in the violations alleged herein, including the NCAA's member-schools and other NCAA Division I athletic conferences not named as defendants in this Complaint, by licensing NCAA footage and images of individuals, teams, and events, creating archival footage and images of residents and citizens of the state, and offering footage and images for sale or license to the relevant market, nationwide, and more particularly to citizens and residents of New York.

## FACTUAL ALLEGATIONS

52.     The NCAA and its named and unnamed co-conspirators have illegally agreed to exploit student-athletes by using their monopoly power to force student-athletes to give up their legal right of publicity and control of their name, image, and likeness; asserting a perpetual license of student-athletes' NIL rights; and appropriating those rights for decades, long after the athletes have completed their collegiate careers.

*The NCAA*

53.    The NCAA was founded in 1906 in reaction to the brutality of college football games, in which players were regularly killed and permanently injured. At its founding, 62 institutional members signed on. The association's initial purpose was to impose rules that would protect student-athletes' health and safety.

54.    After World War II, the organization shifted focus to protecting "amateurism" in college athletics by imposing rules and limits on recruitment, financial aid, and academic performance standards.

55.    Today, the NCAA has more than 1,200 member schools and oversees more than half a million student-athletes across its three competitive divisions; it sponsors more than 90 national championships in 24 sports.

56.    In its Notes to Consolidated Financial Statements for August 31, 2023, the NCAA identifies itself as "the organization through which colleges and universities of the nation speak and act on athletic matters at the national level."  The organization claims its mission is to "[p]rovide a world-class athletics and academic experience for student-athletes that fosters lifelong well-being."  Among its "core values" is "to maintain

intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body."

57.    On its website, NCAA acknowledges that one of two major sources of revenue is "television and marketing rights for the Division I Men's Basketball Championship"—the tournament known as "March Madness."

58.    In Article 2.9 of its constitution,[3] the NCAA declares that "student-athletes should be protected from exploitation by professional and commercial enterprises."

59.    Yet, the NCAA has exploited Plaintiffs, as it has other former student-athletes, for more than forty years, first by requiring them as young athletes to cede their NIL rights to the NCAA and then by appropriating those rights, without consent or compensation, long after they had graduated.

60.    That exploitation has had as its primary purpose the generation of profit for the NCAA.

---

[3] The NCAA constitution was amended in 2022. This discussion refers to the earliest version of the NCAA constitution and bylaws we could locate, dated 2000–2001. On information and belief, this version is substantially the same as the rules in force when Plaintiffs were student-athletes.

61.    Elsewhere, the NCAA constitution allows that acceptance of "athletically related financial aid" up to the school's published cost of attendance does not compromise the student's "amateurism," but prohibits athletes from accepting any other financial assistance or other compensation unless expressly authorized by the NCAA.

62.    In support of the principle of amateurism, Bylaw 12 defines "pay" and identifies sources of payment students may and may not accept and activities they may and may not participate in.

63.    Section 12.5 of that bylaw, which addresses athletes' participation in "promotional activities," forbids the use of student-athletes' name, image, or likeness for any commercial purpose and defines an institution's improper use of a student-athlete's name or image without the student's knowledge or consent as an institutional violation.

64.    Section 12.5.1.10 creates an exception to the limitations on use of student-athletes' images or names for posters promoting NCAA or conference championships.

65.    Section 12.5.2.2 places the onus for stopping unauthorized commercial use of a student-athlete's name or image on the student-athlete.

66.     Under NCAA Bylaw 14.1.3.1, student-athletes are required to sign a form titled "Student-Athlete Statement" each academic year before their athletic season begins.[4]

67.     The form asks the student for information related to financial aid, amateur status, drug tests, involvement in gambling, and other issues that may affect an athlete's eligibility for participation in NCAA sports.

68.     The form is absolutely required. According to the bylaws, "Failure to complete and sign the statement shall result in the student-athlete's ineligibility for participation in all intercollegiate competition."

69.     Although the provision has evidently been eliminated on recent versions of the form, older versions included a requirement that the student-athlete agree to the following statement:

> You authorize the NCAA [or a third party acting on behalf of the NCAA] to use your name or picture to generally promote NCAA championships or other NCAA events, activities or programs.

On information and belief, the Student-Athlete Statements signed by Plaintiffs included this provision or one substantially similar to it.

---

[4] The full name of the form includes a number that changes each academic year.

70.   The NCAA has interpreted this simple statement, presented as part of a form student-athletes—most of them very young adults with little or no legal sophistication—are told they *must* complete if they want to play, **to confer a license in perpetuity** for the use of images and likenesses created during the athlete's collegiate career.

