# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK
## CASE NO.: 1:24-cv-05008-PAE-VF

| | |
|---|---|
| MARIO CHALMERS, SHERRON COLLINS, JASON TERRY, RYAN BOATRIGHT, DEANDRE DANIELS, ALEX ORIAKHI, VINCENT COUNCIL, ROSCOE SMITH, MATT PRESSEY, EUGENE EDGERSON, AARON BRAMLETT, JASON STEWART, GERARD COLEMAN, JUSTIN GREENE, RON GIPLAYE, AND JAMES CUNNINGHAM, individually and on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION a/k/a NCAA; PAC-12 CONFERENCE; BIG TEN CONFERENCE, INC.; BIG TWELVE CONFERENCE, INC.; SOUTHEASTERN CONFERENCE; ATLANTIC COAST CONFERENCE; and BIG EAST CONFERENCE, INC.,<br><br>        Defendants. | **AMENDED COMPLAINT**<br>**CLASS ACTION**<br>**(Jury Trial Demanded)** |

# TABLE OF CONTENTS

**INTRODUCTION** ........................................................................ 1

**PARTIES AND JURISDICTION** ................................................ 5

    The Plaintiffs ........................................................................ 5

    The Defendants..................................................................... 9

    The Co-Conspirators............................................................ 13

    Jurisdiction and Venue........................................................ 13

**OVERVIEW OF THE ANTITRUST CONSPIRACY** ............... 15

    The Purpose of the Conspiracy........................................... 19

    Methods and Means of the Conspiracy ............................... 20

    The Overt Acts .................................................................... 21

        *Repeated Commercial Use of Images, Footage, and
        Likenesses of Student-Athletes*.................................... 22

        *Media Rights Deals Licensing Images and Footage
        of Student-Athletes*........................................................ 35

        *Retention of Profits from Licensing of Student-
        Athletes' Images and Footage* ..................................... 37

        *Annual Enactment of New Bylaws with Illicit
        Horizontal Restrictions*................................................ 38

        *Assertion of Exclusive Copyright to Student-
        Athletes' Footage* ........................................................ 39

*Imposition of Footage Usage and Licensing Policies* .. 40

**ADDITIONAL ALLEGATIONS** .................................................. 42

   The NCAA ........................................................................ 42

   The Collegiate Sports Market .......................................... 48

**CLASS ALLEGATIONS** .............................................................. 53

**CLAIMS FOR RELIEF** ............................................................... 61

   FIRST CLAIM FOR RELIEF: UNREASONABLE
   RESTRAINT OF TRADE – VIOLATION OF
   SECTION 1 OF THE SHERMAN ACT 15 U.S.C. § 1 ......... 61

   SECOND CLAIM FOR RELIEF: UNREASONABLE
   RESTRAINT OF TRADE – GROUP BOYCOTT/
   REFUSAL TO DEAL – VIOLATION OF SECTION 1
   OF THE SHERMAN ACT 15 U.S.C. § 1 .............................. 62

   THIRD CLAIM FOR RELIEF:
   MONOPOLIZATION – VIOLATION OF SECTION 2
   OF THE SHERMAN ACT 15 U.S.C. § 2 .............................. 63

   FOURTH CLAIM FOR RELIEF:
   UNJUST ENRICHMENT ...................................................... 65

**PRAYER FOR RELIEF** .............................................................. 66

## INTRODUCTION

1.    The National Collegiate Athletic Association ("NCAA") is a monopolistic organization that, along with its members and athletic conferences, has long been engaged in an antitrust conspiracy. Through that conspiracy, the NCAA exploits its monopsony power to force student-athletes to give up exceedingly valuable rights related to their names, images, and likenesses, including publicity and broadcasting rights, as well as ownership rights related to images and footage of their athletic performances—all for the purpose of allowing the NCAA and its co-conspirators to repeatedly and continuously use the footage and images of student-athletes and their athletic performances for advertising and other commercial purposes, while unjustly retaining all of the profits from such use for the NCAA and its co-conspirators.

2.    Specifically, the NCAA has long enforced a horizontal agreement among its member schools, who are the sole competitors for student-athlete labor, to each impose the same strict limits on the amounts and types of compensation the schools provide or agree to provide to student-athletes, and to further require student-athletes to

1

assign to the NCAA, the conferences, or the member schools perpetual rights to all footage, images, and likenesses of the student-athlete.

3.     As the United States Supreme Court explained in *NCAA v. Alston*, "the NCAA enjoys monopoly (or, as it's called on the buyer side, monopsony) control in that labor market—such that it is capable of depressing wages below competitive levels and restricting the quantity of student-athlete labor."[1]

4.     As in *Alston*, "this suit involves admitted horizontal price fixing in a market where the defendants exercise monopoly control."

5.     Specifically, the NCAA uses its monopsony power in the labor market and a related horizontal price-fixing conspiracy to obtain a monopoly for itself and its members over images and footage of student-athletes' athletic performances.

6.     But for the wrongful acts described herein, the student-athletes would have received royalties or other compensation for the ongoing advertising and other commercial use of the images and footage featuring them and their athletic performances and would have been—

---

[1] *NCAA v. Alston*, 594 U.S. 69, 86 (2021).

and should be—free to exercise their own rights to commercialize the footage as co-owners of such footage.

7.    By engaging in the antitrust conspiracy and thereby obtaining a monopoly in the supply market for footage of student-athletes' competition, the NCAA has prevented student-athletes—would-be competitors with the NCAA for the supply of such footage—from monetizing the footage through other distribution channels.

8.    With its co-conspirators, the NCAA has engaged in numerous and continual wrongful acts to protect its monopoly power and realize unjust profits therefrom, including numerous specific wrongful acts during the four-year period preceding the filing of the initial Complaint on July 1, 2024, and each of those acts independently caused, and continues to cause, harm to Plaintiffs.

9.    The NCAA and its members have already agreed to pay over $3 billion in settlement funds to certain student-athletes who competed in NCAA competition beginning in mid-2016 to account for these and similar wrongs.

10.    This case is brought on behalf of the remaining former Division I and Football Bowl Subdivision student-athletes to require the

NCAA to account for its longstanding, continual, and ongoing violation of the antitrust laws and the related longstanding, continual, and ongoing infringement of these former student-athletes' legal rights.

11.    Plaintiffs and putative class representatives seek antitrust damages and disgorgement of the unjust enrichment that the NCAA and its members have received as a result of their continual wrongful acts, including using Plaintiffs likenesses for advertising and other commercial purposes and unjustly retaining 100 percent of the profits from the commercial use of images and footage of Plaintiffs and putative class members.

12.    They also seek a declaration that they are co-owners of the images and footage featuring their athletic performances, as well as an accounting and disgorgement from the NCAA and its co-conspirators for the wrongful retention of profits generated from the conspirators' use of the images and footage.

13.    This lawsuit will benefit competition by breaking up the NCAA's illegal monopoly in the market for images and footage of former student-athletes' athletic performances, allowing the student-athletes— who were illegally prohibited from monetizing their talents during their

years of competition—to participate in a competitive market for the supply of such footage, thus increasing the output and availability of footage of student-athletes' past athletic performances, all to the benefit of the public.

## PARTIES AND JURISDICTION

### *The Plaintiffs*

14.    The parties in this litigation are the Plaintiffs, who are former NCAA athletes; the NCAA; and its member conferences.

15.    **Mario Chalmers**, originally from Alaska, matriculated at the University of Kansas from 2005 to 2008. He was a member of the 2008 NCAA Championship Kansas Jayhawks men's basketball team, where he was named Most Outstanding Player of the 2008 NCAA Division I men's basketball tournament. Mr. Chalmers now resides in Spring Lake, North Carolina.

16.    **Sherron Collins**, originally from Chicago, Illinois, played basketball for Kansas from 2006 to 2010 and was a member of the 2008 NCAA Men's Basketball Championship team. Mr. Collins presently resides in Lawrence, Kansas.

