**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**CASE NO.: 1:24-cv-05008-PAE-VF**

| | |
|---|---|
| MARIO CHALMERS, SHERRON COLLINS, JASON TERRY, RYAN BOATRIGHT, DEANDRE DANIELS, ALEX ORIAKHI, VINCENT COUNCIL, ROSCOE SMITH, MATT PRESSEY, EUGENE EDGERSON, AARON BRAMLETT, JASON STEWART, GERARD COLEMAN, JUSTIN GREENE, RON GIPLAYE, AND JAMES CUNNINGHAM, individually and on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION a/k/a NCAA; PAC-12 CONFERENCE; BIG TEN CONFERENCE, INC.; BIG TWELVE CONFERENCE, INC.; SOUTHEASTERN CONFERENCE; ATLANTIC COAST CONFERENCE; and BIG EAST CONFERENCE, INC.,<br><br>        Defendants. | **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS UNDER RULE 12(b)(6)**<br>**[corrected]** |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

STANDARD OF REVIEW .....................................................................................2

ARGUMENT ..........................................................................................................2

    I.   Plaintiffs' Claims Are Not Barred by the Statute of Limitations......................2

        A.  Plaintiffs' Claims Are Timely under the Continuing Wrong Doctrine........3

            1.  Defendants Have Committed Overt Acts within the
Limitations Period...............................................................................3

            2.  Unlike US Airways, Plaintiffs' Injuries Arise from a Price-Fixing
Conspiracy, Not Continued Performance of a Contract ......................7

        B.  Plaintiffs' Claims Are Timely under the Speculative Damages Rule........12

        C.  The Running of the Statute of Limitations is Equitably Tolled................13

        D.  The Statute of Limitations Does Not Apply to Plaintiffs' Request
for Injunctive Relief ...............................................................................15

    II.   The *O'Bannon* Judgment and the *Alston* Settlement Release Do Not
Bar Plaintiffs' Claims. ...............................................................................15

        A.  The *O'Bannon* Judgment Does Not Preclude Plaintiffs' Claims for
Injunctive Relief.....................................................................................15

            1.  There Is No Identity of Parties Between this Case and *O'Bannon*......16

            2.  There Is No Identity of Claims or of Relevant Issues Between
This Case and *O'Bannon*. ...............................................................17

            3.  The *O'Bannon* Injunction Was Not Intended to Be Preclusive...........18

            4.  Due Process Prevents Dismissal of Plaintiffs' Injunctive Relief
Claims. ..............................................................................................19

         B.  The Alston Settlement Release Does Not Preclude Plaintiffs' Claims......20

            1.  This Case Challenges a Horizontal Price-Fixing Conspiracy, Not
the NCAA's Limits on Education-Related Benefits, Which Was
the Issue in *Alston*. .........................................................................21

            2.  The Factual Issues in This Case Are Different than *Alston*.................22

            3.  The NCAA Made This Same Argument, and Lost, in *House*. ............23

III.     Plaintiffs Have Properly Alleged Injury ..............................................24

    A.  Plaintiffs' State-Law Claims Are Sufficiently Pleaded. ............................24

    B.  Defendants' (Irrelevant) Argument That Players Have No Right to
       Compensation for Sports Broadcasts is Wrong. .........................................27

    C.  Defendants' Copyright Preemption Argument Is Also Both Irrelevant
       and Incorrect. ................................................................................29

IV.     Plaintiffs Have Properly Alleged an Unjust Enrichment Claim. ....................33

CONCLUSION..............................................................................................35

## TABLE OF AUTHORITIES

**Cases**

*Allianz v. Global Investors GmbH v. Bank of America Corp.*,
    463 F. Supp. 3d 409 (S.D.N.Y. 2020)....................................................35

*Alston v. NCAA*,
    4:14-cv-01011-CW (N.D. Cal. Mar. 5, 2014)......................................21

*Andrews v. Daughtry*,
    2013 WL *664564* (M.D.N.C. Feb. 22, 2013).......................................32

*Austin v. Downs, Rachlin & Martin Burlington St. Johnsbury*,
    270 Fed. App'x 52 (2d Cir. 2008)........................................................17

*Baltimore Orioles, Inc. v. MLB Players Ass'n*,
    805 F.2d 663 (7th Cir. 1986) ...............................................................31

*Bassett v. Mashantucket*,
    204 F.3d 343 (2d Cir. 2000)................................................................29

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
    603 F.2d 263 (2d Cir. 1979)........................................1, 4, 5, 6, 9, 15

*Blue Cross & Blue Shield of Vermont v. Teva Pharm. Indus Ltd.*,
    712 F. Supp. 3d 499 (D. Vt. 2024)......................................................15

*Brown-Thomas v. Hynie*,
    441 F. Supp. 3d 180 (D.S.C. 2019)................................................29, 30

*California Cosmetology Coal. v. Riley*,
    871 F. Supp. 1263 (C.D. Cal. 1994) ....................................................16

*Choh v. Brown University*,
    No. 3:23-cv-00306-AWT, 2024 WL 4465476 (D. Conn. Oct. 10, 2024) .........9, 10

*Consolidated Edison, Inc. v. Northeast Utilities*,
    332 F.Supp.2d 639 (S.D.N.Y. 2004)...................................................................20

*Cooper v. Fed. Rsrv. Bank of Richmond*,
    226 F.3d 133 (2d Cir. 2000).........................................................................18

*Curtis v. Citibank*,
    867 F.2d 146 (2d Cir. 1989) ........................................................................17

*Danecker v. Bd. of Trustees of Serv. Emps. 32BJ N. Pension Fund*,
    882 F. Supp. 2d 606 (S.D.N.Y. 2012)...................................................................15

*D'Arezzo v. Appel*,
    No. 122-cv-00177PAESDA, 2023 WL 5020344 (S.D.N.Y. *May* 31, 2023)...........2

*de Lacour v. Colgate-Palmolive Co.*,
    338 F.R.D. 324 (S.D.N.Y. 2021) ...........................................................................20

*Dryer v. Nat'l Football League*,
    689 F. Supp. 2d 1113 (D. Minn. 2010).................................................................28

*Dryer v. Nat'l Football League*,
    55 F. Supp. 3d 1181 (D. Minn. 2014).................................................................28

*Dryer v. Nat'l Football League*,
    814 F.3d 938 (8th Cir. 2016) ............................................................................31

*Expert Elec., Inc. v. Levine*,
    554 F.2d 1227 (2d Cir. 1977).........................................................................16, 17

*Fresh Del Monte Produce Inc. v. Del Monte Foods, Inc.*,
    No. 13-CV-8997 (JPO), 2016 WL 236249 (S.D.N.Y. Jan. 20, 2016) ..................17

*Golden Pacific Bancorp v. F.D.I.C.*,
    273 F.3d 509 (2d Cir. 2001)..........................................................................34

*Grant House v. NCAA*,
    545 F. Supp. 3d 804 (N.D. Cal. 2021) ........................................................... *passim*

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
    392 U.S. 481 (1968) ............................................................................................4, 5

*In re Jackson*,
    972 F.3d 25 (2d Cir. 2020) ...............................................................................29, 32

*In re Kaiser Grp. Int'l, Inc.*,
    375 B.R. 120 (Bankr. D. Del. 2007) ....................................................................16

*In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*,
    958 F.3d 1239 (9th Cir. 2020) .............................................................................16

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
    37 F. Supp. 3d 1126 (N.D. Cal. 2014) .................................................................28

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    05-MD-1720, 2024 WL 323614 (E.D.N.Y. June 28, 2024) .................................20

*In re Pre-Filled Propane Tank Antitrust Litig.*
    860 F.3d 1059 (8th Cir. 2017) .............................................................................11

*In re Propranolol Antitrust Litig.*,
    249 F.Supp. 3d 712 (S.D.N.Y. 2017) ...................................................................35

*In re Wholesale Grocery Prods. Antitrust Litig.*,
    752 F.3d 728 (8th Cir. 2014) ...............................................................................11

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997) ............................................................................................4, 5

*Knevelbaard Dairies v. Kraft Foods, Inc*,
    232 F.3d 979 (9th Cir. 2000) .................................................................................4

*Lawlor v. Nat'l Screen Serv. Corp.*,
    349 U.S. 322 (1955).............................................................................................18

*Lucky Brand Dungarees, Inc. v Marcel Fashions Group, Inc.*,
    590 U.S. 405 (2020)...........................................................................................16

*Madison Square Garden v. NHL*,
    No. 07 CV 8455 (LAP), 2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008) ............9, 10

*Marcel Fashions Grp., Inc. v. Lucky Brand Dungarees, Inc.*,
    779 F.3d 102 (2d Cir. 2015).................................................................................17

*Marshall v. ESPN*,
    111 F. Supp. 3d 815 (M.D. Tenn. 2015).........................................................25, 27

*Mathews v. Eldridge*,
    424 U.S. 319 (1976)............................................................................................19

*McKenna v. Wright*,
    386 F.3d. 432 (2d Cir. 2004)..............................................................................2, 13

*Melendez v. Sirius SM Radio, Inc.*,
    50 F 4th 294 (2d Cir. 2022) ...............................................................................32

*Moofly Prods., LLC v. Favila*,
    No. CV1305866SJOPJWX, 2015 WL 12655381 (C.D. Cal. May 19, 2015).......33

*Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*,
    660 F.2d 9 (2d Cir. 1981)....................................................................................20

*NCAA v. Alston*,
    594 U.S. 69 (2021)...................................................................................... *passim*

*NCAA v. Bd. of Regents of Univ. of Oklahoma*,
    468 U.S. 85 (1984)..............................................................................................10

*New Hampshire v. Maine*,

    532 U.S. 742 (2001) ...................................................................................15, 16

*O'Bannon v. NCAA*

    No. C 09-1967 CW, 2010 WL 4451190 (N.D. Cal. Feb. 8, 2010) ..........3, 6, 15, 19