71.   Furthermore, the form is generally presented by a person the student-athlete recognizes as an authority figure, a coach, Athletic Director, or more egregiously, the school's compliance officer, an institutional officer vested with authority of the student-athlete's eligibility. The message is clear: the student-athlete is expected and required to sign the form, no questions asked.

72.   In this way, the NCAA exploits its gross disparity in bargaining power to **coerce student-athletes to give up legal rights they may not even realize they have.**

73.   The NCAA controls virtually all collegiate sports, especially at the elite levels, and it controls access to scholarship funds for Division I student-athletes. Further, NCAA Division I schools provide the only pathway to professional sports for most student-athletes.

74.     Thus, a student-athlete who refuses to sign the statement gives up not only his or her collegiate athletic career, but any prospect of continuing to the professional level.

75.     Further, because refusing to sign would also mean foregoing athletic scholarships, resisting NCAA rules would, for many student-athletes, also mean losing the opportunity for a college education.

*The Collegiate Sports Market*

76.     The NCAA, the Conferences, and its members control the collegiate sports market in the United States, including licensing rights for players' names and likenesses, game footage, and team logos and trademarks. All of these elements are used in a range of products, including on-demand game films, stock footage or imagery for commercial or editorial use, replay of "classic" games on streaming and television outlets, posters and photographs, and other merchandise.

77.     The NCAA exploits its considerable resources through a network of unnamed co-conspirators, including CBS, TNT, and other licensees, affiliates, and participants in the NCAA's various programs and merchandising efforts.

78.    These outlets produce significant income. The NCAA brings in roughly $1 billion each year, the bulk of it from "March Madness," the Division I Men's and Women's Basketball Championship. Media contracts for March Madness, recently extended to 2032, are worth nearly $20 billion.

79.    The NCAA has delegated some of its marketing, promoting, and/or licensing or merchandising activity to TSI, affiliate or subsidiary of TNT Sports, which is a division of Warner Bros. Discovery. TSI maintains the ncaa.com website, and likely other digital media outlets, where it provides access to results, schedules, and both current and archival images and movies.

80.    Indeed, some Plaintiffs have videos prominently placed on NCAA.com:

> a. https://www.ncaa.com/video/basketball-men/2014-04-08/ryan-boatright-national-championship-postgame-interview-rachel-nichols;
>
> b. https://www.ncaa.com/video/basketball-men/2014-04-07/play-day-uconn-national-championship-ryan-boatright
>
> c. https://www.ncaa.com/news/basketball-men/article/2022-02-25/ncaa-video-vault-mario-chalmers-epic-3-pointer-forces-overtime-help-kansas-win

d. https://www.ncaa.com/video/basketball-men/2014-03-28/mbk-404-iowa-state-connecticut-sweet-sixteen

e. https://www.ncaa.com/video/basketball-men/2014-04-05/mbk-601-connecticut-florida

f. MBK: Mizzou routs Ole Miss 98-79 | NCAA.com

g. MBK: Missouri squeaks by South Carolina | NCAA.com

h. Norfolk State pulls off 15-over-2 upset vs. Missouri in 2012 |; NCAA.com

i. UConn-UK | NCAA.com

j. UConn v. Arizona | NCAA.com

k. https://www.ncaa.com/video/basketball-men/2020-03-25/watch-full-game-arizona-beats-kentucky-1997-national-championship

l. https://www.ncaa.com/news/basketball-men/article/2018-04-02/watch-every-one-shining-moment-right-here

81.     Not only Plaintiffs, who were former men's basketball players, but numerous other sports have videos on NCAA.com, including without limitation baseball, cross country, lacrosse and soccer.

82.     NCAA.com also includes a store where visitors can buy NCAA Championships Gear, jerseys, t-shirts, and other "team-spirited" items, promoting a specific school or NCAA tournament.

*The Rise of "March Madness"*

83.   The NCAA men's championship basketball tournament was the brainchild of Ohio State University coach Harold Olsen. The first tournament, held in 1939 with just eight teams, was run by the National Association of Basketball Coaches.

84.   The tournament maintained its eight-team format until 1951, when it was expanded to sixteen teams to allow more teams to compete and alleviate pressure created by the strict geographic selection criteria.

85.   The field was expanded multiple times, to twenty-two teams in 1951, thirty-two teams in 1975 and forty teams in 1979, and forty-eight teams in 1980. The tournament first approached its contemporary form in 1985, when the tournament was expanded to sixty-four teams. A final expansion, in 2011, brought the field to sixty-eight teams.