17. **Jason Terry**, originally from Seattle, Washington, enrolled at the University of Arizona from 1995 to 1999, where he was a member of the 1997 NCAA Championship Arizona Wildcats men's basketball team, as well as the teams that made the Sweet Sixteen in 1996 and the Elite Eight in 1998. He was named Pac-10 Player of the Year and selected to the All-Conference First Team his senior year. Mr. Terry now resides in Salt Lake City, Utah.

18. **Ryan Boatright**, originally from Illinois, matriculated at the University of Connecticut from 2011 to 2015. He was a member of the 2014 NCAA Championship UConn Huskies men's basketball team, and he was named to the 2014 All-Final Four team. Mr. Boatright presently resides in Arizona.

19. **DeAndre Daniels**, originally from California, enrolled at the University of Connecticut from 2011 to 2014, was a member of the 2014 NCAA Championship UConn Huskies men's basketball team, where he was named to the 2014 NCAA All-Tournament East Region team. Mr. Daniels now resides in Crandall, Texas.

20. **Alex Oriakhi**, originally from Massachusetts, attended the University of Connecticut from 2009 to 2012 and was a member of the

2011 NCAA Championship UConn Huskies men's basketball. Mr. Oriakhi transferred to the University of Missouri for his senior season, 2012–2013. Mr. Oriakhi presently resides in Dallas, Texas.

21.    **Vincent Council**, originally from New York, New York, attended and played men's basketball at Providence College from 2009 to 2013. Mr. Council presently resides in Brooklyn, New York.

22.    **Matt Pressey**, originally from Dallas, Texas, attended and played men's basketball at the University of Missouri from 2010 to 2012. Mr. Pressey presently resides in Frisco, Texas.

23.    **Roscoe Smith**, originally from Baltimore, Maryland, played basketball at the University of Connecticut from 2010 to 2012 and was a member of the Huskies' 2011 NCAA Championship men's basketball team. Mr. Smith finished his career at the University of Nevada, Las Vegas, for the 2013–2014 season. Mr. Smith presently resides in Buckeye, Arizona.

24.    **Eugene Edgerson**, originally from New Orleans, Louisiana, enrolled at the University of Arizona from 1996 to 2001, where he was a member of the 1997 NCAA Championship Arizona Wildcats men's basketball team, as well as the teams that made the Elite Eight in 1998

7

and played Duke in the 2001 final. Mr. Edgerson now resides in Tucson, Arizona.

25.    **Aaron Jordan ("A.J.") Bramlett**, originally from Albuquerque, New Mexico, enrolled at the University of Arizona from 1995 to 1999, where he was a member of the 1997 NCAA Championship Arizona Wildcats men's basketball team, as well as the teams that made the Sweet Sixteen in 1996 and the Elite Eight in 1998. Mr. Bramlett now resides in Albuquerque, New Mexico.

26.    **Jason Stewart**, originally from Gardena, California, enrolled at the University of Arizona from 1995 to 1999, where he was a member of the 1997 NCAA Championship Arizona Wildcats men's basketball team, as well as the teams that made the Sweet Sixteen in 1996 and the Elite Eight in 1998. Mr. Stewart now resides in San Diego, California.

27.    **Gerard Coleman**, originally from Massachusetts, attended and played men's basketball at Providence College and Gonzaga University from 2010 to 2014. Mr. Coleman presently resides in Boston, Massachusetts.

28. **Justin Greene**, originally from Brooklyn, New York, attended and played men's basketball at Kent State University from 2008 to 2012. Mr. Greene presently resides in Columbus, Ohio.

29. **Ron Giplaye**, originally from Lowell, Massachusetts, attended and played men's basketball at Providence College from 2010 to 2012, and at East Tennessee State from 2012 to 2015. Mr. Giplaye presently resides in Chicago, Illinois.

30. **James Cunningham**, originally from Oklahoma, attended and played men's basketball at Arizona State from 1994 to 1996 and then at the University of Tulsa from 1996 to 1998. Mr. Cunningham presently resides in Argyle, Texas.

*The Defendants*

31. **NCAA** is an unincorporated association with more than 1,100 member schools, conferences, and other organizations across the United States, Puerto Rico, and parts of Canada. It is headquartered in Indianapolis, Indiana.

32. The NCAA has member schools and a member conference based in New York. Accordingly, it is a citizen of New York. *See Staggs v. Nat'l Collegiate Athletic Ass'n*, No. 18-CV-1981, 2018 WL 4092104, at *1

(S.D. Cal. Aug. 28, 2018) ("Citizenship of an unincorporated entity such as NCAA is determined by the citizenship of all of its members." (citing *Carden v. Arkoma Assoc.*, 494 U.S. 185, 195–96 (1990))).

33.   **Big East Conference, Inc. ("Big East")** is a Delaware-registered not-for-profit corporation; its principal place of business is at 655 Third Avenue, Suite 711, New York, New York 10017. The Big East is a multisport collegiate athletic conference and a "conference member" of Defendant NCAA's Division I. Defendant Big East participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged class members, and will continue to damage class members unless enjoined.

34.   **Pac-12 Conference ("Pac-12")** is an unincorporated association with its principal place of business at 360 3rd Street, Third Floor, San Francisco, California 94107. The Pac-12 is a multisport collegiate athletic conference and a "conference member" of Defendant NCAA's Division I. Defendant Pac-12 participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged class members, and will continue to damage class members unless enjoined.

35.    **Big Ten Conference, Inc. ("Big Ten")** is a nonprofit corporation organized under the laws of Delaware; its principal place of business is at 5440 Park Place, Rosemont, Illinois 60018. The Big Ten is a multisport collegiate athletic conference and a "conference member" of Defendant NCAA's Division I. Defendant Big Ten participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged class members, and will continue to damage class members unless enjoined

36.    **Big 12 Conference, Inc. ("Big 12")** is a nonprofit corporation organized under the laws of Delaware; its principal place of business is at 400 East John Carpenter Freeway, Irving, Texas 75062. The Big 12 is a multisport collegiate athletic conference, and a "conference member" of Defendant NCAA's Division I. Defendant Big 12 participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged class members, and will continue to damage class members unless enjoined.

37.    **Southeastern Conference ("SEC")** is an unincorporated association with its principal place of business at 2201 Richard Arrington Boulevard North, Birmingham, Alabama 35203-1103. The SEC is a

multisport collegiate athletic conference and a "conference member" of Defendant NCAA's Division I. Defendant SEC participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged class members, and will continue to damage class members unless enjoined.

38. **Atlantic Coast Conference ("ACC")** is an unincorporated association with its principal place of business at 4512 Weybridge Lane, Greensboro, North Carolina 27407. The ACC is a multisport collegiate athletic conference and a "conference member" of Defendant NCAA's Division I. Defendant ACC participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged class members, and will continue to damage class members unless enjoined.

39. The Big East, PAC 12, Big Ten, Big 12, SEC, and ACC are collectively referred to herein as the "Conferences."

40. In this complaint, reference to "Defendants" without further definition refers to all defendants, collectively and individually, and to their affiliates or subsidiaries. Allegations that defendants engaged in an act or transaction mean that the defendant engaged in the act or

transaction by or through its officers, directors, agents, employees, or representatives who were actively engaged in the management, direction, control, or transaction of the defendant's business or affairs.

*The Co-Conspirators*

41.    Various persons, firms, corporations, organizations and other business entities, known and unknown, have participated as unnamed co-conspirators in the violations alleged herein, including the NCAA's member schools and other NCAA Division I athletic conferences not named as defendants in this Complaint, by joining and participating in the antitrust conspiracy and monopolistic practices, and by using for advertising and commercial purposes footage of former student-athletes' athletic performances without compensating the former student-athletes.