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*,

    802 F.3d 1049 (9th Cir. 2015) ...............................................................................19

*Ortiz v. Cornetta*,

    867 F.2d 146, 148 (2d Cir. 1989) ...............................................................2, 13, 19

*Parklane Hosiery Co. v. Shore*,

    439 U.S. 322 (1979) .................................................................................................17

*Phillips Petroleum Co. v. Shutts*,

    472 U.S. 797 (1985) .................................................................................................19

*Ray v. ESPN, Inc.*,

    783 F.3d 1140 (8th Cir. 2015) ................................................................................31

*Reach Glob., Inc. v. Ridenhour*,

    No. 20 CIV. 391, 2020 WL 2319176 (S.D.N.Y. May 10, 2020) ....................29, 30

*Robertson v. Nat'l Basketball Ass'n*,

    622 F.2d 34 (2d Cir. 1980) .....................................................................................21

*Rooney v. Columbia Pictures Industries, Inc.*,

    538 F. Supp. 211 (S.D.N.Y 1982) ..................................................................25, 26

*Ross v. Bank of Am., N.A. (USA)*,

    524 F.3d 217 (2d Cir. 2008) ..................................................................................25

*Schine Chain Theaters, Inc. v. United States*,

    334 U.S. 110 (1948) ...................................................................................................6

*Schneider v. Colgate-Palmolive Co.*,
    677 F. Supp. 3d 91 (S.D.N.Y. 2023).....................................................35

*Taylor v. Sturgel*,
    553 U.S. 880 (2008)...........................................................15, 16, 17

*T. B. Harms Co. v. Eliscu*,
    339 F.2d 823 (2d Cir. 1964)....................................................29

*TBK Partners, Ltd. v. W. Union Corp.*,
    675 F.2d 456 (2d Cir. 1982)....................................................20

*TechnoMarine SA v. Giftports, Inc.*,
    758 F.3d 493 (2d Cir. 2014)..............................................17, 18

*United States v. E.I. du Pont de Nemours & Co.*,
    366 U.S. 316 (1961).............................................................1

*United States v. Grinnell Corp*,
    236 F. Supp. 244 (D.R.I. 1964).................................................6

*US Airways, Inc. v. Sabre Holdings Corp.*,
    105 F. Supp. 3d 265 (S.D.N.Y. 2015)..........................................12

*US Airways, Inc. v. Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019).................................................3, 7, 8, 11, 12

*US Airways, Inc. v. Sabre Holdings Corp.*,
    No. 11 CIV. 2725 (LGS), 2022 WL 874945 (S.D.N.Y. Mar. 24, 2022) ...............11

*US Airways, Inc. v. Sabre Holdings Corp.*,
    No. 11 CIV. 2725 (KGS), 2022 WL 1125956 (S.D.N.Y. Apr. 15, 2022) ...........7, 9

*Varner v. Peterson Farms*,
    371 F.3d 1011 (8th Cir. 2004) .................................................11

*Veltri v. Bldg. Serv. 32B–J Pension Fund,*
    393 F.3d 318 (2d Cir.2004)..................................................................................15

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,*
    396 F.3d 96 (2d Cir. 2005)..................................................................................20

*Zacchini v. Scripps-Howard Broad. Co.,*
    433 U.S. 562 (1977)......................................................................................27, 34

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.,*
    401 U.S. 321 (1971)..................................................................................3, 12, 13


**Statutes**

17 U.S.C. § 1101 ..................................................................................................30

Ind. Code. Ann. § 32-36-1-1 ..............................................................................28

Ky. Rev. Stat. Ann. § 391.170 ............................................................................28


**Other**

2 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law (rev. ed.1995) .......................4

13A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure
    (3d ed. 1998) ..............................................................................................33

NCAA Bylaw 12.5..........................................................................................21, 22

NCAA Bylaw 14..............................................................................................21, 22

NCAA Bylaw 15.1..........................................................................................21, 22

## INTRODUCTION

"In general the object of the remedies under the anti-trust laws is to . . . deprive the wrongdoers of the fruits of their unlawful conduct . . ." *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 366 n.12 (1961) (citation omitted). Because "[a]n unlawful monopolist must be deprived of the fruits of its wrongful conduct . . . , [s]o long as a monopolist enjoys 'the flower of evil,' . . . [its] victims must have a remedy." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 296 (2d Cir. 1979).

The NCAA is an unlawful monopolist,[1] and the NCAA and its co-conspirator Conferences continue to reap the benefits of their wrongful conduct in ways that harm former student-athletes long after they leave college. Those former student-athletes "must have a remedy," *id.*, and this case presents the Court with the opportunity to fashion it.

Defendants' motion to dismiss seeks to escape all consequences of their continuing unlawful conduct and ongoing conspiracy. But none of Defendants' arguments meet their burden under Rule 12(b)(6). First, Plaintiffs' claims are timely because their complaint plausibly alleges that Defendants are engaged in an ongoing conspiracy and continue to engage in wrongful acts to reap "the fruits [their] wrongful conduct," *id.*, at the expense of their victims and of competition. Second, the claims are not barred by either *O'Bannon* or *Alston*. Third, the complaint pleads injury by plausibly alleging that but for the Sherman Act violations Plaintiffs would have received compensation within the limitations period. Finally, the unjust enrichment claims are proper as Plaintiffs are reasonably entitled to market-value compensation for Defendants' commercial use of their performances. The motion should be denied.

---

[1] *See NCAA v. Alston*, 594 U.S. 69, 112 (2021) (Kavanaugh, J., concurring) ("Nowhere else in America can businesses get away with agreeing not to pay their workers a fair market rate on the theory that their product is defined by not paying their workers a fair market rate. And under ordinary principles of antitrust law, it is not evident why college sports should be any different. The NCAA is not above the law.").

## STANDARD OF REVIEW

On a motion to dismiss, the defendant bears the burden of proving that it is "*beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief*[.]" *Ortiz v. Cornetta*, 867 F.2d 146, 148 (2d Cir. 1989) (emphasis in original) (internal quotation marks omitted). "[T]he plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the . . . defense." *McKenna v. Wright*, 386 F.3d. 432, 436 (2d Cir. 2004). "A statute of limitations affirmative defense normally cannot be decided on a motion to dismiss." *D'Arezzo v. Appel*, No. 122CV00177PAESDA, 2023 WL 5020344, at *2 (S.D.N.Y. May 31, 2023), *report and recommendation adopted*, No. 22CIV00177PAESDA, 2023 WL 4362989 (S.D.N.Y. July 6, 2023) (internal quotation marks omitted).

## ARGUMENT

## I.    PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS.

Plaintiffs allege that the NCAA has used its acknowledged monopoly power[2] in the market for student-athlete services to acquire monopoly power in the market for footage and images of student-athletes' past performances through another series of horizontal price-fixing agreements. *See, e.g.*, Amend. Compl. at 15–17, ¶¶ 48–50; 18, ¶ 53–55; 19, ¶¶ 56–57; 20–21, ¶¶ 59–64; 44, ¶ 113; 45–46, ¶¶ 120–24; 47–48, ¶¶ 125–30; 53, ¶ 150. Plaintiffs further allege that Defendants continually reap the fruits of their wrongful conduct by "repeatedly us[ing] images and footage of the student-athletes for advertising and other commercial footage without compensating the student-athletes, thereby achieving the goals of generating additional profit and retaining all profit

---

[2] *See Alston*, 594 U.S. at 90 ("The NCAA accepts that its members collectively enjoy monopsony power in the market for student-athlete services, such that its restraints can (and in fact do) harm competition.").

from the commercial use of the footage and images of the student-athletes and their performances." Amend. Compl. at 21, ¶ 64.

Thus, this case involves an admitted monopolist that obtained and maintains its monopoly power illegally and leveraged that power through repeated, ongoing acts that have harmed Plaintiffs and continue to do so *to this day*. Such claims are timely. *See, e.g., O'Bannon v. NCAA*, No. C 09-1967 CW, 2010 WL 445190, at *6 (N.D. Cal. Feb. 8, 2010) (finding under similar circumstances that NCAA's continuing commercial use of student-athletes' images without authorization or compensation restarts Sherman Act statute of limitations).

Defendants nonetheless contend that Plaintiffs' claims are time-barred, erroneously contending that "[a]ll of the relevant alleged anticompetitive conduct . . . occurred between 8 and 30 years ago," when Plaintiffs were student-athletes, outside of the applicable four-year statute of limitations. (Def. Br. at 9). Defendants' contention misapprehends Plaintiffs' claims, and is wrong, for several reasons.

A.    Plaintiffs' Claims Are Timely under the Continuing Wrong Doctrine.

1.    *Defendants Have Committed Overt Acts within the Limitations Period.*

As the Supreme Court has explained, "In the context of a continuing conspiracy to violate the antitrust laws . . ., each time a plaintiff is injured by an act of the defendants a cause of action accrues to [the plaintiff] to recover the damages caused by that act and . . ., as to those damages, the statute of limitations runs from the commission of the act." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971). Thus, "'[a]ntitrust law provides that, in the case of a 'continuing violation,' say, a price–fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, 'each overt act that is part of the violation and that injures the plaintiff,' *e.g.*, each sale to the plaintiff, 'starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.'" *US Airways, Inc. v. Sabre*

*Holdings Corp.*, 938 F.3d 43, 67–68 (2d Cir. 2019) (quoting *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997)).

In other words, each time a horizontal price-fixing agreement causes a buyer to overpay or a seller to be underpaid, the price-fixing agreement inflicts antitrust injury on the counterparty, and each distorted transaction "starts the statutory period running again." *Id. See, e.g., Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988–89 (9th Cir. 2000) ("When horizontal price fixing causes buyers to pay more, *or sellers to receive less*, than the prices that would prevail in a market free of the unlawful trade restraint, antitrust injury occurs. . . . To hold otherwise would be contrary to long-established antitrust law." (emphasis added) (citing 2 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 375b at 297 (rev. ed.1995)). "So long as a monopolist continues to use the power it has gained illicitly [to harm others], it has no claim on the repose that a statute of limitations is intended to provide." *Berkey Photo*, 603 F.2d at 295. As the Second Circuit has stated:

> [T]here can be no unfairness in preventing a monopolist that has established its dominant position by unlawful conduct from exercising that power in later years to extract an excessive price. After all, it is only a pristine "origin" that may save a monopoly . . . from the condemnation of [the Sherman Act]. The taint of an impure origin does not dissipate after four years if a monopolist continues to extract excessive prices because of it.