86.   The NCAA took early and aggressive action to make the NCAA men's basketball tournament the premier post-season collegiate basketball event. In particular, the NCAA acted to stave off competition from the National Invitational Tournament (NIT), a competition launched by the Metropolitan Basketball Writers Association in 1938.

87.    In the tournaments' early years, the NIT often received more coverage than the NCAA tournament and teams frequently participated in both events. In 1950, City College of New York won both the NIT and the NCAA title.

88.    The NCAA enacted two rule changes, one in 1951 and one in 1971, to cement its tournament's status as *the* postseason tournament.

89.    First, in 1951, the NCAA banned teams from participating in both tournaments.

90.    Second, in 1971, the NCAA made a rule banning teams that declined an NCAA invitation from participating in other post-season tournaments. As a result, the NIT now functions as a sort of consolation prize for teams not invited into the NCAA bracket.

91.    Thus, by wielding its draconian rules to subjugate members and eliminate competing events from the schedule, the NCAA established its tournament as the premiere—indeed, nearly the only— postseason basketball venue.

92.    In the years since, the NCAA tournament has become a cultural phenomenon, with millions tracking favorites and developing their own brackets. The final game of the tournament has often been the

most watched event on television, surpassing even other landmark broadcasts, such as the Oscar Awards and the Super Bowl.

93.   "March madness" was first used to refer to the tournament in 1982, by commentator Brent Musburger, who used it to describe particularly wild games and especially upsets. Musburger knew the term from his time covering high school basketball tournaments in Illinois, where it had been coined by a referee in 1939, to describe upsets and postseason games that were otherwise unconventional.[5]

94.   The term caught on, and in 2011, the NCAA paid the Illinois High School Association more than $17 million for the trademark to the phrase.[6] "March Madness" is now used by the NCAA to refer to and promote the tournament.

95.   The tournament now accounts for the largest share of NCAA revenues, generated through media rights and merchandise sales.

96.   CBS has been the association's primary broadcast partner since its timely acquisition of broadcast rights in 1982. Throughout the

---

[5] Patrick Pinak, *So, Where Did the Term "March Madness" Come From Anyway?*, Fanbuzz, Mar. 16, 2023, https://fanbuzz.com/college-basketball/march-madness-phrase-origin/.

[6] *Id.*

1980s, ESPN also broadcast the tournament's early rounds, contributing to both ESPN's rise and the soaring popularity of the tournament.

97.    Under current arrangements, which have been extended through 2032, NCAA has a joint contract with CBS and Warner Bros. Discovery that splits the tournament between CBS, TBS, TNT, and truTV. Broadcasters and facilities are shared across all four outlets.

98.    The current broadcast contracts funnel approximately $900 million to the NCAA each year.

99.    The NCAA tournament contributes additional funds through licensing of key images and footage, as well as licensing of logos and terms like "March Madness" for merchandise.

100.    The 2023 tournament generated a total of $1.3 billion in revenue for the NCAA.

101.    The NCAA also has multiple YouTube channels, March Madness: (https://www.youtube.com/channel/UCKjEtnnXEHsXE9IvCb92V7g) and another for NCAA sports (https://www.youtube.com/user/ncaa), where full games can be watched anywhere at any time. That channel generates additional funds through advertising. This channel includes numerous

NCAA Division I, II and III sports, athletes and interviews dating back decades. Viewers must watch advertisements in order to access games and other content.

102. Similarly, on NCAA.com, users may view game footage, including footage of the 1997, 2008, 2011 and 2014 NCAA men's basketball championship games, only after watching an advertisement, from which the NCAA and/or its co-conspirators earn commercial revenues.

103. Players have never been paid for their participation in NCAA sports, including Division I basketball, although since the U.S. Supreme Court's decision in *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69 (2021), the NCAA has temporarily suspended its rules barring independent endorsement deals.

104. However, student-athletes' value to the NCAA does not end with their graduation; archival footage and other products constitute an ongoing income stream for the NCAA long after the students whose images are used have moved on from college.

105.   Replays of historic moments from previous tournaments are a mainstay of the NCAA's and broadcasters' promotional activity and of other NCAA products and income streams, such as the YouTube channel.

106.   In addition, the NCAA also sells viewer information to third parties for advertising parties.

107.   Former players have never been compensated for this continuing use of their names, images, and likenesses, to the clear commercial advantage of the NCAA.