*Jurisdiction and Venue*

42.    The Court has jurisdiction over the federal claims in this Complaint under 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

43.    The Court also has jurisdiction over this matter under 28 U.S.C. § 1332(d) in that this is a class action in which the matter in

controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some of the members of the proposed class are citizens of a state different from Defendants.

44.    The Court has personal jurisdiction over Defendants because, *inter alia*, they (a) transacted business throughout the United States, including this District; (b) participated in organizing intercollegiate athletics contests and marketing, promoting, licensing, or selling merchandise throughout the United States, including this District; (c) had substantial contacts with the United States, including this District; and (d) were engaged in an illegal anticompetitive scheme that was directed at and had the intended effect of causing injury to persons residing in or doing business throughout the United States, including this District.

45.    In addition, the NCAA engages in substantial activity within New York, including by retaining member institutions in the state; hosting events in the state, including Division I Basketball Tournament games; and enforcing its rules on New York institutions, including state universities.

46.    The Court has personal jurisdiction over the Conferences because the Conferences have minimum contacts with this District and they have, as agents of the NCAA and otherwise, engaged in substantial activity within New York, including by licensing NCAA footage and images of individuals, teams, and events within New York; creating archival footage and images of residents and citizens of the State; and offering footage and images for view, sale, or license to citizens and residents of New York, and thus conspired to harm and did harm citizens and residents of New York and this District.

47.    Venue is proper in this Court under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26.

## OVERVIEW OF THE ANTITRUST CONSPIRACY TO MONOPOLIZE THE SUPPLY MARKET FOR IMAGES AND FOOTAGE OF STUDENT-ATHLETES' PAST PERFORMANCES

48.    Beginning at a time unknown but no later than the 1980s and continuing to the present, in the Southern District of New York and elsewhere, the Defendants did knowingly and intentionally combine, conspire, and agree to enter into an anticompetitive agreement to unreasonably restrain interstate commerce and trade by suppressing and

eliminating competition in **the relevant market**, which is the supply market for images and footage of student-athletes' past athletic performances. That market both directly supplies consumers with content and supplies buyers who wish to monetize such footage, for example, by attracting viewers to watch game replays or by to using such images and footage and the likenesses of the student-athletes contained therein as part of commercial advertisements.

49.    As part of that unlawful agreement, the conspirators (a) collectively and illegally agreed not to pay any compensation to student-athletes for their work in connection with the creation of images and footage of the athletes' athletic performance, as well as to not recognize any ownership claims by the student-athletes in such images and footage; (b) collectively and illegally agreed to prohibit student-athletes from receiving any compensation for images and footage of their athletic performances; and (c) further collectively and illegally agreed to usurp all ownership rights of such images and footage and to continually and repeatedly use such images and footage of student-athletes and their athletic performances for the sole commercial benefit of the conspirators.

50.    In so doing, the NCAA and its members obtained a monopoly in the market for supply of images and footage of student-athlete performances.

51.    NCAA officials justified these monopolistic practices under the guise of preserving amateurism, though a broad consensus among economists and professors of sports management held that "amateurism" as the NCAA defined it was just a façade to cover up what amounted to the monopolization of the industry via a cartel and collective price-fixing.[2]

---

[2] *See, e.g.,* **Robert J. Barro, "The Best Little Monopoly in America," BusinessWeek, December 9, 2002** ("NCAA is the clear choice for best monopoly in America."); **[Nobel Prize Winner] Gary Becker, "The NCAA as a Powerful Cartel," The Becker-Posner Blog, April 3, 2011** ("It is impossible for an outsider to look at these rules without concluding that their main aim is to make the NCAA an effective cartel that severely constrains competition among schools for players."); **Gary Becker, "The NCAA: A Cartel in Sheepskin Clothing," Business Week, September 14, 1987** ("Economists . . . strongly agree that cartels raise prices, lower outputs, and are bad for society. . . . The NCAA is a prime example of such a cartel. It is time that all the NCAA's restrictions on competition for athletes and sports revenues be declared an unlawful conspiracy in violation of the antitrust laws."); **Brad R. Humphreys and Jane E. Ruseski, "Monitoring Cartel Behavior and Stability: Evidence from NCAA Football," Southern Economic Journal, Vol. 75, No. 3, 2001, pp. 1–20** ("Most economists view the National Collegiate Athletic Association (NCAA) as a cartel operating as a monopsonist in the market for athletic recruits."); **Lawrence M. Kahn, "Markets: Cartel Behavior and Amateurism in College Sports," Journal of Economic Perspectives, Vol. 21, 2007, pp. 209–226** ("Most economists who have studied the NCAA view it as a cartel that attempts to produce rents, both by limiting payments for inputs such as player compensation and by limiting output.") **Daniel E. Lazaroff, "The NCAA in Its Second Century: Defender of Amateurism or Antitrust Recidivist?" Oregon Law Review, Vol. 86, No. 2, 2007, pp. 329–371** ("Commentators have explained that while the 'original mission' of the NCAA 'focused on providing public goods' by reducing violence and standardizing play, the NCAA 'quickly turned its attention from standardizing rules to instituting the outlines of a cartel.'"); **Richard Posner, "Monopsony in College Athletics," The Becker-Posner Blog, April 3, 2011** ("The National Collegiate Athletic Association behaves monopsonistically in forbidding its member colleges and universities to pay its athletes. . . . [C]artels, including monopsonistic ones, are generally deemed to be illegal per se under American antitrust law . . ."); **[Former Chief FTC Economist] Robert D. Tollison, "Understanding the Antitrust Economics of Sports Leagues," Antitrust, Spring 2000, pp. 21– 24** ("[E]conomists generally view the NCAA as a cartel. They hold this view because the NCAA has

52.    The United States Supreme Court recognized this economic reality in *Alston*.

53.    The NCAA has long conditioned eligibility to play Division I sports on the student-athlete's relinquishment to the NCAA and its members of all rights to be compensated for his or her image, likeness or name in association with his or her sports participation.

54.    This practice perpetuated the NCAA's monopoly power in the market for student-athlete labor and in the market for images and footage of student-athletes' past performances.

55.    Thus, the NCAA's monopoly power is not the result of growth or development as a consequence of a superior product, business acumen, or historic accident, but rather of a deliberate course of conduct aimed at eliminating competition in the relevant market.

---

historically devised rules to restrict output (the number of games televised) and to restrict competition for inputs (student-athletes). . . . NCAA has obtained much more durable returns on its cartel behavior than other, more notable cartels such as OPEC." ); **[Former Director of the NCAA] Walter Byers, Unsportsmanlike Conduct: Exploiting College Athletes (1995)** ("Collegiate amateurism is not a moral issue; it is an economic camouflage for monopoly practice.") ("[P]rotecting young people from commercial evils is a transparent excuse for monopoly operations that benefit others. The colleges do take part in trusts (i.e., groups in which control of the members is vested in a single entity), combinations (as association of firms for a commercial purpose), and monopoly practices (exclusive control of a commodity or service).")).

56.    Defendants have illegally agreed to exploit student-athletes and used their monopsony power in the labor market to force student-athletes to give up their legal right of publicity and control of their name, image, and likeness; asserted a perpetual license of student-athletes' publicity, broadcasting, and name, image, and likeness rights; asserted complete ownership of all images and footage and copyrights related to images and footage of student-athletes' athletic performances; and appropriated those rights and property for decades, long after the athletes have completed their collegiate careers.

57.    In so doing, Defendants have monopolized the relevant market—the supply market for images and footage of student-athletes' past athletic performances.

## The Purpose of the Conspiracy

58.    The goal of the antitrust conspiracy to unreasonably restrain trade was and is to monopolize and control the supply market for images and footage of student-athletes' past athletic performances and generate excess profits by capturing the substantial portion of revenue that would otherwise have to be paid to the student-athletes for the commercial use of their images and footage of them and their athletic performances

during their tenure within the NCAA system, and to stifle any competition for such images and footage.