*Id*. at 296 (internal citations omitted).

For example, in *Hanover Shoe*, the Supreme Court addressed a plaintiff's 1955 lawsuit against a defendant that had implemented a policy, dating back to 1912, of "leasing but not selling" shoe machinery. *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 495, (1968). The Court stated that the cause of action did not involve "a violation which, if it occurs at all, must occur within some specific and limited time span"; instead, the cause of action involved conduct "which inflicted continuing and accumulating harm on [the plaintiff]." *Id.* at 502 n.15. As a result,

while plaintiff "could have sued in 1912 for the injury then being inflicted, it was equally entitled to sue in 1955." *Id.*

This Court applied *Hanover Shoe* in *Berkey Photo*, 603 F.2d at 294, which held that, when a monopolist engages in anticompetitive conduct before the limitations period and "use[s] the power it has gained illicitly to overcharge its customers" during the limitations period, the customers may sue for overcharges incurred during the four years before filing suit. *Id.* at 295-96.

The Supreme Court subsequently addressed the continuing-violation doctrine's application to price-fixing conspiracies: "Antitrust law provides that, in the case of a continuing violation, say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, each overt act that is part of the violation and that injures the plaintiff, *e.g.*, each sale to the plaintiff, starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." *Klehr*, 521 U.S. at 189 (internal quotation marks and citation omitted).

Here, like *Hanover Shoe*, *Berkey Photo*, and *Klehr*, each time the NCAA and its co-conspirators use footage or images of Plaintiffs' performances for commercial purposes, Plaintiffs—the suppliers of such performances—are underpaid, because, "[b]ut for the [horizontal price-fixing agreement], the student-athletes would have received royalties or other compensation for the ongoing advertising and other commercial use of the images and footage featuring them and their athletic performances." Amend. Compl. at 2, ¶ 6; *see also id*. at 22, ¶ 66 (Plaintiffs "would be compensated for such use but for the ongoing horizontal price-fixing agreement."). Accordingly, each commercial use of footage of Plaintiffs' performances underpays Plaintiffs, thus harming them and restarting the statute of limitations. Defendants continue to "enjoy[] 'the flower of evil,'" that is, the fruits of their illegally obtained monopoly power and unlawful

horizontal price-fixing agreement; "[their] victims must have a remedy," and Defendants "[have] no claim on the repose that a statute of limitations is intended to provide." *Berkey Photo*, 603 F.2d at 296, 295 (cleaned up). When Defendants *recorded* images or footage of Plaintiffs' athletic performances is irrelevant—it is Defendants' continued *use* of these images or footage for commercial gain within the limitations period as part of an *ongoing* horizontal price-fixing conspiracy that is relevant. *See, e.g.*, *O'Bannon*, 2010 WL 445190, at *6.

The alternative rule urged by Defendants—that a monopolist is immune from liability for the damages it causes so long as it obtained monopoly power more than four years ago—"would mean that

> "those who had unlawfully built their empires could preserve them intact. They could retain the full dividends of their monopolistic practices and profit from the unlawful restraints of trade which they had inflicted on competitors. Such a course would make enforcement of the Act a futile thing unless perchance the United States moved in at the incipient stages of the unlawful project." . . . An unlawful monopolist must be "deprived of the fruits" of its wrongful conduct. . . . [The Sherman Act] requires "the rooting out of a plant . . . (that) represents an ultimate growth from seeds which have been declared unlawful." So long as a monopolist enjoys "the flower of evil," . . . [its] victims must have a remedy.

*Id*. (quoting *Schine Chain Theaters, Inc. v. United States*, 334 U.S. 110, 128 (1948), then quoting *United States v. Grinnell Corp.*, 236 F. Supp. 244, 258 (D.R.I. 1964)). Plaintiffs allege ongoing harmful exploitation of illegally obtained monopoly power; therefore, the statute of limitations does not provide comfort to Defendants.[3]

---

[3] The complaint also alleges that Defendants have engaged in illicit acts of monopoly maintenance during the limitations period and that those acts have inflicted harm on Plaintiffs during the limitations period. For example, Defendants and their alleged co-conspirators collectively agreed to certain media rights deals during the limitations period that "allow only the [NCAA] member institutions (not the student-athletes) to license footage for 'advertising/commercial use.'" Amend. Compl. at 36, ¶ 87 (discussing August 13, 2024, media licensing agreement). The complaint alleges that these acts "protect the conspirators' monopoly" and "prohibit Plaintiffs" from "obtain[ing] compensation." *Id*. at 41-42, ¶ 105. Just as the statute of limitations does not allow a price-fixing conspirator or illegal monopolist to reap enhanced profits obtainable only because of a price-fixing agreement that was first entered into before the limitations period, the statute of limitations does not allow Defendants to commit illegal acts of monopoly maintenance within the limitations period that inflict harm during the limitations period simply because Defendants committed similar illegal acts before the limitations period as well. So the monopoly maintenance claim is timely for this reason as well.

2. *Unlike US Airways, Plaintiffs' Injuries Arise from a Price-Fixing Conspiracy, Not Continued Performance of a Contract.*

The distinction between Defendants' continued use of Plaintiffs' performances being "overt acts" occurring during the limitations period, as opposed to the "continued effects of acts that occurred long ago" (Def. Br. at 9), is highlighted by the Second Circuit's decision in *US Airways*, 938 F.3d at 68. In *US Airways*, the parties entered into binding contracts in 2006 (outside the limitations period) and in 2011 (within the limitations period) under which the defendant was entitled to certain payments from the plaintiff. *US Airways*, 938 F.3d at 67–68. Years later, the plaintiff alleged that certain contract provisions created an unreasonable restraint of trade and sought treble damages resulting from all acts of contract performance. *Id*. The defendant moved for summary judgment prohibiting the recovery of damages stemming from the 2006 contract as outside the statute of limitations. The district court granted that motion. After the plaintiff prevailed at trial, the defendant appealed and the plaintiff cross-appealed arguing, in part, that the district court erred in granting the limited summary judgment against them. *Id*. at 48.

In affirming the district court's decision that the plaintiffs could not recover damages arising out of the 2006 contract, the Second Circuit relied on the fact that each allegedly anticompetitive act of contract performance was "pursuant to . . . contract[ual] agreements *binding the parties.*" *Id.* at 69 (emphasis added). The Court's holding was also limited to rejecting the plaintiff's appellate argument that "each act taken in performance of a contract *necessarily* constitutes an overt act for purposes of the continuing-violation rule." *Id*. at 69 (emphasis added). Accordingly, as the district court noted on remand, if the complaint alleged "conduct [that] is in addition to and independent of the [relevant] [c]ontract," *US Airways* would not apply. *US Airways, Inc. v. Sabre Holdings Corp. ("US Airways II")*, No. 11 CIV. 2725 (LGS), 2022 WL 1125956, at *6 (S.D.N.Y. Apr. 15, 2022).

7

Here, unlike *US Airways*, there are no contracts. Contrary to Defendants' assertions, the complaint does not allege the existence of any binding contract between the NCAA or its members and Plaintiffs or the proposed class members. To the contrary, the complaint alleges that "*to the extent they exist*," any assignments of rights "are legally invalid and void" because "they are the product of coercion, represent an instrument of illegal conduct, and are otherwise against public policy." Amend. Compl. at 48, ¶ 130 (emphasis added). These allegations are supported by factual allegations that the student-athletes were "barely the age of maturity," *id*. at 59, ¶ 168; that NCAA rules forbid student-athletes from seeking legal advice," *id*. at 53 n.8; and that the form "ma[de] no mention of legal rights," *id*. at 53, ¶ 150. The complaint does not allege that every Plaintiff actually signed any forms, and it affirmatively alleges that any signed forms are not binding.

Even if the Court assumes that a binding contract exists as to every Plaintiff, Plaintiffs have alleged that the forms do not validly assign rights to compensation or ownership. Rather, the forms are alleged to state that "the NCAA or a third party acting on behalf of the NCAA [may] use [Plaintiffs'] name or picture to generally promote NCAA championships or other NCAA events, activities or programs." *Id*. at 46, ¶ 123. The complaint alleges that these forms do *not* "convey a perpetual license for uncompensated use of a person's name, image, likeness, and the footage" of Plaintiff's performances. *Id*. at 53, ¶ 150. Accordingly, even if the forms constitute binding contracts, the harmful conduct at issue—that is, Defendants' commercial use of Plaintiffs' performances without compensating Plaintiffs—was not authorized by these forms.

Further, even if assignments exist, constitute binding contracts, and were alleged to cause the damages at issue (none of which is the case), Plaintiffs' claims are timely because they rest on conduct independent of any forms—that is, the deployment of a horizontal price-fixing conspiracy and the illegal monopolization of markets. As the district court explained in *US Airways II*, under

*US Airways* and *Berkey Photo*, plaintiffs can recover "consistent with the statute of limitations" if they can prove that (1) defendant "engaged in willful conduct to acquire or maintain monopoly power independent of the [relevant] Contract, (2) [defendant] had monopoly power at the time of the conduct and (3) the conduct resulted in damages within the four-year statutory period . . ." *US Airways II*, 2022 WL 1125956, at *6. The instant complaint alleges just that. Accordingly, the claims are timely because they rest on exploitation of illegally obtained monopoly power and horizontal price fixing—that is, conduct "in addition to and independent of" the purported assignment forms—within the statutory period. *See id*.

Defendants rely primarily on two district court orders to support their contrary argument, *Choh v. Brown University*, No. 3:23-cv-00306-AWT, 2024 4465476, at *12-13 (D. Conn. Oct. 10, 2024), and *Madison Square Garden, L.P. v. NHL*, No. 07 CV 8455 (LAP), 2008 WL 4547518, at *5 (S.D.N.Y. Oct. 10, 2008). Def. Mem. at 11. These cases do not support Defendants' position but instead highlight that the contract-execution rule applies only where the plaintiff freely chose to enter into a binding contract.