108.   In sum, the Division I Men's Basketball Tournament has grown into a media juggernaut, yielding billions of dollars in revenue for the NCAA and its affiliates and co-conspirators.

109.   Those billions were made on the backs of Plaintiffs—and other players like them—and they continue to roll in, in large part from the uncompensated use of the players' names and likenesses, long after the players have left school.

110.  The young players who played any NCAA Division I sport prior to June 15, 2016[7] should never have been coerced into signing a contract that stripped them of their legal rights.

111.  Further, the NCAA had no valid legal reason to believe that a simple, understated waiver making no mention of legal rights and no suggestion that legal counsel should be sought[8] could convey a perpetual license for uncompensated use of a person's name and likeness.

### Class Allegations

112.  The foregoing paragraphs are incorporated by reference as if fully set forth herein.

113.  Plaintiffs bring this action on behalf of former NCAA student-athletes under Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of the following Class, defined as:

> All persons who were NCAA student-athletes prior to June 15, 2016, whose image or likeness has been used in any video posted by or licensed by the NCAA, the Conferences, TSI or their agents, distributors, contractors, licensees, subsidiaries, affiliates, partners or

---

[7] Upon information and belief, June 15, 2016 is the cutoff for any athlete in the *House v. NCAA*, 4:20-cv-03919 (ND CA) settlement.

[8] In fact, NCAA rules forbid student-athletes from seeking the advice of either a lawyer or an agent.

> anyone acting in concert with any of the foregoing entities or persons.

114. Plaintiffs seek a declaration that any assignment of publicity rights is unlawful and unenforceable, a declaration of entitlement to a present and future share of any revenue generated from the use of their publicity rights, including but not limited to the use of their name, image and likeness, and injunctive relief barring Defendants from using the same absent reasonable remuneration.

115. On behalf of the members of the Class, Plaintiffs seek compensation for any revenue generated from the use of their past publicity rights, including but not limited to the use of their name, image and likeness, during their period of eligibility, and after, including without limitation, through licensing, marketing, promotion, online, or other income streams that Class members would have received absent Defendants' unlawful conduct.

116. Plaintiffs seek certification of nationwide class for their antitrust claims (First and Second Claims, *infra*), and a nationwide class for their unjust enrichment claims (Third Claim, *infra*).

117. Excluded from the Class are any officers, directors, and employees of Defendants.

118.   Also excluded from the Class are: (a) any Judge or Magistrate presiding over this action and members of their families; (b) Defendants and any entity in which Defendants have a controlling interest in, or has a controlling interest in Defendants, and its legal representatives, successors and assigns; and (c) all persons and entities who properly execute and file a timely request for exclusion from the Class.

119.   *Numerosity*: Plaintiffs are unable to provide a specific number of members in the Class because that information is solely in the possession of Defendants. However, the exact number of Class members, including the names and addresses of all Class members, will be easily ascertained through a review of Defendant's business records. Upon information and belief, each Class contains thousands of members and is therefore so numerous that joinder of all members would be impracticable.

120.   *Commonality*: Common questions of law and fact predominate over any individual issues that may be presented, because Defendants tacitly admit they have engaged in the conduct set forth above (*Alston* 594 U.S. at 86), thus the common questions of law and fact are:

> a. Whether Defendants engaged in a contract, combination, and conspiracy, consisting of horizontal

and vertical agreements that artificially depress prices in the market for student-athletes' labor, fixing those prices near zero;

b. Whether such contract, combination, and conspiracy, consisting of horizontal and vertical agreements is enforceable;

c. Whether Defendants illegally agreed to exploit student-athletes by using their monopoly power to force student-athletes to give up their legal right of publicity and control of their name, image, and likeness; asserting a perpetual license of student-athletes' NIL rights; and appropriating those rights for decades, long after the athletes have completed their collegiate careers;

d. Whether such conduct caused the Class to receive less, or near zero compensation, than they would have for use of their publicity rights, including name image and likeness in a competitive market;

e. Whether Defendants violated Section I of the Sherman Act;

f. Whether the Defendants and their co-conspirators conduct caused injury to Plaintiffs and the Class;

g. Whether the Plaintiffs and Class are entitled to declaratory and injunctive relief;

h. Whether and to what extent Plaintiffs and the Class are entitled to damages;

i. Whether Defendants have been unjustly enriched.

121.   *Typicality*: The claims of Plaintiffs are typical of the claims of the Class and all are based on the same facts and legal theories, as all such claims arise out of Defendants' unlawful conduct.