## Method and Means of the Conspiracy

59.    Each year, the NCAA and its members—who comprise all of the competitors in the labor market for student-athlete services—together agreed, through the annual passage of NCAA Bylaws and otherwise, to suppress competition in and monopolize the labor market for student-athlete services by entering into an agreement to uniformly impose the same strict limits on the amount and types of compensation provided to student-athletes.

60.    Each year, the NCAA and its members agree to adhere to and enforce such anticompetitive restrictions, including but not limited to investigating and punishing employees of member institutions for violations, as well as student-athletes and any others associated in any meaningful way with the athletic programs of the member institutions.

61.    Each year, the NCAA and its members agree to require every student-athlete, as a condition of participation in NCAA competitions, to assign all rights to any images and footage of the student-athletes to the members, conferences, or the NCAA.

62.    Each year, the NCAA and its members agree to claim exclusive ownership of all images and footage of student-athletes' athletic performances, as well as exclusive ownership of the copyrights to such images and footage.

63.    As a result, the NCAA and its members obtain and maintain monopoly power in the relevant market.

64.    Then, in reliance on the illegal usurpation of the student-athletes' rights, the NCAA, the conferences, and the NCAA's members continually and repeatedly use images and footage of the student-athletes for advertising and other commercial footage without compensating the student-athletes, thereby achieving the goals of generating additional profit and retaining all profit from the commercial use of the footage and images of the student-athletes and their performances.

## The Overt Acts

65.    Each of the following acts constitute new and independent acts causing additional injury to Plaintiffs and the putative class members.

Repeated Commercial Use of Images, Footage, and Likenesses of

Student-Athletes

66.    Each commercial use of the images and footage of the student-athletes by the NCAA, the conferences, and their members and other commercial purposes constitutes a new and independent act by the conspirators, as opposed to the mere reaffirmation of a prior act, and each such use causes discrete and additional injury to the student-athletes who would be compensated for such use but for the ongoing horizontal price-fixing agreement.

67.    A discrete act of advertising and other commercial use occurs, for example, each time an internet or television viewer is shown an image, footage, or likeness of the student-athlete as part of an advertisement or other commercial purpose; each time an internet or television user is shown an advertisement or other commercial promotion before or during the viewing of an image, footage, or likeness of the student-athlete; and each time an individual is otherwise shown an advertisement or commercial promotion, in person or via electronic means, featuring the image, footage, or likeness of the student-athlete.

68.    Each day from at least on or about February 25, 2022, through the present, the NCAA used for advertising and other commercial purposes the name, image, likeness of Mario Chalmers and footage of his athletic performance, including, but not limited to, the use of Mr. Chalmers' footage to generate advertising revenue, as demonstrated by the following screenshot, taken November 6, 2024, which shows the advertisement shown on NCAA.com before a viewer is allowed to watch the video showing "Mario Chalmers' CLUTCH 3-pointer, from every angle."



69.     Each day from on or about November 3, 2020, through the present, the NCAA used for advertising and other commercial purposes the name, image, likeness of Sharron Collins and footage of his athletic performance, including, but not limited to, the use of Mr. Collins' footage to generate advertising revenue, as demonstrated by the following screenshot, taken November 7, 2024, which shows the advertisement shown on NCAA.com before a viewer is allowed to watch footage of Sherron Collins and his athletic performance.



70.     Each day from at least on or about October 23, 2020, through the present, the NCAA used for advertising and other commercial

purposes the name, image, likeness of DeAndre Daniels and footage of his athletic performance, including, but not limited to, the use of Mr. Daniels' footage to generate advertising revenue, as demonstrated by the following screenshot, taken November 7, 2024, which shows the advertisement shown on NCAA.com before a viewer is allowed to watch footage of DeAndre Daniels and his athletic performance.



71.    Each day from on or about March 25, 2020, through the present, the NCAA used for advertising and other commercial purposes the name, image, likeness, and footage of Jason Terry and his athletic performance, including, but not limited to, the use of Mr. Terry's footage to generate advertising revenue, as demonstrated by the following screenshot, taken November 7, 2024, which shows the advertisement

shown on NCAA.com before a viewer is allowed to watch footage of Jason Terry and his athletic performance.



72.    Each day from on or about April 7, 2014, through the present, the NCAA used for advertising and other commercial purposes the name, image, likeness of Ryan Boatright and footage of his athletic performance, including, but not limited to, the use of Mr. Boatright's footage to generate advertising revenue, as demonstrated by the following screenshot, taken November 7, 2024, which shows the advertisement shown on NCAA.com before a viewer is allowed to watch footage of Ryan Boatright and his athletic performance.



73.    From on or about February 3, 2013, through the present, the NCAA used for advertising and other commercial purposes the name, image, likeness of Alex Oriakhi and footage of his athletic performance, including, but not limited to, the following screenshot showing Mr. Oriakhi's image featured on the NCAA website.



74.    From in or about 2012 through the present, an NCAA member institution and co-conspirator has used for advertising and other commercial purposes the name, image, likeness of Vincent Council and footage of his athletic performance, including, but not limited to, the following YouTube video, screenshotted on November 7, 2024, featuring Mr. Counsel, which has been continuously used by a co-conspirator to generate ticket sales since 2012.



75.    From in or about 2011 through the present, an NCAA member institution and co-conspirator herein has used for advertising and other commercial purposes the name, image, likeness of Roscoe Smith and

footage of his athletic performance, including, but not limited to, the following screenshot, taken November 7, 2024, of the advertisement shown on NCAA.com before a viewer is allowed to watch footage of Roscoe Smith and his athletic performance.



76. Each day from at least on or about March 18, 2020, through the present, the NCAA used for advertising and other commercial purposes the name, image, likeness of Matt Pressey and footage of his athletic performance, including, but not limited to, the use of Mr. Pressey's footage to generate advertising revenue, as demonstrated by the following screenshot, taken November 7, 2024, which shows the

advertisement shown on NCAA.com before a viewer is allowed to watch footage of Matt Pressey and his athletic performance.



Each day from at least on or about March 25, 2020, through the present, the NCAA used for advertising and other commercial purposes the name, image, likeness of Eugene Edgerson and footage of his athletic performance, including, but not limited to, the use of Mr. Edgerson's footage to generate advertising revenue, as demonstrated by the following a screenshot, taken November 7, 2024, which shows the advertisement shown on NCAA.com before a viewer is allowed to watch footage of Eugene Edgerson and his athletic performance.



77.    Each day from at least on or about March 25, 2020, through the present, the NCAA used for advertising and other commercial purposes the name, image, likeness of Aaron Bramlett and footage of his athletic performance, including, but not limited to, the use of Mr. Bramlett's footage to generate advertising revenue, as demonstrated by the following screenshot, taken November 7, 2024, which shows the advertisement shown on NCAA.com before a viewer is allowed to watch footage of Aaron Bramlett and his athletic performance.



78.    Each day from at least on or about March 25, 2020, through the present, the NCAA used for advertising and other commercial purposes the name, image, likeness of Jason Stewart and footage of his athletic performance, including, but not limited to, the use of Mr. Stewart's footage to generate advertising revenue, as demonstrated by the following screenshot, taken November 7, 2024, which shows the advertisement shown on NCAA.com before a viewer is allowed to watch footage of Jason Stewart and his athletic performance.



79.    Each day from at least on or about March 25, 2020, through the present, the NCAA used for advertising and other commercial purposes the name, image, likeness of Jason Stewart and footage of his athletic performance, including, but not limited to, the use of Mr. Chalmers' footage to generate advertising revenue, as demonstrated by the following screenshot, taken November 7, 2024, which shows the advertisement shown on NCAA.com before a viewer is allowed to watch footage of Jason Stewart and his athletic performance.



80.    In addition to these examples, during the four years preceding July 1, 2024, the NCAA, the Defendant Conferences, and the NCAA member schools have also otherwise used for advertising and other commercial purposes the name, image, likeness of the named Plaintiffs and the putative class members, as well as images and footage of their athletic performances. For example, NCAA television advertisements within the four years preceding July 1, 2024, have featured Mario Chalmers and his athletic performances that occurred while he played at the University of Kansas, as well as the performances of many other putative class members.