In *Choh,* for instance, multiple former student-athletes brought a Section 1 claim alleging that the Ivy League schools' collective decision not to offer athletic scholarships to their student-athletes constitutes an unreasonable restraint of trade. *Id*. at *1. Rather than allege that the Ivy League schools have a monopoly in the buyer's market for student-athlete labor, the complaint recognized that plaintiffs had a choice: they could attend an Ivy League school that does not offer an athletic scholarship or attend other NCAA Division I schools that do offer such scholarships. *Id*. The complaint was dismissed for "Failure to Allege Any Properly Defined Market" and for "Failure to Allege Market-Wide Anticompetitive Effects." *Id*. at *8–11. The court also held that

one plaintiff's claim was untimely because that plaintiff enrolled in school (and thus freely accepted the restriction at issue) more than four years before the complaint was filed. *Id*. at *11.

Here, on the other hand, Plaintiffs allege that the horizontal price-fixing agreement gave them *no choice* but to accept the market-wide restrictions that continue to harm them, because those restrictions were imposed by every Division I school. Amend. Compl. at 1–2, ¶ 1–5. That lack of choice makes all the difference. The Sherman Act exists to protect competition so that consumers can exercise free choice. *See, e.g., NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 107 (1984) ("A restraint that has the effect of reducing the importance of consumer preference . . . is not consistent with th[e] fundamental goal of antitrust law."). The plaintiffs in *Choh* (and in *US Airways*) were contractually bound by the choices they made to agree to the restriction at issue. Plaintiffs here are not, because they had no choice because of the market-wide restraint imposed upon them.

Defendants' reliance on *Madison Square Garden* is similarly misplaced. There, plaintiff Madison Square Garden ("MSG") chose to purchase the New York Rangers NHL team and, in so doing, expressly agreed to preexisting policies adopted by the NHL. *Madison Square Garden, L.P. v. NHL*, No. 07-CV-8455 (S.D.N.Y. Oct. 10, 2008). MSG later challenged some of those restrictions, claiming that they created an unreasonable restraint of trade under Section 1. *Id*. at *1–*2, *5. The district court granted summary judgment in favor of the NHL as to all the policies MSG had agreed to (and alternatively dismissed those claims based on the defense of laches), but it allowed the case to move forward as to MGS's challenge to a policy that MSG did not agree to—the NHL's "New Media Strategy." *Id*. at *1–*10; *see also* prior order 2007 WL 3254421, at *3 (S.D.N.Y. Nov. 2, 2007) (providing additional factual detail). Once again, the pivotal factor

was that the plaintiff validly contractually agreed to the restrictions at issue. Having done so, it had only four years from entering into the contract to challenge a term therein.

At most, these cases establish that, where a plaintiff challenges as anticompetitive a contractual restriction plaintiff freely agreed to, the plaintiff must bring its case within four years of that agreement. But those cases, and the contract-execution rule generally, are inapplicable where, as here, the purported contract was merely an instrument of a preexisting illegal horizontal price-fixing agreement and/or exploitation of illegally obtained monopoly power, or where the plaintiff plausibly alleges that the agreement at issue was not binding.

Further, the contract-execution rule at issue in *US Airways* applies only to contracts between "*the parties*" to the lawsuit, *US Airways*, 938 F.3d at 69 (emphasis added); and, in all events, it does not apply to a horizontal price-fixing agreement itself. *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1067 (8th Cir. 2017). In *US Airways*, the court adopted the contract-execution rule in force in the Eighth Circuit and specifically cited *Varner v. Peterson Farms*, 371 F.3d 1011, 1019-20 (8th Cir. 2004), for the rule it was adopting. 938 F.3d at 68. Yet,

> *Varner* is about a tying arrangement, not a price-fixing conspiracy . . . Defendants' horizontal price-fixing agreement gave them "unlawfully acquired market power to charge an elevated price." Each time Defendants used that power (*i.e.*, each sale), they committed an overt act, inflicting new and accumulating injury.

*Pre-Filled Propane*, 860 F.3d at 1067 (cleaned up). Thus, where, as here, the complaint alleges injury from a horizontal price-fixing conspiracy or an illegal monopoly—as opposed to an allegedly unreasonable contractual agreement between the parties to the lawsuit[4]—the *US Airways* contract-execution rule does not apply. *See id.* Were it otherwise, competitors could enter into price-fixing agreements, "wait four years . . . , then reap the profits of their illegal agreement with impunity because any antitrust claims would be time barred." *In re Wholesale Grocery Prods. Antitrust Litig.*, 752 F.3d 728, 736 (8th Cir. 2014). Fortunately, "[t]hat is not the law." *Id.*

---

[4] *See US Airways, Inc. v. Sabre Holdings Corp.*, No. 11 CIV. 2725 (LGS), 2022 WL 874945, at *6 (S.D.N.Y. Mar. 24, 2022) ("[T]he Second Circuit's basis for distinguishing Hanover Shoe was not that it involved an ongoing monopoly, but rather that its claims did not arise out of a contract *to which Plaintiff and Defendant were parties*.").

11

B.  Plaintiffs' Claims Are Timely under the Speculative Damages Rule.

Even if the continuing-violation rule did not apply (it does), there is another applicable rule—the speculative damages rule. *US Airways, Inc. v. Sabre Holdings Corp. ("US Airways I")*, 105 F. Supp. 3d 265, 277 (S.D.N.Y. 2015), *aff'd*, 938 F.3d 43.[5] The Supreme Court created the speculative damages rule in *Zenith*, holding that if the "amount and nature" of the damages from an anticompetitive contract was "unprovable" at the time a contract was executed, no antitrust claim accrues at the time of execution. Instead, "the cause of action for future damages . . . accrue[s] only on the date [those damages were] suffered"—and Plaintiffs can "sue to recover [such damages] at any time within four years from the date they were inflicted." *Zenith*, 401 U.S. at 339–40. As the Court explained,

> [I]t is hornbook law, in antitrust actions as in others, that even if injury and a cause of action have accrued as of a certain date, future damages that might arise from the conduct sued on are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable. . . . *[T]he cause of action for future damages, if they ever occur, will accrue only on the date they are suffered; thereafter the plaintiff may sue to recover them at any time within four years from the date they were inflicted.* [Absent such authority,] future damages that could not be proved within four years of the [initial] conduct from which they flowed would be forever incapable of recovery, contrary to the congressional purpose [of the Sherman Act].

*Zenith*, 401 U.S. at 339–40 (emphasis added) (cleaned up).

The damages at issue here—uncompensated commercial uses of Plaintiffs' athletic performances many years after Plaintiffs were in school—were unprovable at the time any assignment agreements would have been signed (if they were). Plaintiffs would have signed such documents before the NCAA season, before their athletic performances occurred and were captured on film, and before the commercial uses at issue here. *See* Amend. Compl. at 20, ¶ 59–61. At the time of signing, Plaintiffs would not have known whether they would play in games,

---

[5] The Second Circuit in *US Airways* did not address speculative damages because the plaintiff in that case chose to contest only the rulings with regard to the continuing violation exception. *US Airways*, 938 F.3d at 67–68.

whether recordings of their footage would be valuable for commercial use, or whether the NCAA or its members and co-conspirators would use such footage for commercial purposes. The damages they would suffer in the future were unknown, unprovable, and entirely speculative at the time the forms would have been signed. So Plaintiffs were not required to bring their antitrust claims within four years of such signing; instead, "the cause of action . . . accrue[d] only on the date [the damages were] suffered," and Plaintiffs "may sue to recover them at any time within four years from the date they were inflicted." *Zenith*, 401 U.S. at 339.

Defendants do not argue that the damages alleged here would have been known, provable and non-speculative at the time the assignment forms were potentially signed—and the complaint does not establish that they were; instead, it reasonably infers the opposite. *See McKenna*, 386 F.3d. at 436 ("plaintiff is entitled to all reasonable inferences that defeat the defense" (cleaned up)). Accordingly, the face of the complaint does not establish "beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim[s] which would entitle [them] to relief[.]'" *Ortiz*, 867 F.2d at 148. The speculative damages exception plausibly applies; thus, the claims are timely.

## C.    The Running of the Statute of Limitations is Equitably Tolled.

Finally, equitable estoppel tolls the application of the statute of limitations in this case. Defendants affirmatively stated that the NCAA's rules are designed to "protect[] [student-athletes] from exploitation by professional and commercial enterprises." Amend. Compl. at 44, ¶ 112. That assertion is a misrepresentation of fact as applied to the conduct here, and the NCAA and its co-conspirators knew and intended that student-athletes would rely upon its claim to be operating in the interest of the student-athletes. As students and for many years thereafter, Plaintiffs reasonably relied on the NCAA's statements that it was operating to protect them from exploitation and to otherwise foster their "lifelong well-being." Amend. Compl. at 43, ¶ 111. But, as has become clear,

much of the NCAA's conduct—including the conduct at issue here—is directed toward increasing the NCAA's income at the expense of student-athletes. Under these circumstances, equitable estoppel applies.

Plaintiffs have been diligently pursuing their rights with respect to the labyrinth of NCAA rules and potentially anticompetitive agreements. Many of the Plaintiffs were class members in *O'Bannon* and most were class members in *Alston*. Those cases ultimately addressed different legal issues and resolved different factual questions, such that those cases do not bar this suit, but they established the legal framework for the instant suit and brought to light important facts that revealed the hollow nature of the NCAA's claims to be operating in the interest of student-athletes' interest and imposing *reasonable* market-wide restraints in pursuit of that goal.

The NCAA's veil of confidentiality imposed further barriers to Plaintiffs' ability to proceed, and its prohibition on student-athletes consulting lawyers enabled it to use the money that should have gone to compensate student-athletes to fund legal defenses designed to prevent student-athletes from successfully litigating these issues. Amend. Compl. at 59, ¶ 170–171. For decades, the NCAA succeeded, winning early dismissals and judgments based on now-repudiated legal propositions. That practical bar was lifted only in 2021, with the Supreme Court's *Alston* opinion.