122.   *Adequacy*: Plaintiffs are adequate representatives of the Class and will protect the claims and interests of the Class. Plaintiffs have retained counsel experienced in the prosecution of complex class actions. Neither Plaintiffs, nor counsel, have interests that conflict with those of the Class and will vigorously prosecute the claims alleged herein. Plaintiffs are aware of their responsibilities and have accepted such responsibilities.

123.   *Predominance and Superiority*:  The Class are appropriate for certification because questions of law and fact common to the members of the Class predominate over questions affecting only individual members. A class action is superior to other methods for the fair and efficient resolution of this controversy. The class action device presents fewer management difficulties, and provides the benefit of a single adjudication, economy of scale, and comprehensive supervision by a single court. The damages suffered by Plaintiffs and each member of the Class are relatively small as compared to the expense and burden of

individual prosecution of the claims asserted in this litigation. Thus, absent class certification, it would not be feasible for Plaintiffs and members of the Class to redress the wrongs done to them. It also would be grossly inefficient for the judicial system to preside over large numbers of individual cases. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the judicial system. Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court.

124.   Defendants have acted or refused to act on grounds generally applicable to the members of Declaratory and Injunctive Relief Class, thereby making final injunctive relief appropriate for the members of the Declaratory and Injunctive Relief Class as a whole.

*Antitrust Allegations*

125.  The NCAA and its co-conspirators, members, and partners engaged in a contract, combination, and conspiracy, consisting of horizontal and vertical agreements, understanding and concert of action,

that artificially depress prices in the market for student-athletes' labor, fixing those prices near zero.

126.  The NCAA and its members enjoy a monopsony (*i.e.*, a buyer-side monopoly) in the market for student-athletes' labor because no reasonable substitute exists for the elite athletic and academic opportunities offered by Division I schools.

127.  The NCAA leverages its monopsony power in the market for student-athletes' labor power to give itself a monopoly in the market for student-athletes' names, images, and likenesses.

128.  By conditioning student-athletes' eligibility to play on their surrender of their publicity rights for the duration of their college careers; prohibiting student-athletes from receiving any compensation for their name, image, and likeness rights during their college careers; and continuing to appropriate those rights long after students have graduated and ostensibly moved beyond the reach of the NCAA, the NCAA has made itself the sole source for collegiate athlete names, images, and likenesses—even for athletes who graduated decades ago.

129. Thus, the NCAA has acquired both monopsony power, pushing the price of student-athlete names, images, and likenesses to

zero when it acquires them, and monopoly power, making itself the only seller in the market for those names, images, and likenesses.

130.  These actions, which are ongoing and continue to this day, constitute an unreasonable restraint of trade that eliminated competition in the market for former student-athletes' name, image, and likeness rights.

131.  Furthermore, the NCAA's conduct constitutes unlawful exercise of its monopoly power to stifle competition and unreasonably restrain trade.

*Estoppel/Equitable Tolling/Continuing Harm*

132.  Defendants are estopped from relying on any limitations or disclaimers as a defense to Plaintiffs' and Class Members' claims. Defendants knew or should have known that the acts complained herein were a violation of antitrust laws and offend the reasonable expectations of Plaintiffs and Class Members and have been continuous and ongoing for decades. Thus, Defendants' own conduct precludes them from relying on the statute of limitations.

133.  Plaintiffs and Class Members are entitled to equitable tolling of their claims from the date of the first unlawful act of Defendants and

their coconspirators, including without limitation the requirement that Plaintiffs and Class Members sign away publicity rights, barely at the age of maturity, an extraordinary circumstance that prevented Plaintiffs from pursuing their rights, initially within the first act's limitations period, and the harm is ongoing and continuous to this day.

134. Plaintiffs and Class Members are entitled to invoke the continuing violations doctrine because although, upon information and belief, Plaintiffs signed away their respective publicity rights at the time they played sports for their respective schools, Defendants actions, subsequent and continuing, are repeated violations of Section 1 of the Sherman Act, such that with each continuing violation, the statute of limitations has been repeatedly restarted since the advent of Plaintiffs and Class Members work as NCAA student athletes.

*Relevant Market*

135. The relevant markets are the nationwide markets for the labor of NCAA college athletes in the sports in which they competed. In these labor markets, current and prospective athletes competed for roster spots on the various athletic teams. NCAA member institutions recruited and retained the best players by offering bundles of goods and services

including scholarships to cover the cost of attendance, education-related benefits and awards, as well as access to the athletic training facilities, coaching, medical treatment, and opportunities to compete at the highest levels of college sports in front of large crowds and television audiences.