81.    The conspirators have refused to pay anything to the Plaintiffs and putative class members for the conspirators' aforementioned advertising and other commercial use of Plaintiffs' likeness or images and footage of them and their athletic performance.

82. Each such use of Plaintiffs' likeness and athletic performances as part of the copy of an advertisement or for another commercial purpose without compensating Plaintiffs for such use constitutes a wrongful act in furtherance of the antitrust conspiracy that has harmed Plaintiffs.

Media Rights Deals Licensing Images and Footage of Student-Athletes

83. Throughout the four years preceding July 1, 2024, the NCAA, the Conference Defendants, and the NCAA member schools have each entered into various media rights deals that, upon information and belief, include value for the licensing of footage of former student-athletes, including Plaintiffs and the putative class members.

84. The conspirators have not provided *any* compensation—much less just or appropriate compensation—to Plaintiffs for the use of their likenesses or images and footage of them and their athletic performances.

85. By way of example and not limitation, this year, the NCAA entered into agreements with Veritone and ESPN discussed below.

*The 2024 Veritone Agreement*

86.     On or about August 13, 2024, the NCAA entered into a multiyear agreement with Veritone to serve as the NCAA's official global archive of record and exclusive, worldwide footage agent for all NCAA championship content, including content featuring all of the putative class members.

87.     The terms of the agreement allow only the member institutions (not the student-athletes) to license footage for "advertising/commercial use."[3]

88.     Under the agreement with Veritone, student-athletes, fans and others must pay to purchase footage and images and can only use such images and footage for personal use.

89.     Plaintiffs and the putative class members did not receive any—much less appropriate—compensation as part of this 2024 Veritone agreement.

---

[3] "NCAA Member Institution Footage Access Program," NCAA, December 6, 2022, https://www.ncaa.com/_flysystem/public-s3/images/2023/10/17/2023-24%20NCAA%20Member%20Institution%20Footage%20Licensing%20Overview_Veritone.pdf.

*The 2024 ESPN Agreement*

90.    In 2024, the NCAA entered into a media rights deal with ESPN, which licensed broadcast rights to numerous NCAA competitions.

91.    Upon information and belief, this contract also included rights to certain archival footage featuring Plaintiffs and/or putative class members.

92.    Plaintiffs and the putative class members did not receive any—much less appropriate—compensation as part of this 2024 ESPN agreement.

Retention of Profits from Licensing of Student-Athlete Images and
Footage

93.    In addition to signing media rights deals within the four years preceding July 1, 2024, and regardless of when the media rights deals were signed, the NCAA receives payments each year for the licensing of its library of images and footage of former student-athletes and illegally retains 100 percent of such payments, despite a legal obligation to compensate the student-athletes whose names, images, likenesses and athletic performances are the primary subject and primary source of value of such media.

<u>Annual Enactment of New Bylaws with Illicit Horizontal Restrictions</u>

94.    Each year during the existence of the conspiracy, the conspirators agreed, through the voting on, passage of, and adherence to new NCAA Bylaws, to impose an unwavering restriction on the conspirators paying current or former players for the conspirators' commercial use of the images of the student-athletes and the footage of them and their athletic performances.

95.    This act of voting on and passing a new set of rules to which all of the competitors for student-athlete services each agree to adhere to constitutes a new act of horizontal price-fixing and other agreement to unreasonably restrain trade.

96.    Because each year the restrictions voted on by the conspirator-competitors include restrictions prohibiting the payment of student-athletes and further protect the NCAA's monopsony and its footage monopoly, each of these annual agreements to enact the annual NCAA Bylaws constitute new independent acts that harm plaintiffs.

Assertion of Exclusive Copyright to Footage

97.    On or about December 14, 2022, the NCAA enacted "NCAA Footage Usage and Licensing Policies" (the "2022 Footage Policy").[4]

98.    The 2022 Footage Policy wrongly asserts on behalf of the conspirators that the NCAA "retains exclusive copyright to all . . . video footage (e.g., television, digital, and photographs) to all 90 NCAA championships."

99.    But, as the Defendants and their co-conspirators well know, the student-athletes are co-owners of these copyrights because, unlike professional athletes, they are not subject to the work-for-hire doctrine which would vest exclusive rights to the footage in the teams, the conferences, or the leagues if the student-athletes were employees. Instead, under universal principles of equitable ownership and the inalienable right to benefit from the fruits of one's labor, the subjects of the footage, who provided the dominant portion of the value of the footage as compared to the relatively minor contribution of the creative choices

---

[4] "NCAA Footage Usage and Licensing Policies," NCAA, December 14, 2022, https://www.ncaa.com/_flysystem/public-s3/files/Footage%20Usage%20Licensing_1.pdf.

of camera angles—and who did not validly assign away their ownership rights—retain a co-ownership interest in the footage.

100. Each assertion by the NCAA and its co-conspirators of exclusive ownership constitutes a new and independent wrongful act furthering the purposes of the antitrust conspiracy to monopolize the market for images and footage of student-athletes and their athletic performances and causes additional discrete harm to student-athletes by prohibiting them from profiting from their co-ownership interests in their own footage.

101. Upon information and belief, the NCAA, each of the conference defendants, and the NCAA member schools each similarly and annually assert, including within the four years preceding July 1, 2024, exclusive ownership over the footage of student-athletes' athletic performances. Each such assertion is a new, independent, and harmful additional act for the same reason discussed above.

<u>Imposition of Footage Usage and Licensing Policies</u>

102. The enactment by the conspirators of the 2022 Footage Policy also constitutes an independent act causing injury for the additional

reason that it prohibits Plaintiffs and putative class members from licensing footage that they co-own.

103. Specifically, paragraph A.5 of the 2022 Footage Policy provides, "Under no circumstances may any highlights be broadcast or otherwise distributed on the Internet or via any other on-line service, mobile application, digital medium or computer network, without the prior written permission from the NCAA or its designee."

104. This provision enforces the NCAA's and its co-conspirators' monopoly on footage of student-athletes' performances and prevents student-athletes from realizing any compensation from footage that they co-own.

105. Upon information and belief, the NCAA, each of the conference defendants, and the NCAA member schools have similarly and annually imposed image and footage usage policies, including within the four years preceding July 1, 2024, prohibiting broadcasters and others from obtaining and using footage from any source other than the NCAA, the Conferences, or the NCAA member schools, as the case may be. The enactment of each new policy constitutes a discrete harmful act that protects the conspirators' monopoly in the market for student-

41

athlete footage and prohibits Plaintiffs and the putative class members from exercising their co-ownership rights to obtain compensation for such footage.

*    *    *

106.  As detailed further herein, the continuing violations of the Sherman Act and student-athletes' rights constitute numerous breaches of the law by the monopolistic horizontal price-fixing conspiracy charged herein.

107.  The NCAA has been recognized by the United States Supreme Court to be a monopoly but still acts as if it is "above the law." *Alston*, 594 U.S. at 112 (Kavanaugh, J., concurring). It is not, and, it must account for its continual wrongful conduct and cease its continuing violations.

## ADDITIONAL ALLEGATIONS

### The NCAA

108.  The NCAA was founded in 1906 in reaction to the brutality of college football games, in which players were regularly killed and permanently injured. At its founding, 62 institutional members signed

42

on. The association's initial purpose was to impose rules that would protect student-athletes' health and safety.

109.  After World War II, the organization shifted focus to protecting "amateurism" in college athletics by imposing rules and limits on recruitment, financial aid, and academic performance standards.

110.  Today, the NCAA has more than 1,200 member schools and oversees more than half a million student-athletes across its three competitive divisions; it sponsors more than 90 national championships in 24 sports.