Defendants fault Plaintiffs for not bringing the case earlier, but Plaintiffs have diligently pursued a correction of the law from the Supreme Court and, having obtained it, now diligently pursue the natural consequences of that ruling. These unique facts as applied to this market and these market participants provide a plausible basis for equitable tolling.

Of course, "equitable 'tolling is an extraordinary remedy because if applied too liberally it threatens to undermine the purpose of statutes of limitations of allowing potential defendants

predictability and ultimate repose.'" *Danecker v. Bd. of Trustees of Serv. Emps. 32BJ N. Pension Fund*, 882 F. Supp. 2d 606, 613 (S.D.N.Y. 2012) (quoting *Veltri v. Bldg. Serv. 32B–J Pension Fund*, 393 F.3d 318, 326 (2d Cir.2004)). But this case involves "a monopolist [that] continues to use the power it has gained illicitly [to harm others; so] it has no claim on the repose that a statute of limitations is intended to provide." *Berkey Photo*, 603 F.2d at 295.

> D.    The Statute of Limitations Does Not Apply to Plaintiffs' Request for Injunctive Relief.

As a final matter, the four-year statute of limitations applicable to the Sherman Act damages claims discussed above does not apply to Plaintiffs' request for injunctive relief. *See, e.g.*, *Blue Cross & Blue Shield of Vermont v. Teva Pharm. Indus., Ltd.*, 712 F. Supp. 3d 499, 536 (D. Vt. 2024) (citing cases).

## II.    THE *O'BANNON* JUDGMENT AND THE *ALSTON* SETTLEMENT RELEASE DO NOT BAR PLAINTIFFS' CLAIMS.

> A.    The *O'Bannon* Judgment Does Not Preclude Plaintiffs' Claims for Injunctive Relief.

Defendants contend that the final judgment in *O'Bannon* forecloses Plaintiffs' claims for injunctive relief. It is unclear whether Defendants rely on issue preclusion, Def. Mem. at 14 (arguing that *O'Bannon* "bars relitigating the same issues"), or claim preclusion, *id*. (quoting the test for claim preclusion), but neither apply.

Under claim preclusion, "a final judgment forecloses 'successive litigation of *the very same claim*, whether or not relitigation of the claim raises the same issues as the earlier suit.'" *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001)). Issue preclusion, on the other hand, "bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the

issue recurs in the context of a different claim." *Id*. (quoting *New Hampshire*, 532 U.S. at 748–49).

### 1.  There Is No Identity of Parties Between This Case and <u>O'Bannon</u>.

Both issue preclusion and claim preclusion require an identity of the parties. *Lucky Brand Dungarees, Inc. v Marcel Fashions Group, Inc.,* 590 US 405, 411–12 (2020). Contrary to Defendants' claims (Def. Mem. at 15 n.7), identity of parties does not exist here. Defendants bear the burden of *proving* privity, *see, e.g., In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1255 (9th Cir. 2020) (for res judicata, NCAA "bears the burden of proving . . . identity or privity between the parties"), and they have not met that burden.

The mere fact of the Conferences' membership in the NCAA does not create the required privity. "Under federal law, mere membership in a trade association alone does not create the privity necessary to bind the member to a judgment against an organization." *California Cosmetology Coal. v. Riley*, 871 F. Supp. 1263, 1267-68 (C.D. Cal. 1994) (declining to apply res judicata), *aff'd*, 110 F.3d 1454 (9th Cir. 1997); *see generally Alston*, 594 U.S. at 79 ("The 32 conferences in Division I function similarly to the NCAA itself, but on a smaller scale. They 'can and do enact their own rules.'") (citation omitted). The mere fact that entities may be closely related does not establish privity. *See, e.g.*, *In re Kaiser Grp. Int'l, Inc.*, 375 B.R. 120, 125 (Bankr. D. Del. 2007) (denying summary judgment: "Whether privity exists in a case that involves a parent (non-party) and wholly-owned subsidiary (party) is a factual inquiry requiring evidence of whether the parent controlled the earlier lawsuit and its interests were represented by the subsidiary in that earlier action.") (cleaned up, citations omitted).

Defendants' reliance on *Expert Elec., Inc. v. Levine*, 554 F.2d 1227 (2d Cir. 1977), is unavailing. There, privity existed not because the parties in the second action were members of an

association named in a prior action, but because the association, as required by New York state law, represented its members and had authority to represent them in the prior action. *Id.* at 1231–33.

Finally, Defendants' reliance on the doctrine of "defensive nonmutual collateral estoppel" (Def. Mem. at 15 n.7) is misplaced. That doctrine does not apply unless, *inter alia*, the party against whom it is invoked *lost* the prior action. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n.4 (1979) ("Defensive use occurs when a defendant seeks to prevent a plaintiff from asserting a claim the plaintiff has previously litigated and lost against another defendant."); *Austin v. Downs, Rachlin & Martin Burlington St. Johnsbury*, 270 Fed. App'x 52, 54 (2d Cir. 2008) (summary order). Even assuming that the plaintiffs here were also the plaintiffs in *O'Bannon*, the NCAA was the *losing* party in that case, *see* Def. Mem. at 5; accordingly, the doctrine is inapplicable here.

### 2. There Is No Identity of Claims or of Relevant Issues Between This Case and *O'Bannon*.

Claim preclusion bars relitigation of "the very same claim." *Taylor*, 553 U.S. at 892. Claim preclusion "does not preclude litigation of events arising after the filing of the complaint that formed the basis of the first lawsuit." *Curtis v. Citibank, N.A.*, 226 F.3d 133, 139 (2d Cir. 2000). "[W]hen a defendant commits repeated acts, each of which can independently support a cause of action . . .[,] *[r]es judicata* will not . . . 'bar a subsequent suit for any breach that had not occurred when the first suit was brought.'" *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 500–01 (2d Cir. 2014). In other words, "claim preclusion 'does not bar a claim arising subsequent to a prior action even if the new claim is premised on facts representing a continuance of the same course of conduct.'" *Fresh Del Monte Produce Inc. v. Del Monte Foods, Inc.*, No. 13-CV-8997 (JPO), 2016 WL 236249, at *4 (S.D.N.Y. Jan. 20, 2016) (quoting *Marcel Fashions Grp., Inc. v. Lucky Brand Inc.*, 779 F.3d 102, 108 (2d Cir. 2015) (internal citation omitted). "A contrary result . . . would

17

'immunize the defendant against all suits concerning [ongoing violations]'—effectively converting claim preclusion from a shield against duplicative litigation into a perpetual license to [violate the law]." *Id*. (quoting *Technomarine*, 758 F.3d at 503). Accordingly,

> That both suits involved 'essentially the same course of wrongful conduct' is not decisive. Such a course of conduct . . . may frequently give rise to more than a single cause of action . . . While the [prior] judgment precludes recovery on claims arising prior to its entry, it cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case.

*TechnoMarine SA*, 758 F.3d at 499 (quoting *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 327-28 (1955)). Because the instant claim is not "the very same claim," but instead arises out of conduct occurring after the *O'Bannon* complaint, claim preclusion does not apply.

To successfully assert issue preclusion, Defendants must identify "an issue actually litigated and determined" that was "essential to th[e] judgment." *Cooper v. Fed. Rsrv. Bank of Richmond*, 467 U.S. 867, 874 (1984). Defendants do not identify such an issue, and they cannot because the terms of *O'Bannon* are very different from the claims asserted here. The claims in this case turn on different licensing arrangements and uses of footage that occurred *after* the *O'Bannon* judgment. Accordingly, issue preclusion also does not bar Plaintiffs' claims.

### 3. The O'Bannon Injunction Was Not Intended to Be Preclusive.

In the *House* matter, the NCAA argued, as it also attempts to do here, that in *O'Bannon* (and *Alston*) "the Ninth Circuit 'validated' . . . rules limiting student-athlete compensation that Plaintiffs now challenge." *Grant House v. NCAA*, 545 F. Supp. 3d 804, 819 (N.D. Cal. 2021). The *House* court rejected that argument because "[t]he Ninth Circuit made clear in both [cases] that any holdings . . . with respect to whether certain NCAA limits on student-athlete compensation could be enjoined as anticompetitive were based on, and limited to, the record presented in those cases." *Id*. "Indeed, the court of appeals recognized in both [cases] that, because the analysis

18

demanded by the Rule of Reason requires the evaluation of 'dynamic market conditions and consumer preferences' and is 'inherently fact-dependent,' 'courts must continue to subject NCAA rules, including those governing compensation, to antitrust scrutiny.'" *Id*. (quoting *O'Bannon v. NCAA*, 802 F.3d 1049, 1065 (9th Cir. 2015)). Therefore, the injunction issued in *O'Bannon* was not intended to—and thus does not—have preclusive effect.

### 4.   *Due Process Prevents Dismissal of Plaintiffs' Injunctive Relief Claims.*

Due process requires notice and an opportunity to be heard, as well as a meaningful hearing at a meaningful time, before a property right—such as the right to bring a claim—can be taken. *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976). The Supreme Court has recognized that for damages claims to bind absent plaintiffs, "plaintiff must receive notice plus an opportunity to be heard and participate in the litigation." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985). What protections due process requires before the absent plaintiffs' future equitable claims could be extinguished is unsettled, and it is unclear what notice or other procedural protections, if any, Plaintiffs received with respect to the *O'Bannon* injunction. These uncertainties further establish that Defendants cannot carry their burden at this stage of proving that dismissal is required "beyond doubt." *Ortiz*, 867 F.2d at 148.

Moreover, due process prohibits barring Plaintiffs' claims here because the court in *O'Bannon* expressly limited its effect to the record before it. *Grant House*, 545 F. Supp. 3d at 812. By doing so, the court informed class members, such as Plaintiffs, that it was *not* necessary to preserve claims based on subsequent conduct causing them harm—such as the conduct at issue here. *See id.* Accordingly, due process would prevent depriving Plaintiffs of such claims in this case.