136. All former NCAA student-athletes have been denied the opportunity to pursue economic benefits in a competitive market free of the NCAA's restraints. This antitrust injury to the class is exacerbated by the reality that only a small percentage of former college athletes had careers in professional athletics, and even those that did often had very short careers. For many former student-athletes, college is where the value of their athletic skill was at, or close to, its peak and was an optimal time to realize that value. But the NCAA's anticompetitive restraints prohibited them from doing so.

137. Accordingly, on behalf of a class of all NCAA student athletes, Plaintiffs request a declaratory judgment that the NCAA's rules are unlawful as well as an injunction permanently

## FIRST CLAIM FOR RELIEF
### UNREASONABLE RESTRAINT OF TRADE
### *Violation of Section 1 of the Sherman Act*
### *15 U.S.C. § 1*

138.  The foregoing paragraphs are incorporated by reference as if fully set forth herein.

139.  15 U.S.C. § 1 provides, "Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court."

140. The NCAA, and their co-conspirators, by and through Defendants' co-conspirators officers, directors, employees, agents, or other representatives, have entered into a continuing horizontal and vertical contract, combination, and conspiracy in restraint of trade to artificially depress to near zero the price for the use of, and to limit supply for, licensing, and sale of Plaintiff and Class Members' publicity rights,

43

including names, images, and/or likenesses, in the relevant market, nationwide, in violation of Section 1 of the Sherman Act.

141. The NCAA rules and practices—including the requirements that student-athletes sign away their names, images, likenesses, and publicity rights (collectively "publicity rights") to the NCAA—and the agreement among the NCAA and its named and unnamed co-conspirators, including its member institutions, to adhere to these rules constitute a contract or combination between the NCAA, its member institutions, and its partners and co-conspirators in restraint of trade in the market for student-athlete services.

142. This combination and conspiracy by Defendants (which possess a dominant position in the relevant market) has resulted in, and will until restrained continue to result in, anti-competitive effects, including inter alia: (a) fixing the compensation of Plaintiffs and the Proposed Class at artificially low levels, since Plaintiffs and class members have been unable to negotiate for compensation in a free market; and (b) eliminating or suppressing, to a substantial degree, competition among Defendants for skilled labor in the market

143. The NCAA and its partners, co-conspirators, and member institutions deploy their market power, via NCAA rules, to reduce the cost of student-athletes' publicity rights to zero.

144. The NCAA's illegal conduct has deprived Plaintiffs of substantial profits they would otherwise have earned from their publicity rights.

145. The NCAA's illegal conduct has damaged Plaintiffs by diminishing their opportunity to maximize their compensation for their publicity rights, including their rights related to images related to the most profitable portion of NCAA's revenue, basketball.

146.   The full amount of this damage is currently unknown, and it continues to increase as the NCAA and its affiliates and co-conspirators continue to profit from the NCAA's ongoing, uninterrupted usurpation of Plaintiffs' and Class Members publicity rights.

147. The NCAA damaged and continues to damage Plaintiffs to this day by earning revenue from advertisers who pay for placements on NCAA.com and or the NCAA's YouTube channels that are shown to viewers before they are allowed to view videos of Plaintiffs and the Class.

148. The NCAA has used videos of Plaintiffs and the Class—without Plaintiffs' consent and without compensating Plaintiffs—in commercial advertising since the time that they played in the NCAA, up to and including this year.

149. The NCAA's requirement that student-athletes assign their publicity rights to the NCAA is not justified by any procompetitive objective. The NCAA's publicly stated goals in creating the rules are mere pretext; the rules serve only to allow the NCAA to maximize its profit from student-athletes' uncompensated labor in the only labor market available to them.

150. Even if there were any shred of procompetitive benefit to the NCAA unreasonably forcing student-athletes to assign their publicity rights to the NCAA, and to the NCAA's assumption that those rights have been surrendered in perpetuity, numerous less restrictive alternatives could accomplish any procompetitive objective the NCAA could articulate.

151. A genuine case or controversy exists between Plaintiffs and Defendants regarding the legality of the NCAA's requirement that

student-athletes assign their publicity rights to the NCAA without compensation.

152.  As a direct and proximate result of Defendants' combinations and contracts to restrain trade, suppress compensation, and eliminate competition for skilled labor, Plaintiffs and members of the Class have suffered injury to their business or property and have been deprived of the benefits of free and fair competition. Absent Defendants' conduct, Plaintiffs and Class Members would have received a competitive share of the revenue being brought into the NCAA and their coconspirators from Plaintiffs' and Class members' labor. As a result, Plaintiffs and the Class have suffered damages in an amount to be proved at trial.