111.  In its Notes to Consolidated Financial Statements for August 31, 2023, the NCAA identifies itself as "the organization through which colleges and universities of the nation speak and act on athletic matters at the national level." The organization claims its mission is to "[p]rovide a world-class athletics and academic experience for student-athletes that fosters lifelong well-being." Among its "core values" is "to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body."

112.  In Article 2.9 of its constitution,[5] the NCAA declares that "student-athletes should be protected from exploitation by professional and commercial enterprises."

113.  Yet, the NCAA has exploited Plaintiffs, as it has other former student-athletes, for more than forty years, first by requiring them as young athletes to cede their NIL rights to the NCAA and then by appropriating those rights, without consent or compensation, long after they had graduated.

114.  That exploitation has had as its primary purpose the generation of profit for the NCAA.

115.  Elsewhere, the NCAA constitution allows that acceptance of "athletically related financial aid" up to the school's published cost of attendance does not compromise the student's "amateurism," but prohibits athletes from accepting any other financial assistance or other compensation unless expressly authorized by the NCAA.

---

[5] The NCAA constitution was amended in 2022. This discussion refers to the earliest version of the NCAA constitution and bylaws we could locate, dated 2000–2001. On information and belief, this version is substantially the same as the rules in force when Plaintiffs were student-athletes.

116.  In support of the principle of amateurism, Bylaw 12 defines "pay" and identifies sources of payment students may and may not accept and activities they may and may not participate in.

117. Section 12.5 of that bylaw, which addresses athletes' participation in "promotional activities," forbids the use of student-athletes' name, image, or likeness for any commercial purpose and defines an institution's improper use of a student-athlete's name or image without the student's knowledge or consent as an institutional violation.

118.  Section 12.5.1.10 creates an exception to the limitations on use of student-athletes' images or names for posters promoting NCAA or conference championships.

119.  Section 12.5.2.2 places the onus for stopping unauthorized commercial use of a student-athlete's name or image on the student-athlete.

120.  Under NCAA Bylaw 14.1.3.1, student-athletes are required to sign a form titled "Student-Athlete Statement" each academic year before their athletic season begins.[6]

---

[6] The full name of the form includes a number that changes each academic year.

121.   The form asks the student for information related to financial aid, amateur status, drug tests, involvement in gambling, and other issues that may affect an athlete's eligibility for participation in NCAA sports.

122.   The form is absolutely required. According to the bylaws, "Failure to complete and sign the statement shall result in the student-athlete's ineligibility for participation in all intercollegiate competition."

123.   Although the provision has evidently been eliminated on recent versions of the form, older versions included a requirement that the student-athlete agree to the following statement:

> You authorize the NCAA [or a third party acting on behalf of the NCAA] to use your name or picture to generally promote NCAA championships or other NCAA events, activities or programs.

On information and belief, the Student-Athlete Statements signed by Plaintiffs included this provision or one substantially similar to it.

124.   The NCAA has interpreted this seemingly simple statement, presented as part of a form student-athletes—most of them very young adults with little or no legal sophistication—are told they *must* complete if they want to play, to confer a license in perpetuity for the use of images and likenesses created during the athlete's collegiate career.

46

125.   Furthermore, the form is generally presented by a person the student-athlete recognizes as an authority figure—a coach, Athletic Director, or more egregiously, the school's compliance officer, an institutional officer vested with authority over the student-athlete's eligibility. The message is clear: the student-athlete is expected and required to sign the form, no questions asked.

126. In this way, the NCAA exploits its gross disparity in bargaining power to coerce student-athletes to give up legal rights they may not even realize they have.

127.   Specifically, by way of example and not limitation, the NCAA controls virtually all collegiate sports, including at the elite levels, and it controls access to scholarship funds for Division I student-athletes. Further, NCAA Division I schools provide the only pathway to professional sports for most student-athletes.

128. Thus, a student-athlete who refuses to sign the statement gives up not only his or her collegiate athletic career, but any prospect of continuing to the professional level.

129.  Further, because refusing to sign would also mean forgoing athletic scholarships, resisting NCAA rules would, for many student-athletes, also mean losing the opportunity for a college education.

130.  Due to the fact that they are the product of coercion, represent an instrument of illegal conduct, and are otherwise against public policy, these assignments, to the extent they exist, are legally invalid and void.

## The Collegiate Sports Market

131.  The NCAA, the Conferences, and their members control the collegiate sports market in the United States, including licensing rights for players' names and likenesses, game footage, and team logos and trademarks. These elements are used in a range of products, including on-demand game films, stock footage or imagery for commercial or editorial use, replay of "classic" games on streaming and television outlets, posters and photographs, and other merchandise.

132.  The NCAA exploits its considerable resources through a network of unnamed co-conspirators, including CBS, TNT, and other licensees, affiliates, and participants in the NCAA's various programs and merchandising efforts.

133.  These outlets produce significant income. The NCAA brings in roughly $1 billion each year, the bulk of it from "March Madness," the Division I Men's and Women's Basketball Championship. Media contracts for March Madness, recently extended to 2032, are worth nearly $20 billion.

134.  Indeed, nearly all Plaintiffs have videos prominently placed on NCAA.com, as reflected above and below, by way of example and not limitation:

    a.  https://www.ncaa.com/video/basketball-men/2014-04-08/ryan-boatright-national-championship-postgame-interview-rachel-nichols;

    b.  Play of the Day: Boatwright with Two

    c.  Play of the Day: Mario Chalmers' Clutch 3-Pointer from Every Angle

    d.  Sweet 16: Huskies Dog Iowa State

    e.  Final 4: UConn Knocks Off Florida

    f.  MBK: Mizzou routs Ole Miss 98-79 | NCAA.com

    g.  MBK: Missouri squeaks by South Carolina | NCAA.com

    h.  Norfolk State pulls off 15-over-2 upset vs. Missouri in 2012 |; NCAA.com

    i.  Men's Basketball: UConn–UK

j.    Men's Basketball: UConn v. Arizona

k.    Men's Basketball: Arizona Beats Kentucky for 1997 National Championship

l.    March Madness Highlights: Watch Every "One Shining Moment"

135.   Not only Plaintiffs, who were former men's basketball players, but numerous other athletes have videos on NCAA.com, including without limitation baseball, cross country, lacrosse, and soccer.

136.   NCAA.com also includes a store where visitors can buy NCAA Championships Gear, jerseys, t-shirts, and other "team-spirited" items, promoting a specific school or NCAA tournament.

137.   The NCAA also has multiple YouTube channels, including one dedicated to March Madness (https://www.youtube.com/channel/UCKjEtnnXEHsXE9IvCb92V7g) and another for NCAA sports (https://www.youtube.com/user/ncaa), on which full games can be watched anywhere at any time. The NCAA channel includes numerous NCAA Division I, II and III sports, athletes and interviews dating back decades. The channels generate additional funds through advertising. Viewers must watch advertisements in order to access games and other content.

138. Similarly, on NCAA.com, users may view game footage, including footage of the 1997, 2008, 2011, and 2014 NCAA men's basketball championship games, only after watching an advertisement, from which the NCAA and/or its co-conspirators earn commercial revenues.

139. The NCAA and its co-conspirators earn revenues from advertisers that use the footage to attract viewers, who are shown ads before, and in some case while, the footage is shown to the viewer.

140. The NCAA and its co-conspirators do not compensate the student-athletes for this use of their likenesses or the use of such footage, which the student-athletes co-own for the reasons discussed above.

141. Players have never been paid for their participation in NCAA sports, including Division I basketball, although since the U.S. Supreme Court's decision in *Alston*, the NCAA has temporarily suspended its rules barring independent endorsement deals.

142. However, student-athletes' value to the NCAA does not end with their graduation; archival footage and other products constitute an ongoing income stream for the NCAA long after the students whose images are used have moved on from college.

143.  Replays of historic moments from previous tournaments are a mainstay of the NCAA's and broadcasters' promotional activity and of other NCAA products and income streams, such as the YouTube channel.