B.    The *Alston* Settlement Release Does Not Preclude Plaintiffs' Claims.

The claim release provision in the *Alston* settlement agreement has no effect on any Plaintiff's ability to pursue claims in this case, including Plaintiffs who were members of the *Alston* class. "The law is well established . . . that class action releases may include claims not presented and even those which could not have been presented ***as long as the released conduct arises out of the 'identical factual predicate'*** as the settled conduct." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 107 (2d Cir. 2005) (emphasis added) (citing *TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982)); *see also In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 05-MD-1720, 2024 WL 323614, slip op. at 31 (E.D.N.Y. June 28, 2024) (class action releases "cannot be boundless" and are limited by the "identical factual predicate" doctrine). A claim is based on a separate factual predicate when it depends "upon a different legal theory [and] proof of further facts[.]" *TBK*, 675 F.2d at 462 (*quoting Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 18 n.7 (2d Cir. 1981)). A court "should 'decline to permit the uncompensated release of claims resting on a separate factual predicate from that settled in the class action." *Consolidated Edison, Inc. v. Northeast Utilities*, 332 F.Supp.2d 639, 652 (S.D.N.Y. 2004) (quoting *TBK*, 675 F.2d at 462). Defendants bear the burden of showing the "identical factual predicate" between this case and *Alston*. *See de Lacour v. Colgate-Palmolive Co.*, 338 F.R.D. 324, 338 (S.D.N.Y. 2021) ("The Court is not persuaded that *Defendants have made a sufficient showing* that the [release] defense applies.") (emphasis added).

This case is not based on the "identical factual predicate" as *Alston*; therefore, the class action release in *Alston* does not apply here. *See Grant House*, 545 F. Supp. 3d at 819.

1.  *This Case Challenges a Horizontal Price-Fixing Conspiracy, Not the NCAA's Limits on Education-Related Benefits, Which Was the Issue in* Alston*.*

First, Defendants' assertion that Plaintiffs' claims arise from the same underlying "NCAA rules limiting compensation generally" is mistaken and, even if broadly correct, insufficient. *See* Def. Mem. at 16. *Alston* focused on challenges to NCAA Bylaw 15.1, which addresses limits on education-related benefits. *See* Complaint, *Alston v. NCAA*, 4:14-cv-01011-CW (N.D. Cal. Mar. 5, 2014), § 143 ("The Plaintiff in this litigation specifically challenges NCAA Bylaw 15.1 . . ."); *see also Alston*, 594 U.S. at 69–70 ("The Court considers only the subset of NCAA rules restricting education-related benefits that the district court enjoined."). Plaintiffs here do not challenge Bylaw 15.1.

What Plaintiffs challenge here is the ongoing horizontal price-fixing conspiracy and monopoly maintenance in which the NCAA is currently engaged with respect to footage of student-athletes' performances. Of relevance are NCAA policies and restrictions barring *former* student-athletes from profiting from the NCAA's ongoing use of their names, images, and likenesses long after they have graduated, including Bylaw 12.5, which addresses student-athletes' right to profit from use of their names, images, and likenesses, and Bylaw 14's requirement that student-athletes sign a waiver purporting to cede their name, image, and likeness (NIL) rights to the NCAA in perpetuity. *See* Amend. Compl. at 44–46, ¶¶ 116–23. But neither Bylaw 12.5 nor Bylaw 14 were raised by plaintiffs or addressed by the court or any party in *Alston*. And the overarching agreement to deprive student-athletes of the ability to receive compensation for the commercial use of their performances reflected in footage captured by the conspirators was not at issue in *Alston* either.

*Robertson v. Nat'l Basketball Ass'n*, 622 F.2d 34 (2d Cir. 1980), does not help Defendants. That case concerned an order enjoining Wilt Chamberlain, a member of a class of players who

filed an antitrust action against the National Basketball Association, from filing a separate action in California while the class action was in process. But Chamberlain sought to contest a subset of the same rules and practices contested in the class action—not a separate set of rules governing a different income source, as is the case here. Here, the two sets of provisions at issue, in *Alston* and in the present case, are distinct in their operation and in their effects. Bylaw 15.1, at issue in *Alston*, concerns benefits paid directly to or on behalf of students, in the form of scholarships and grants-in-aid. Bylaws 12.5 and 14 limit student-athletes' ability to earn money independently, from their own NIL and/or their performances. And, in any event, the claims in *Alston* were focused on different conduct inflicting a different type of harm than is at issue here.

   *2. The Factual Issues in This Case Are Different than <u>Alston</u>.*

   Second, this case requires different factual support than *Alston*. In *Alston*, the Plaintiff argued that the limits on educational support imposed by NCAA Bylaw 15.1 artificially depressed the size of scholarships offered by participating universities. The affected market was the market for student-athletes' labor, and the effect of the anticompetitive conduct was essentially to artificially limit the direct compensation available to athletes, in the form of scholarships and grants-in-aid. Plaintiffs in the present case assert an entirely different market—the market for footage of former student-athletes' athletic performances—and a different mechanism by which the anticompetitive conduct works harm: by barring former student-athletes from the market for their NIL and/or performances and wrongfully asserting ownership over that NIL and/or performances. Addressing these claims, and establishing the nature and extent of damages, will require developing a different factual record documenting different forms of conduct than was required in *Alston*.

Further, the claims in this case are based on new facts that post-date *Alston*. Plaintiffs' complaint is based on conduct occurring after *Alston*, including commercial uses of Plaintiffs' performances and/or NIL that post-dated *Alston*. Plaintiffs' evidence will include the NCAA's changed stance toward student-athlete NIL in the wake of *Alston* and its progeny, as well as additional data regarding the effect of loosened compensation rules on student-athletes and on the market for college sports. Each of these findings is relevant and important to the claims brought in this case, and each became available only after the *Alston* settlement was finalized. Therefore, the factual predicate underlying this case cannot be considered "identical" to that of *Alston*.

Beyond these distinctions, the present Plaintiffs allege entirely different forms of harm than were posted in *Alston*. The harm alleged in *Alston*—and the underlying basis for the settlement of the plaintiffs' damages claims—was the wrongful deprivation of compensation for athletic services that Plaintiffs would have received absent the NCAA's rules restricting education-related benefits. In the present case, Plaintiffs' alleged harm entails the wrongful deprivation of compensation for the continuing use of student-athletes' performances and their NIL after their graduation, from conferences, colleges and the NCAA system. The NCAA's rules banning compensation for use of Plaintiffs' NIL were not at issue in *Alston*; thus, the Plaintiffs' claims here for monetary damages arising from the application of those rules cannot be barred by the *Alston* settlement release.

### 3. *The NCAA Made This Same Argument, and Lost, in* <u>House</u>.

The NCAA made this same argument in *House*, a case challenging the same anticompetitive conduct by the NCAA and its co-conspirators in depriving student-athletes from receiving compensation for their NIL. *Grant House,* 545 F.Supp.3d at 819. Like the ten plaintiffs in this case who were members of the Division I Men's Basketball Class in *Alston*, one of the

*House* plaintiffs was a member of the Division I FBS Football Class in *Alston* and was subject to

the same *Alston* release. *Id.* The Northern District of California rejected the NCAA's argument

that the *Alston* release barred the plaintiff's NIL claims in *House*:

> Tymir Oliver's damages claims here are not based on the identical factual predicate
> as the damages claim in *Alston*. As discussed above, his claims are materially
> distinguishable from those in *Alston* because they are based on (1) challenge to
> some rules that were not challenged in *Alston*; (2) a legal theory that was not raised
> in *Alston*, which requires different facts from those litigated in *Alston*; and (3) new
> facts that post-date *Alston*. Accordingly, the Court cannot conclude at this juncture
> that Tymir Oliver's claims for damages were released via the *Alston* settlement.

*House*, 545 F.Supp.3d at 819–20.

For the same reasons, this Court should reach the same conclusion as the *House* court and

hold that Plaintiffs' claims are not foreclosed by the terms of the unrelated *Alston* settlement.

### III.   PLAINTIFFS HAVE PROPERLY ALLEGED INJURY.

Defendants argue that Plaintiffs have not plausibly pleaded injury because Plaintiffs have

not identified any legal rights that have been violated. That is wrong. Plaintiffs have pleaded

violations of the Sherman Act, and the legal right at issue is the right to be free from harm

stemming from Sherman Act violations. If the Court elects to further consider Defendants' "no

legal injury" argument, it should reject it.

> A.   <u>Plaintiffs' State-Law Claims Are Sufficiently Pleaded.</u>

Defendants wrongly suggest that pleading economic and competitive injury is insufficient,

asserting that Plaintiffs also must show that they have a legal right to the compensation they allege

Defendants wrongly deprived them of. The court in *House* easily rejected this exact argument.

That court correctly explained, "A plaintiff can show that it was injured in fact by alleging that it

was deprived of the opportunity to receive compensation it otherwise would have received but for

the challenged conduct. *To make this showing, a plaintiff need not establish that it has a legal

entitlement to the compensation in question.*" *House*, 545 F. Supp. 3d at 816 (emphasis added);

*see also Ross v. Bank of Am., N.A.(USA)*, 524 F.3d 217, 220 (2d Cir. 2008) (Plaintiff's allegation that credit-card issuing banks colluded amongst one another to impose mandatory arbitration clauses in their contracts was sufficient to demonstrate injury-in-fact because allegations of "injuries to the market," rather than individual harm, is all that a Plaintiff need make for standing purposes.). Defendants' argument that Plaintiffs do not have legal rights separate from the right not to be damaged by Sherman Act violations amount to an affirmative factual defense that Plaintiffs would not have received the compensation they allege they have been deprived of. That factual argument is premature at the 12(b)(6) stage.

Defendants' reliance on *Marshall* and *Rooney* are misplaced. Regarding *Marshall v. ESPN*, 111 F. Supp. 3d 815, 835 (M.D. Tenn. 2015), *aff'd*, 668 F. App'x 155 (6th Cir. 2016) (unpublished), as the court in *House* explained:

> Plaintiffs here have satisfied [the burden to plausibly plead antitrust injury because] they have alleged facts from which the fact-finder could infer that, but for the challenged [restraints or agreements], schools and conferences would [have] be[en] willing to share . . . revenue with the members of the sub-class even if they had no publicity rights in broadcasts, to the extent that doing so would help the schools and conferences compete with other schools and conferences for recruits.