153.  For the reasons set forth above, Plaintiffs and the Class are entitled to a declaratory judgment that any assignment of publicity rights under the circumstances in which the NCAA presents its required waiver to students is unlawful and unenforceable.

154.  Plaintiffs and the Class are also entitled to a permanent injunction enjoining the NCAA and any person acting through it from relying on any unenforceable assignment of publicity rights.

155. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Class have been injured and financially damaged, including without limitation, lost profits, less or near zero compensation, precisely the type of injuries antitrust laws were designed to prevent, making Defendants conduct and unlawful restraint of trade.

156. Pursuant to Section 4 of the Clayton Act, Plaintiffs are entitled to recover treble the amount of actual damages, as well as their reasonable attorneys' fees and costs.

157. Plaintiffs and the Class are further entitled to a permanent injunction terminating the ongoing violations alleged in this Complaint.

### SECOND CLAIM FOR RELIEF
### UNREASONABLE RESTRAINT OF TRADE
### GROUP BOYCOTT/REFUSAL TO DEAL
### *Violation of Section 1 of the Sherman Act*
### *15 U.S.C. § 1*

158. The foregoing paragraphs are incorporated by reference as if fully set forth herein.

159. 15 U.S.C. § 1 provides, "Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal."

160. Defendants' group boycott/refusal to deal encompasses Defendants' concerted acts to prevent Class Members from being compensated for use of their images, likenesses and/or names and/or their concerted refusal to permit compensation to be paid to members of the Class for use of their images, likenesses and/or names, in violation of Section 1 of the Sherman Act.

161. Defendants' group boycott/refusal to deal group boycott/refusal to deal also includes Defendants' ongoing concerted action to deny class members compensation in the form of royalties for the continued use of their images, likenesses and/or names for profit.

162. The NCAA possesses monopsony and monopoly power in the market for student-athlete labor and services.

163. Through its rules and practices, the NCAA wields its monopsony power willfully to quash competition and drive the cost of student-athletes' labor down to zero.

164. The NCAA uses its monopsony power to further exploit student-athletes by forcing them to assign their publicity rights to the NCAA, and then assuming that that assignment is perpetual.

165.  The NCAA always conditioned eligibility to play Division I sports on the relinquishment to the NCAA and its members by the athlete of all rights to be compensated for his or her image, likeness and/or name associated with the playing of those sports.

166.  This practice perpetuates the NCAA's monopoly power in the market for student-athlete labor and in other markets by consolidating relevant assets—the publicity rights of well-known athletes—under its control at zero cost.

167.  Thus, the NCAA's monopoly power is not the result of growth or development as a consequence of a superior product, business acumen, or historic accident, but rather of a deliberate course of conduct aimed at eliminating competition.

168.  There is no valid procompetitive reason for the NCAA to require student-athletes to assign their publicity rights to the NCAA in perpetuity.

169.  Rather, the purpose of this requirement is to allow the NCAA to extract maximum profit from the uncompensated labor of student-athletes, taking full advantage of its monopoly power to derive further profits for itself.

170.  The NCAA has leveraged its monopoly power by unlawfully requiring that all member institutions enforce the requirement that student-athletes assign their publicity rights to the NCAA in perpetuity.

171.  This requirement has allowed the NCAA to leverage its labor-side monopsony to create additional profits and power—and also monopoly power—in the separate market for media licensing of game footage, images, and accounts.

172.  Defendants have leveraged their power in a concerted action to deny class members compensation in the form of royalties for the continued use of their images, likenesses and/or names for profit.

173.  Defendants' power is an unlawful restraint on trade and a violation of Section 1 of the Sherman Act as a group boycott and/or refusal to deal.

174.  Defendants used eligibility rules and bylaws as a threat of a group boycott to force all Class members, including Plaintiffs, to abide by the NCAA's rules. Plaintiffs and Class members received less compensation, near zero, and substantially fewer benefits than they otherwise would have received for the use of their athletic services in competitive labor markets, and thus suffered antitrust injuries.

175. The NCAA has always conditioned eligibility on the relinquishment to the NCAA and its members by the student athlete of all rights to be compensated for their athletic services (except in limited circumstances) arbitrarily dictated by the NCAA and enforced by the NCAA.