144.  In addition, the NCAA also sells viewer information to third parties for advertising parties.

145.  Former players have never been compensated for this continuing use of their names, images, and likenesses, or their co-owned images and footage.

146.  Such failure to pay appropriate compensation provides undue commercial advantage of the NCAA and perpetuates its monopoly power.

147.  In sum, Division I sports, including the Men's Basketball Tournament and the Football Bowl Subdivision, have grown into a media juggernaut, yielding billions of dollars in revenue for the NCAA and its affiliates and co-conspirators.

148.  Those billions were made on the backs of Plaintiffs—and other players like them—and they continue to roll in, in large part from the uncompensated use of the players' names, images, likenesses and footage, long after the players have left school.

149. The young players who played any NCAA Division I sport prior to June 15, 2016,[7] should never have been coerced into signing a contract that stripped them of their legal rights.

150. Further, the NCAA had no valid legal reason to believe that a simple, understated waiver making no mention of legal rights and no suggestion that legal counsel should be sought[8] could convey a perpetual license for uncompensated use of a person's name, image, likeness, and the footage that they rightly co-own.

151. The continued violations of the NCAA, the Conferences and their co-conspirators harm Plaintiffs and putative class members and undermine and destroy competition in the relevant market for the supply of images and footage of student-athletes' past performances.

## CLASS ALLEGATIONS

152. The foregoing paragraphs are incorporated by reference as if fully set forth herein.

---

[7] Upon information and belief, June 15, 2016, is the cutoff for athletes included in the *House v. NCAA*, 4:20-cv-03919 (ND CA) settlement.

[8] In fact, NCAA rules forbid student-athletes from seeking the advice of either a lawyer or an agent.

53

153.  Plaintiffs bring this action on behalf of former NCAA student-athletes under Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of the following Class, defined as:

> All individual persons who were NCAA student-athletes prior to June 15, 2016, whose image, likeness, or footage has been used or licensed for commercial purposes by the NCAA, the Conferences, or Veritone; or their agents, distributors, contractors, licensees, subsidiaries, affiliates, or partners; or anyone acting in concert with any of the foregoing entities or persons.

154.  On behalf of the members of the Class, Plaintiffs seek a declaration that any assignment of publicity rights is unlawful and unenforceable; a declaration that Class members are entitled to a present and future share of any revenue generated from the use of their publicity rights, including but not limited to the use of their name, image, likeness, and co-owned footage; and injunctive relief barring Defendants from using the same absent reasonable remuneration.

155.  On behalf of the members of the Class, Plaintiffs also seek a declaration of co-ownership of all such footage.

156.  On behalf of the members of the Class, Plaintiffs seek compensation for any revenue generated from the use of their past

publicity rights, including but not limited to the use of their name, image, likeness, and co-owned footage during their period of eligibility, and after, including without limitation, through licensing, marketing, promotion, online, or other income streams that Class members would have received absent Defendants' unlawful conduct.

157. Plaintiffs seek certification of a nationwide class for their antitrust claims (First and Second Claims, *infra*), a nationwide class for their Monopoly claims (Third Claim, *infra*), and a nationwide class for their unjust enrichment claims (Fourth Claim, *infra*).

158. Excluded from the Class are any officers, directors, and employees of Defendants.

159. Also excluded from the Class are any Judge or Magistrate presiding over this action and members of their families.

160. *Numerosity*: The number of class members is likely in the thousands and is therefore so numerous that joinder of all members would be impracticable. The exact number of Class members, including the names and addresses of all Class members, will be easily ascertained through a review of Defendant's business records.

161.   *Commonality*: Common questions of law and fact predominate over any individual issues that may be presented. Those questions include the following:

      a. Whether Defendants engaged in an unlawful contract, combination, and conspiracy, consisting of horizontal and vertical agreements that artificially depress prices in the market for student-athletes' labor, fixing those prices near zero;

      b. Whether such contract, combination, and conspiracy consisting of horizontal and vertical agreements is enforceable;

      c. Whether such conduct caused the Class to receive less, or near zero compensation, than they would have for use of their publicity rights, including name image and likeness in a competitive market;

      d. Whether Defendants violated Sections 1 and/or 2 of the Sherman Act;

      e. Whether Defendants have been unjustly enriched;

      f. Whether the conduct of Defendants and their co-conspirators caused injury to Plaintiffs and the Class;

      g. Whether the Plaintiffs and Class are entitled to declaratory and injunctive relief;

      h. Whether and to what extent Plaintiffs and the Class are entitled to damages;

      i. Whether Plaintiffs and the Class are co-owners of the relevant footage in which they are featured; and

> > j. Whether Plaintiffs and the Class are entitled to an accounting for the use of the footage in which they are featured.

162.  *Typicality*: The claims of Plaintiffs are typical of the claims of the Class and are based on the same facts and legal theories, as all such claims arise out of Defendants' unlawful conduct.

163.  *Adequacy*: Plaintiffs are adequate representatives of the Class and will protect the claims and interests of the Class. Plaintiffs have retained counsel experienced in the prosecution of complex class actions. Neither Plaintiffs, nor counsel, have interests that conflict with those of the Class and Plaintiffs and Counsel will vigorously prosecute the claims alleged herein.

164.  *Predominance and Superiority*: A class action is superior to other methods for the fair and efficient resolution of this controversy. Questions of law and fact common to the members of the Class predominate over questions affecting only individual members. The class action is superior to other methods for the fair and efficient resolution of this controversy. The class action device presents fewer management difficulties and provides the benefit of a single adjudication, economy of scale, and comprehensive supervision by a single court. The damages

suffered by Plaintiffs and each member of the Class are relatively small as compared to the expense and burden of individual prosecution of the claims asserted in this litigation. Thus, absent class certification, it would not be feasible for Plaintiffs and members of the Class to redress the wrongs done to them. It also would be grossly inefficient for the judicial system to preside over large numbers of individual cases. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the judicial system.

165.   Defendants have acted or refused to act on grounds generally applicable to the members of the putative Class, thereby making final injunctive and declaratory relief appropriate for the members of the class as a whole.

## *Estoppel / Equitable Tolling*

166. All of the foregoing paragraphs are incorporated by reference as if fully set forth herein.

167. Defendants are estopped from relying on any limitations or disclaimers as a defense to Plaintiffs' and Class Members' claims. Defendants knew or should have known that the acts complained of

58

herein were a violation of antitrust laws and offend the reasonable expectations of Plaintiffs and Class Members and have been continuous and ongoing for decades. Thus, Defendants' own conduct precludes them from relying on the statute of limitations.

168. Plaintiffs and Class Members are entitled to equitable tolling of their claims from the date of the first unlawful act of Defendants and their coconspirators, including without limitation the requirement that Plaintiffs and Class Members, who were barely at the age of maturity, sign away publicity rights, an extraordinary circumstance that prevented Plaintiffs from pursuing their rights within the first act's limitations period, and the harm is ongoing and continuous to this day.

169. Estoppel and equitable tolling are also appropriate because the NCAA used its superior market power to unjustly obtain substantial revenues for itself and prevent the vast majority of student-athletes from obtaining the revenue they were due, and then used its superior market and economic power to fund extensive legal campaigns to protect its monopoly power.

170. For example, the NCAA's lawyers consistently used now-repudiated dictum in a 1984 case to argue that it was reasonable to

"assume" that the NCAA's conduct is justifiable,[9] to avoid legal scrutiny for its increasingly profitable monopolistic and otherwise illegal conduct. The Supreme Court repudiated that dictum in 2021 in *Alston*, thus removing a significant practical impediment to legal relief.

171. It is inequitable to allow the NCAA to misappropriate substantial funds, use those funds to fund extensive legal efforts to avoid courts recognizing the illegality of the NCAA's conduct, and then rely on the fruits of such efforts to claim that it is now too late for Plaintiffs to recover, when the Court only recently removed the practical impediment to Plaintiffs' legal relief.