*House*, 545 F. Supp. 3d at 816–17. So too here. Plaintiffs allege that but for the restraints at issue, they would be compensated for the ongoing commercial exploitation of their athletic performances. Whether Plaintiffs are legally entitled to that compensation under a particular law other than the Sherman Act is beside the point at this stage.

As for *Rooney v. Columbia Pictures Industries, Inc*., 538 F. Supp. 211, 230 (S.D.N.Y 1982), *aff'd*, 714 F.2d 117 (2d Cir. 1982), which was a summary judgment order, that case is relevant only by contrast. There, it was uncontested that Mickey Rooney entered into binding contracts (at least 27 of them) in which he gave up the right to compensation that he later alleged he was wrongly deprived of. But unlike Plaintiffs here, Rooney entered willingly into

25

"contracts . . . 26nvolve[ing] the exchange of money for services . . . [which included] an agreement that all rights to the resulting product shall rest with the employer," *id*. at 229, before the alleged antitrust conspiracy began, *id*. at 223. Here, by contrast, Plaintiffs allege that they did *not* enter into valid contracts—and were coerced to the extent that they signed any contractual documents—and did *not* knowingly or legally assign any rights to compensation for the exploitation of their performances to anyone. Amend. Compl. at 46–47, ¶¶ 120–30. Thus, while the court in *Rooney* arrived at a factually determined conclusion that the plaintiff was not harmed as he alleged, that holding supports Plaintiffs' contention that, absent a contract "involving the exchange of money for services" and "an agreement that all rights to the resulting product shall rest with the employer," *Rooney*, 538 F. Supp. At 229, performers (such as Plaintiffs) have the right to seek compensation for the future commercial uses of their performances.

Ultimately, to show as a matter of law that student-athletes could not be harmed by the horizontal price-fixing conspiracy and illegal monopoly alleged here, Defendants would have to show that schools or conferences would *never*, "beyond doubt," compete in the national market for student-athlete labor at issue here by offering such compensation, and that they would never offer compensation to former student-athletes for use of the footage of their athletic performances. But just as commercial employers compete for labor by offering pay above the legally mandated minimum wage, schools and conferences may well have offered compensation beyond the minimum to which student-athletes were legally entitled but for the collusion at issue. Accordingly, Defendants' state-law arguments are irrelevant at this stage.

If the Court elects to address these factual arguments, it should reject them.

B.    Defendants' (Irrelevant) Argument That Players Have No Right to Compensation for Sports Broadcasts Is Wrong.

Defendants' argument that "*participants* have no right [to compensation for the] broadcast or rebroadcast of a sporting event," Def. Mem. at 21, is also plainly incorrect. As the Supreme Court explained in *Zacchini*, broadcasting a performance without the performer's consent "poses a substantial threat to the economic value of that performance" and presents "the strongest case for a 'right of publicity'" because it involves "the appropriation of the very activity by which the entertainer acquired his reputation in the first place." *Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 575–76 (1977). The court identified the source of a performance's economic value as lying in "the 'right of exclusive control over the publicity given to [the] performance,'" and "[t]he rationale for (protecting the right of publicity) [as] the straightforward one of preventing unjust enrichment by the theft of good will." *Id*.

*Marshall v. ESPN*, upon which Defendants rely, does not except sports broadcasts from that holding. Defendants argue that the holding in *Marshall* is that "broadcasting or rebroadcasting . . . [a] sports event does not implicate players' publicity rights." Def. Mem. at 21. But the district court's ruling in *Marshall* was explicit that its ruling was based on the lack of a right to publicity *under Tennessee law*. *Marshall*, 111 F. Supp.3d at 835. Thus, while the court in *Marshall* concluded that student-athletes may not be able to assert rights of publicity with respect to game broadcasts under Tennessee law, that in no way means that student-athletes cannot establish such rights under any state law or that, but for the anticompetitive restrictions at issue here, schools would not have offered compensation even in the absence of a legal requirement to do so. In any event, while Tennessee's and some other state's right of publicity statutes specifically

27

designate sports broadcasting as exempt, many do not—thus establishing that rights to publicity exist in many states. *See, e.g.,* Ind. Code. Ann. § 32-36-1-1; Ky Rev. Stat. Ann. § 391.170.[6]

Defendants also argue that the district court's summary judgment decision in *Dryer v. Nat'l Football League*, 55 F. Supp. 3d 1181 (D. Minn. 2014), supports their contention that rebroadcasting sports events "does not implicate players' publicity rights." Def. Mem. at 21. But *Dryer* supports the opposite conclusion; as the district court in *O'Bannon* explained, *Dryer* "suggests that athletes *may* bring such claims under Minnesota law to recover for the unauthorized use of their names and images in at least certain kinds of broadcast footage." *In re NCAA Student-Athlete Name & Likeness Licensing Litigation*, 37 F. Supp. 3d 1126, 1145 (N.D. Cal. 2014) (citing *Dryer v. Nat'l Football League*, 689 F. Supp. 2d 1113, 1123 (D. Minn. 2010)) (emphasis added). Specifically, rather than indicating that athletes lack publicity rights in sports broadcasts, the *Dryer* court affirmed that Minnesota recognizes a common law right of publicity. *Dryer*, 55. F Supp. 3d at 1197. The court granted the defendants' motion not because it found no right existed, but because the undisputed evidence in that case showed that the NFL Films productions at issue[7] fell within a "newsworthiness exception" to right of publicity claims under Minnesota law (an exception that also exists in the laws of California, Texas, and New York). *Id.* at 1197–99.

Thus, far from invoking the purported legal principle that performers have no right of publicity in game broadcasts, *Dryer* supports the conclusion that athletes may bring right of publicity claims for use of their NILs in broadcasts insofar as those broadcasts do not fit within an

---

[6] When a state enumerates certain exemptions and does not include sports broadcasts among them, as other states have done, basic principles of statutory construction dictate that sports broadcasts are not exempt. And when certain legislatures decide to expressly exempt sports broadcast, that act is a recognition of the likelihood that such broadcasts would otherwise infringe on athletes' publicity rights.

[7] The *Dryer* court described most of these films as treating a game or season with "30-minute dramatic narrative[s] featuring music, narration, and clips of important plays from the game itself in real time and slow motion," sometimes including interviews with players. 55 F. Supp. 3d at 1186.

exception—for example, when the broadcast is of an entire game or a portion of a game is used in an advertisement or for commercial gain, which is exactly what Plaintiffs allege occurred here.[8]

C.    Defendants' Copyright Preemption Argument Is Also Both Irrelevant and Incorrect.

The cases Defendants rely on for their claim of copyright preemption also contradict their argument. For example, *In re Jackson*, 972 F.3d 25, 38 (2d Cir. 2020), explains that if "the state-created [claim] vindicates a substantial state law interest, i.e. an 'interest[ ] outside the sphere of congressional concern in the [copyright] laws,'" the claim will *not* be preempted. Certainly, protecting children, students, and performers from commercial exploitation is a valid state interest that is outside Congress's concern in the Copyright Act—and, conversely, Congress did not intend to immunize those who profit from recordings of performances obtained through coercive or illegal means or without the valid consent of the performers.

Indeed, federal courts lack jurisdiction under the Copyright Act if a complaint "s[eeks] to adjudicate the ownership of a copyright or invalidate an agreement on state law grounds, including for insufficient consideration, fraud, or an invalid assignment, [issues] which [do not have] implications for the Copyright Act." *Brown-Thomas v. Hynie*, 441 F. Supp. 3d 180, 209 (D.S.C. 2019). For as Judge Friendly explained, "an action 'arises under' the Copyright Act if and only if the complaint is for a remedy expressly granted by the Act, e.g., a suit for infringement or for the statutory royalties for record reproduction, 17 U.S.C. § 101, . . . or asserts a claim requiring construction of the Act. . . . The general interest that copyrights, like all other forms of property, should be enjoyed by their true owner is not enough to meet this last test." *T. B. Harms Co. v.*

---

[8] Defendants' last-ditch argument regarding right to publicity is that recognizing a right to publicity would give "every person depicted in a sporting event—not only players, but . . . even spectators—[the ability] to assert such a right," which would "make broadcasts next to impossible by giving each participant veto power over broadcasts." Def. Mem. at 22. That argument is also wrong. It is undisputed that people can waive such rights through *valid* consent, such as freely buying a ticket to a sports event. These issues can be addressed through contracts entered into at the time of ticket purchase. And, in any event, Defendants' policy argument cannot satisfy their burden here.

*Eliscu*, 339 F.2d 823, 828 (2d Cir. 1964); *Bassett v. Mashantucket*, 204 F.3d 343, 349 (2d Cir. 2000) (reaffirming that the *T.B. Harms* test is the correct test).

Judge Hellerstein's discussion of copyright preemption in *Reach Glob., Inc. v. Ridenhour*, No. 20 CIV. 391 (AKH), 2020 WL 2319176, at *2 (S.D.N.Y. May 10, 2020), is instructive.  There the court remanded a state case removed to federal court on the basis of copyright preemption explaining,

> mere reference to a copyright interest is not enough, and even a cursory reading of Defendants' pleadings reveal that their claims revolve around the core assertion that Plaintiffs tricked Ridenhour into assigning away his copyrights. This is a matter of contract and fraud, not of copyright. The parties do not dispute that the copyrights at issue are enforceable; nor do they ask the Court to resolve any issue pertaining to the breadth of the copyrights' coverage or the meaning of the Act itself. The case is thus about which of the parties owns the copyrights under the contracts and in light of various principles of state common law, which falls short for purposes of jurisdiction.

*Id.* (cleaned up) (citing cases). Moreover, the Copyright Act itself prohibits "[a]nyone [from], without the consent of the performer or performers involved . . . distributing or offering to distribute, selling or offering to sell . . . , or trafficking in any [audio or visual recordings of a live musical performance]," and further provides that "State Law is Not Preempted" by this section. 17 U.S.C. § 1101 (cleaned up). Thus, to the extent that Congress addressed the type of exploitative conduct at issue here, it both prohibited it and expressly did not preempt state claims on these grounds.[9]  Therefore, where, as here, a claim rests on exploitation of performers, insufficient consideration, illegal coercion, and unauthorized distribution of recordings of live performances, those claims are not preempted. *Cf. Ridenhour*, 2020 WL 2319176, at *2; *Brown-Thomas*, 441 F. Supp. 3d at 209 (noting that the Copyright Act does not provide jurisdiction to address such issues).