176. As a direct and proximate result of Defendants' combinations and contracts to restrain trade, suppress compensation, and eliminate competition for skilled labor, Plaintiffs and members of the Class have suffered injury to their business or property and have been deprived of the benefits of free and fair competition. Absent Defendants' conduct, Plaintiffs and Class Members would have received a competitive share of the revenue being brought into the NCAA and their coconspirators from Plaintiffs' and Class members' labor. As a result, Plaintiffs and the Class have suffered damages in an amount to be proved at trial.

177. A genuine case or controversy exists between Plaintiffs and Defendants regarding the legality of the NCAA's requirement that student-athletes assign their publicity rights to the NCAA without compensation.

178.  For the reasons set forth above, Plaintiffs and the Class are entitled to a declaratory judgment that any assignment of publicity rights under the circumstances in which the NCAA presents its required waiver to students is unlawful and unenforceable.

179.  Plaintiffs and the Class are entitled to a permanent injunction enjoining the NCAA and any person acting through it from relying on any unenforceable assignment of publicity rights.

180.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Class have been injured and financially damages, including without limitation, lost profits, less or near zero compensation, precisely the type of injuries antitrust laws were designed to prevent, making Defendants conduct and unlawful restraint of trade.

181.  Pursuant to Section 4 of the Clayton Act, Plaintiffs are entitled to recover treble the amount of actual damages, as well as their reasonable attorneys' fees and costs.

182.  Plaintiffs and the Class are further entitled to a permanent injunction terminating the ongoing violations alleged in this Complaint

## THIRD CLAIM FOR RELIEF
## UNJUST ENRICHMENT

183.  Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

184.  Defendants have received money from advertisements and other promotional images centered around Plaintiffs' images; Plaintiffs' have not consented to such use, nor have they been compensated for it.

185.  These images, and the publicity rights and benefits associated with them, belong in equity and good conscience not to the NCAA but instead to Plaintiffs.

186.  But for the illegal, unethical, and unscrupulous conduct of the NCAA and its co-conspirators, described above, Plaintiffs would have been paid substantial sums for the use of their names, images, and likenesses in the NCAA's advertisements and other promotional efforts.

187.  Defendants have been unjustly enriched as a result of the unlawful conduct detailed herein to the detriment of Plaintiffs.

188.  Defendants should not be permitted to retain the benefits conferred upon them via their wrongful conduct and have been unjustly enriched.

189.  Defendants must disgorge all of Defendants' profits resulting from the wrongful conduct described herein to Plaintiffs under law, equity, and good conscience.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class, pray unto the Court for judgment:

1.  That Plaintiffs have any recover all actual damages from Defendants, jointly and severally, together with interest as allowed by law;

2.  That Plaintiffs have and recover treble damages pursuant to 15 U.S.C. § 15;

3.  That Plaintiffs have and recover of Defendants, jointly and severally, pre- and post-judgment interest, as allowed by law;

4.  That Plaintiffs have and recover of Defendants, jointly and severally, costs and attorney fees as allowed by law;

5.  That Plaintiffs have a trial by jury;

6.  That Plaintiffs have such other relief as the Court deems just and proper.

JURY TRIAL DEMANDED

This 1st day of July 2024.

MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC

/s/ *Peggy Wedgworth*
Peggy Wedgworth,
NY Bar No.: 2126159
405 East 5th Street
New York, NY 10022
T: (212) 594-5300
pwedgeworth@milberg.com

Scott C. Harris*
NC Bar No.: 35328
Michael Dunn*
NC Bar No.: 47713
James R. DeMay*
NC Bar No.: 36710
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC
900 W. Morgan Steet
Raleigh, NC 27603
T: (919) 600-5000
sharris@milberg.com
michael.dunn@milberg.com
jdemay@milberg.com

Elliot Abrams*
N.C. Bar No. 42639
CHESHIRE PARKER
SCHNEIDER, PLLC
133 Fayetteville St., Ste 400
Raleigh, NC 27601
T: (919) 833-3114
elliot.abrams@cheshirepark.com

W. Stacy Miller II*
N.C. Bar 21198
MaryAnne M. Hamilton*
N.C. Bar 59323
**MILLER LAW GROUP, PLLC**
Post Office Box 6340
Raleigh, NC 27628
T: (919) 348-4361
stacy@millerlawgroupnc.com
maryanne@millerlawgroupnc.com

Scott Tompsett*
MO Bar No. 51493
**TOMPSETT COLLEGIATE
SPORTS LAW**
1236 W. 61st Terrace
Kansas City, MO 64113
T: (816) 216-7866
stompsett@scotttompsett.com

*Attorneys for Plaintiffs*

*\* To Be Admitted Pro Hac Vice*