---

[9] *See NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 117, 104 S. Ct. 2948, 2969, 82 L. Ed. 2d 70 (1984).

## FIRST CLAIM FOR RELIEF
## UNREASONABLE RESTRAINT OF TRADE
### *Violation of Section 1 of the Sherman Act*
### *15 U.S.C. § 1*

172.  The foregoing paragraphs are incorporated by reference as if fully set forth herein.

173.  Defendants did knowingly and intentionally combine, conspire, and agree to enter into an anticompetitive agreement to unreasonably restrain interstate commerce and trade by suppressing and eliminating competition in the relevant market, which is the supply market for images and footage of student-athletes' past athletic performances in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

174.  Defendants have power in this market.

175.  Defendants engaged in a conspiracy in restraint of trade to artificially depress to near zero the price paid to Plaintiffs and Class Members for the use of, and to limit supply for, licensing, and sale of Plaintiffs' and Class Members' publicity rights, including names, images, and/or likenesses and footage of Plaintiffs and Class Members. These agreements unreasonably suppressed the relevant market.

176.  These agreements are not reasonably necessary to accomplish any procompetitive goals. Any procompetitive benefits are outweighed by

anticompetitive harm, and there are less restrictive alternatives by which the NCAA, the Conferences, and their members would be able to reasonably achieve any procompetitive goals.

**SECOND CLAIM FOR RELIEF**
**UNREASONABLE RESTRAINT OF TRADE**
**GROUP BOYCOTT/REFUSAL TO DEAL**
***Violation of Section 1 of the Sherman Act***
***15 U.S.C. § 1***

177.  The foregoing paragraphs are incorporated by reference as if fully set forth herein.

178.  Defendants did knowingly and intentionally combine, conspire, and agree to enter into an anticompetitive agreement to unreasonably restrain interstate commerce and trade by suppressing and eliminating competition in the relevant market, which is the supply market for images and footage of student-athletes' past athletic performances in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

179.  Defendants engaged in group boycott/refusal to deal by conditioning student-athletes' eligibility to play on the students assigning their publicity rights to Defendants. Defendants reached a horizontal agreement to implement this policy in an effort to unlawfully assert control over the entire relevant market, and by refusing to pay

anything to student athletes for use of footage of their athletic performances or recognize their co-ownership rights to such footage. These agreements suppressed competition in the relevant market by preventing Plaintiffs from reaching commercial deals related to their name, image, likeness, footage, and publicity rights, thus eliminating competition by allowing Defendants to be the sole supplier of such footage.

180.  These agreements are not reasonably necessary to accomplish any procompetitive goals. Any procompetitive benefits are outweighed by anticompetitive harm, and there are less restrictive alternatives by which the NCAA, the Conferences, and their members could reasonably achieve any procompetitive goals.

## THIRD CLAIM FOR RELIEF
## MONOPOLIZATION
### *Violation of Section 2 of the Sherman Act*
### *15 U.S.C. § 2*

181.  The foregoing paragraphs are incorporated by reference as if fully set forth herein.

182.  Defendants have monopolized, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, two relevant markets related to the supply

of student-athlete images and footage: (1) the market for student-athlete labor; and (2) the market for student-athlete images and footage.

183.  Defendants have monopoly power in both relevant markets.

184.  Defendants willfully and unlawfully maintained their monopoly in each relevant market through an exclusionary course of conduct and anticompetitive acts described herein. Each of Defendants' actions individually and collectively increased, maintained, or protected their monopoly in each relevant market.

185.  While each of Defendants' acts is anticompetitive in its own right, Defendants' interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process in each relevant market, including, as compared to a more competitive environment, raising barriers to entry into the relevant market, depressing competition, imposing near-zero prices in one market and supracompetitive prices in the other, stabilizing prices, and slowing market growth.

186.  Defendants' exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Defendants' anticompetitive and unlawful conduct.

## FOURTH CLAIM FOR RELIEF
## UNJUST ENRICHMENT

187.  Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

188.  Defendants have received money from advertisements and other promotional images centered around Plaintiffs' images. Plaintiffs' have not consented to such use, nor have they been compensated for it.

189.  These images, and the publicity rights and benefits associated with them, belong in equity and good conscience not to the NCAA but rather to Plaintiffs.

190.  But for the illegal, unethical, and unscrupulous conduct of the NCAA and its co-conspirators, described above, Plaintiffs would have been paid substantial sums for the use of their names, images, and likenesses in the NCAA's advertisements and other promotional efforts.

191.  Defendants have been unjustly enriched as a result of the unlawful conduct detailed herein to the detriment of Plaintiffs.

192.  Defendants should not be permitted to retain the benefits conferred upon them via their wrongful conduct and have been unjustly enriched.

193. Defendants must provide an accounting and disgorge all of Defendants' profits resulting from the wrongful conduct described herein to Plaintiffs under law, equity, and good conscience.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class, pray unto the Court for judgment:

1.  That Plaintiffs have and recover all actual damages from Defendants, jointly and severally, together with interest as allowed by law;

2.  That Plaintiffs have and recover treble damages as allowed by 15 U.S.C. § 15;

3.  That the Court declare Plaintiffs to be co-owners of the footage at issue featuring their athletic performances and the related copyrights.

4.  That the Court declare that any assignment of publicity rights under the circumstances in which the NCAA presents its required waiver to students is unlawful and unenforceable.

5.    That Defendants provide an accounting of the use of Plaintiffs' names, images, likenesses, and footage of Plaintiffs for commercial purposes and any revenue from such use.

6.    That Defendants disgorge their unjust gains received to date.

7.    That the Court create a constructive trust to prevent future unjust enrichment.

8.    That Plaintiffs have and recover of Defendants, jointly and severally, pre- and post-judgment interest, as allowed by law;

9.    That Plaintiffs have and recover of Defendants, jointly and severally, costs and attorney fees as allowed by law;

10.    That Plaintiffs have a trial by jury;

11.    That Plaintiffs have such other relief as the Court deems just and proper.

JURY TRIAL DEMANDED

*Signature page follows*

This 14th day of November 2024.

                    **MILBERG COLEMAN BRYSON**
                    **PHILLIPS GROSSMAN, PLLC**

                    /s/ *Peggy Wedgworth*
                    Peggy Wedgworth, NY Bar No.: 2126159
                    405 East 5th Street
                    New York, NY 10022
                    (212) 594-5300
                    pwedgeworth@milberg.com

                    /s/ *Scott C. Harris*   (*pro hac vice*)
                    Scott C. Harris, NC Bar No.: 35328
                    Michael Dunn, NC Bar No.: 47713
                    James R. DeMay, NC Bar No.: 36710
                    900 W. Morgan Steet
                    Raleigh, NC 27603
                    sharris@milberg.com
                    michael.dunn@milberg.com
                    jdemay@milberg.com

                    **CHESHIRE PARKER**
                    **SCHNEIDER, PLLC**

                    /s/ *Elliot Abrams* (*pro hac vice*)
                    Elliot Abrams, N.C. Bar No. 42639
                    133 Fayetteville St., Ste 400
                    Raleigh, NC 27601
                    T: (919) 833-3114
                    elliot.abrams@cheshirepark.com

                    **MILLER LAW GROUP, PLLC**

                    */s/ W. Stacy Miller II* (*pro hac vice*)
                    W. Stacy Miller II, N.C. Bar 21198
                    MaryAnne M. Hamilton, N.C. Bar 59323
                    Post Office Box 6340
                    Raleigh, NC 27628
                    T: (919) 348-4361
                    F: (919) 729-2953
                    stacy@millerlawgroupnc.com
                    maryanne@millerlawgroupnc.com

**TOMPSETT COLLEGIATE
SPORTS LAW**

<u>/s/ Scott Tompsett (*pro hac vice pending*)</u>
Scott Tompsett, MO Bar No. 51493
1236 W. 61st Terrace
Kansas City, MO 64113
T: (816) 216-7866
stompsett@scotttompsett.com

69