---

[9] The section only addresses musical performances, but there is no reason to believe that Congress would specifically protect and expressly not preempt state laws protecting musical performers but intended to allow exploitation of athletic performers or preempt state laws that protect them. Section 1101 shows that issues of exploitation of performers are outside the scope of the general provision of the Copyright Act and thus not preempted.

It is no accident that the sports-related cases Defendants cite in their preemption argument involve *professional* sports, where the work-for-hire doctrine applies. "*Because the [professional athletes] are employees* and their performances before broadcast audiences are within the scope of their employment, the telecasts . . . are works made for hire . . . . Thus, . . . *the [teams] . . . own all of the rights encompassed in the telecasts* of the games." *Baltimore Orioles, Inc. v. MLB Players Ass'n*, 805 F.2d 663, 670 (7th Cir. 1986) (emphasis added). The NCAA maintains that student-athletes are not employees, so the work-for-hire doctrine does not apply. Consequently, questions of copyright ownership and publicity rights violations turn on state-law questions such as validity of consent, sufficiency of consideration, and the use of exploitative practices, including horizontal price-fixing, prohibitions on the hiring of lawyers, and threats to prevent the student-athletes from receiving their scholarships and thus their education—in short, issues outside the scope of the Copyright Act. Accordingly, if Plaintiffs were to present publicity rights claims, those are not preempted.

This conclusion is further borne out by *Dryer v. Nat'l Football League*, 814 F.3d 938, 943 (8th Cir. 2016). There, the Eighth Circuit not only explained that "a right-of-publicity suit challeng[ing] the expressive, *non-commercial* use of a copyrighted work" will be preempted, but clarified that suits alleging commercial or advertising uses generally will not be. It also indicated that lack of consent would change the preemption analysis. *Id*. at 942 ("The appellants do not argue that NFL Films lacked permission to record appellants' live performances in NFL games."). Similarly, in *Ray v. ESPN, Inc.*, 783 F.3d 1140, 1144 (8th Cir. 2015), the court determined that preemption applied because the professional wrestling performance was itself copyrightable and because the professional "collaborated in the creation" of the filmed performance—thus indicating that exploitation would change the result.

In *Melendez v. Sirius SM Radio, Inc.*, 50 F 4th 294, 303 (2d Cir. 2022), there was no issue of coercion or exploitation. As in *Jackson*, the court explained that copyright preemption turns, first, on "a fact-specific inquiry" into whether the claim is based on the defendant's exploitation of uncopyrightable matter (such as plaintiffs' likeness) or on uses of "the copyrighted work in which that [non-copyrightable material] is embodied[.]" *Id.* (quoting *Jackson*, 972 F.3d at 47). If, as the NCAA argues, athletic performances are not copyrightable, Def. Mem. at 20, this framework establishes that preemption does not apply, because the primary value Defendants have exploited here is Plaintiffs' non-copyrightable performances contained within the footage, as opposed to the artistic decisions, such as camera choice or lighting, attributable to the "authors" of the copyrighted work.

In other words, because an athletic performance—like a person's likeness—is not copyrightable, a copyright owner must validly acquire the rights to exploit the non-copyrightable value contained within the film. Professional teams do that through their contracts and the work-for-hire doctrine. The NCAA and its co-conspirators have not validly obtained the right to exploit such non-copyrightable value; therefore, under *Melendez*, *Jackson*, and a host of other cases that apply the copyrightable vs. non-copyrightable framework, Plaintiffs' claims for compensation for commercial use of their non-copyrightable performances are not preempted.

Finally, copyright preemption does not apply because Plaintiffs do not seek to stop the conspirators from exhibiting the films themselves; rather, they seek just compensation for the commercial use of the non-copyrightable performances captured in the films. Amend. Compl. at 54, ¶¶ 154–56. Such claims for accounting and contribution by a party asserting a co-ownership or right to proceeds under state laws are outside the scope of the Copyright Act and thus not preempted. *See, e.g., Andrews v. Daughtry*, No. 1:12-CV-00441, 2013 WL 664564, at *8

(M.D.N.C. Feb. 22, 2013); *Moofly Prods., LLC v. Favila*, No. CV1305866SJOPJWX, 2015 WL 12655381, at *6 (C.D. Cal. May 19, 2015).

In short, but for Plaintiffs' athletic performances, the footage in question would have no value. Publicity claims involving the commercial exploitation of recordings of nonprofessional athletes' performances are not preempted because ownership of the primary value—the performances—is a state-law question that implicates substantial state interests and thus falls outside the scope of the Copyright Act. That is particularly true where the recordings are the product of exploitation or coercion of the performers, since states have a substantial interest in preventing commercial exploitation and coercion of their young people.

In any event, because Plaintiffs' alleged antitrust injuries are based on being "deprived of the opportunity to receive compensation it otherwise would have received but for the challenged conduct . . ., [P]laintiff[s] need not establish th[ey] ha[ve] a legal entitlement to the compensation in question." *Grant House*, 545 F. Supp. 3d at 816 (citing, *inter alia*, 13A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3531.4 (3d ed. 1998) ("[L]oss of an opportunity may constitute injury, even though it is not certain that any benefit would have been realized if the opportunity had been accorded.") (collecting cases))). So these questions of whether preemption applies and what state law remedies Plaintiffs are or would have been entitled to need not be decided here. The complaint plausibly alleges injury, which is all that is required.

## IV.    PLAINTIFFS HAVE PROPERLY ALLEGED AN UNJUST ENRICHMENT CLAIM.

A person who is unjustly enriched at the expense of another is subject to liability in restitution. Restatement (Third) of Restitution & Unjust Enrichment § 1 (2011). To state a claim

for unjust enrichment under New York law,[10] a plaintiff must allege three elements: (1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the benefit to the plaintiff. *Golden Pacific Bancorp v. F.D.I.C.*, 273 F.3d 509 (2d Cir. 2001). "The rationale for [preventing unconsented to broadcasting of a performer's performance] is the straightforward one of preventing unjust enrichment. . . . No social purpose is served by having the defendant get free some aspect of the plaintiff that would have market value and for which he would normally pay." *Zacchini*, 433 U.S. at 575–76.

Plaintiffs clearly allege that the Defendants were enriched by illegally obtaining and retaining the exceedingly valuable rights related to Plaintiffs' athletic performances, and Plaintiffs' names, images, and likenesses. *See* Amend. Compl. at 1, ¶ 1; 4, ¶ 11. This enrichment was at the expense of Plaintiffs as Defendants retained all profit from and exclusive control of this footage and prevented student-athletes from monetizing the footage through other distribution channels. *See* Amend. Compl. at 3, ¶ 7. To this day, the NCAA and its co-conspirators continue to earn substantial revenue from the use of Plaintiffs' athletic performances. Amend. Compl. at 51, ¶ 138–39. Equity requires that Defendants return the profits they have received via their wrongful conduct.

Defendants first argue that Plaintiffs' unjust enrichment claim must be dismissed because Plaintiffs did not identify the jurisdictions whose law governs the unjust enrichment claim. However, this Court has held that "such an identification is not necessary at the pleading stage because the elements of unjust enrichment are similar in every state," and "defendants have made no showing that any differences in the various state laws are material at this early stage of

---

[10] Plaintiffs analyze unjust enrichment under New York law in the first instance, as it is exemplary of other states' laws.

litigation." *Allianz v. Global Investors GmbH v. Bank of America Corp.*, 463 F. Supp. 3d 409, 432–33 (S.D.N.Y. 2020) (citing *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 729–30 (S.D.N.Y. 2017)). The same is true here. Defendants have not alleged nor shown that any differences in the various state laws are material at this point in litigation. There is also a "growing consensus" that courts should defer consideration of standing until after class certification. *Schneider v. Colgate-Palmolive Company*, 677 F. Supp. 3d 91, 106 (S.D.N.Y. 2023).

The remainder of Defendants' arguments for dismissal have been addressed in the preceding sections and fail for the same reasons.

Ultimately, the complaint alleges a "straightforward [case] of . . . unjust enrichment." *Zacchini,* 433 U.S. at 576. Defendants' motion to dismiss this claim should be denied.

## CONCLUSION

Defendants have not met their burden to obtain dismissal. The motion to dismiss should be denied.

This 17th day of December 2024.

**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**

/s/ *Peggy Wedgworth*
Peggy Wedgworth, NY Bar No.: 2126159
405 East 5th Street
New York, NY 10022
(212) 594-5300
pwedgeworth@milberg.com

/s/ *Scott C. Harris*    (*pro hac vice*)
Scott C. Harris, NC Bar No.: 35328
Michael Dunn, NC Bar No.: 47713
James R. DeMay, NC Bar No.: 36710
900 W. Morgan Steet
Raleigh, NC 27603
sharris@milberg.com
michael.dunn@milberg.com

jdemay@milberg.com

**CHESHIRE PARKER**
**SCHNEIDER, PLLC**

/s/ *Elliot Abrams* (*pro hac vice*)
Elliot Abrams, N.C. Bar No. 42639
133 Fayetteville St., Ste 400
Raleigh, NC 27601
T: (919) 833-3114
elliot.abrams@cheshirepark.com

**MILLER LAW GROUP, PLLC**

/s/ *W. Stacy Miller II* (*pro hac vice*)
W. Stacy Miller II, N.C. Bar 21198
MaryAnne M. Hamilton, N.C. Bar 59323
Post Office Box 6340
Raleigh, NC 27628
T: (919) 348-4361
F: (919) 729-2953
stacy@millerlawgroupnc.com
maryanne@millerlawgroupnc.com

**TOMPSETT COLLEGIATE**
**SPORTS LAW**

/s/ Scott Tompsett (*pro hac vice pending*)
Scott Tompsett, MO Bar No. 51493
1236 W. 61st Terrace
Kansas City, MO 64113
T: (816) 216-7866
stompsett@scotttompsett.com