UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MARIO CHALMERS *et al.*, | | |
| | Plaintiffs, | 24 Civ. 5008 (PAE) |
| -v- | | |
| | | OPINION & ORDER |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION A/K/A NCAA *et al.*, | | |
| | Defendants. | |

PAUL A. ENGELMAYER, District Judge:

This putative class action is the latest in a series of lawsuits by collegiate student-athletes against the National Collegiate Athletic Association and its members and athletic conferences (together, the "NCAA"). These cases have involved claims for monetary and injunctive relief arising from the NCAA's use of the student-athletes' names, images, and likenesses ("NIL") in advertisements and for other commercial purposes.

Plaintiffs here are 16 student-athletes who played college sports before June 15, 2016. That date was the start date of the settlement class period in a prior case against the NCAA that preliminarily settled in 2024, around the time plaintiffs brought this action.[1] Plaintiffs sue the NCAA and six of its member conferences (the "conference defendants").[2] They claim violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1–2, and unjust enrichment in violation of state law. The heart of these claims is that the NCAA, colluding with the conference

---

[1] *See In re College Athlete NIL Litig.*, 4:20-cv-03919 (N.D. Cal. Mar. 3, 2025) ("*House*"), Dkt. 718 (proposed settlement class includes "[a]ll student-athletes . . . [between] June 15, 2016 through September 15, 2024").

[2] These are the Big East Conference, Inc., Pac-12 Conference, Big Ten Conference, Inc., Big 12 Conference, Inc., Southeastern Conference, and Atlantic Coast Conference.

defendants, violated antitrust laws by forcing student-athletes to enter into agreements upon enrolling in the universities that (1) forced them to forgo compensation for use of their NILs from their college playing career and (2) enabled the NCAA and the conference defendants unjustly to retain ownership and control of these NILs and collect revenues from these that rightfully belonged to the plaintiffs.

The NCAA[3] now moves, on various grounds, to dismiss the Amended Complaint ("AC") for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The NCAA argues that plaintiffs' claims are time-barred, precluded by prior lawsuits and judgments, and do not plead injury, and that the state-law claim is redundant.

For the reasons below, the Court holds that plaintiffs' claims are untimely and otherwise precluded as a matter of law, and dismisses the AC in full.

## I. Background[4]

### A. Factual Background

#### 1. Defendants

The NCAA was founded in 1906 by 62 institutional members to regulate intercollegiate sports and protect student-athletes' safety. AC ¶ 108. After World War II, the NCAA shifted its focus to protecting "amateurism" in college sports by imposing rules concerning recruitment, financial aid, and academic performance. *Id.* ¶ 109.

---

[3] In describing the contentions of the parties in this litigation, the Court refers to the defendants collectively as the NCAA.

[4] This account is predominantly drawn from the facts pled in AC, Dkt. 104, with context supplied by the parties' submissions on the pending motion. These include the NCAA's memorandum of law, Dkt. 108 ("Defs. Br."); plaintiffs' opposition, Dkt. 114 ("Pls. Opp."); and the NCAA's reply, Dkt. 116 ("Defs. Reply").

Today, the NCAA has more than 1,200 member schools and oversees more than 500,000 student-athletes across three competitive divisions. *Id.* ¶ 110. It sponsors more than 90 national championships across 24 sports. *Id.* The NCAA holds itself out as "the organization through which colleges and universities of the nation speak and act on athletic matters at the national level." *Id.* ¶ 111. The rules contained in its constitution and bylaws regulate, *inter alia*, financial aid, NIL rights, student recruitment, and academic eligibility. *Id.* ¶¶ 112–21.

The NCAA's Division I ("DI") member conferences include the Big East Conference, Inc., the Pac-12 Conference, the Big Ten Conference, Inc., the Big 12 Conference, Inc., the Southeastern Conference, and the Atlantic Coast Conference. Each is a multisport collegiate athletic conference which the AC alleges participated in the NCAA's collusive restraint of trade. *Id.* ¶¶ 33–40.

## 2. Prior Litigation Involving Defendants

Because defendants' motion to dismiss turns heavily on prior litigation, the Court here recaps the relevant lawsuits against the NCAA and its member conferences relating to student-athletes' NILs.

### a. Keller *and* O'Bannon

On May 5, 2009, Sam Keller, a former starting quarterback for the Arizona State University and University of Nebraska football teams, sued the NCAA, Electronic Arts, Inc. ("EA"), and the Collegiate Licensing Company ("CLC"). Keller's lawsuit, a putative class action, alleged that the defendants had unlawfully used student-athletes' NILs in video games. *Keller v. NCAA*, No. 9 Civ. 1967 (N.D. Cal. May 5, 2009), Dkt. 1 ("*Keller* Complaint").

On July 21, 2009, Ed O'Bannon, a former All-American basketball player at the University of California, Los Angeles ("UCLA") and a member of its 1995 championship team, sued the NCAA and CLC. His lawsuit, also a putative class action, alleged that the NCAA's

amateurism rules, insofar as they prevented student-athletes from being compensated for use of

their NILs, were an illegal restraint of trade under Section 1 of the Sherman Act.  *See O'Bannon*

*v. NCAA*, 802 F.3d 1049, 1055 (9th Cir. 2015)); *see* 3d Consolidated Am. Class Action Compl.,

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, No. 9 Civ. 1967 (N.D. Cal. July

19, 2013), Dkt. 832 ("*O'Bannon* Complaint").  O'Bannon specifically challenged the NCAA's

rules that he claimed required student-athletes to sign forms "relinquish[ing] all rights in

perpetuity for use of their images, likenesses and/or names," in live broadcasts and archival

footage.  *O'Bannon* Complaint ¶ 610.

During pretrial proceedings, the *Keller* and *O'Bannon* lawsuits were consolidated in

federal district court in the Northern District of California.  *O'Bannon*, 802 F.3d at 1055.  In

November 2013, the district court denied certification of a damages relief class, but certified an

injunctive and declaratory relief class.  *In re NCAA Student-Athlete Name & Likeness Licensing*

*Litig.*, No. 9 Civ. 1967 (N.D. Cal. Nov. 8, 2013), Dkt. 893.  It defined that class as:

> All current and former student-athletes residing in the United States who compete
> on, or competed on, an NCAA Division I (formerly known as "University Division"
> before 1973) college or university men's basketball team or on an NCAA Football
> Bowl Subdivision (formerly known as Division I–A until 2006) men's football
> team and whose images, likenesses and/or names may be, or have been, included
> or could have been included (by virtue of their appearance in a team roster) in game
> footage or in videogames licensed or sold by Defendants, their co-conspirators, or
> their licensees.

*O'Bannon v. NCAA*, 7 F. Supp. 3d 955, 965 (N.D. Cal. 2014).

After class certification, the plaintiffs voluntarily dismissed their damages claims with

prejudice.  *O'Bannon*, 802 F.3d at 1056.  *O'Bannon* and *Keller* were deconsolidated, and the

*Keller* plaintiffs then settled their claims with the NCAA.  *Id.*  The *Keller* Settlement Agreement

included a release, stating:

> [A]ny and all past, present, and future claims . . . arising out of, involving, or relating to the alleged use of any name, image, photograph, or likeness in EA's production, manufacture, sale, distribution, or publication of NCAA-Branded Videogames, or the alleged use of or failure to compensate for the alleged use of any NCAA student-athlete's name, image, photograph, or likeness in connection with EA'S NCAA-Branded Videogames by the NCAA, EA, CLC, or any Person, that have been, could have been, or should have been asserted in the Lawsuits, including but not limited to any claims based in any way on alleged rights of publicity or name, image, and likeness rights under the law of any state or the United States, whether recognized now or hereafter, including any rights recognized in court decisions or statutes.

*Keller v. NCAA*, No. 9 Civ. 1967 (N.D. Cal. July 23, 2014), Dkt. 1158-2 ("*Keller* Settlement") ¶ 33.

The remaining injunctive claims against the NCAA in *O'Bannon* proceeded to a bench trial before United States District Judge Claudia Wilken.  *O'Bannon*, 802 F.3d at 1056.  Judge Wilken found that the challenged NIL compensation rules violated Section 1 of the Sherman Act.  *Id.*  As a remedy, she "prohibit[ed] the NCAA from enforcing any rules to prevent its member schools and conferences from offering to deposit a limited share of licensing revenue in trust for their FBS football and Division I basketball recruits, payable when they leave school or their eligibility expires."  *O'Bannon*, 7 F. Supp. 3d at 1008.

The Ninth Circuit affirmed in part and reversed in part.  *O'Bannon*, 802 F.3d at 1079.  It affirmed the injunction barring the NCAA from capping scholarships below the cost of attendance.  *Id.* at 1075.  But it held that the district court erred in enjoining the NCAA to permit students "to receive NIL cash payments untethered to their education expenses."  *Id.* at 1076.  The Supreme Court denied both parties' petitions for certiorari.  *O'Bannon v. NCAA*, 580 U.S. 815 (2016).

### b.    Alston

In March 2014, during the *O'Bannon* litigation, other student-athletes filed several antitrust actions against the NCAA and DI conferences.  On June 13, 2024, these were

consolidated into a multidistrict litigation ("MDL"), also before Judge Wilken, under the caption

*NCAA Grant-In-Aid Cap Antitrust Litigation* ("*Alston*").  375 F. Supp. 3d 1058, 1065 n.5 (N.D.

Cal. 2019), *aff'd*, 958 F.3d 1239 (9th Cir. 2020), *aff'd sub nom. NCAA v. Alston*, 594 U.S. 69

(2021).  As later recounted by the United States Court of Appeals for the Ninth Circuit, the

*Alston* plaintiffs "sought to dismantle the NCAA's entire compensation framework," "[r]ather

than confining their challenge to rules prohibiting NIL compensation."  *Alston*, 958 F.3d at 1247.

They challenged all NCAA limits on compensation and benefits in excess of the cost of

attendance, not just those related to NIL.  *Id.* at 1247–48.  In December 2015, Judge Wilken

certified three injunctive relief classes, *Alston*, No. 14 Md. 2541 (N.D. Cal. Dec. 4, 2015),

Dkt. 305 (Order), and, in December 2017, approved a settlement agreement as to damages for all

three, *id.*, Dkt. 746 ("*Alston* Settlement")*.*

     Salient here, one of the three *Alston* settlement classes consisted of Division 1 men's

basketball players, to wit:

> All current and former NCAA Division I men's basketball student-athletes who, at
> any time from March 5, 2014 through the date of Preliminary Approval of this
> Settlement [which occurred on March 21, 2017], received from an NCAA member
> institution for at least one academic term (such as a semester or quarter) a Full
> Athletics Grant-In-Aid.

*Alston* Settlement, at 2.  In the *Alston* Settlement Agreement, class members released their claims

against the "Releasees," which included the NCAA, each conference defendant, and each

member institution (past and present), as follows:

> As of the Settlement Agreement's Effective Date, the Releasors will release the
> Releasees from any and all past, present and future claims, demands, rights, actions,
> suits, or causes of action, for monetary damages of any kind (including but not
> limited to actual damages, statutory damages, and exemplary or punitive damages),
> whether class, individual or otherwise in nature, known or unknown, foreseen or
> unforeseen, suspected or unsuspected, asserted or unasserted, contingent or non-
> contingent, under the laws of any jurisdiction, which Releasors or any of them,
> whether directly, representatively, derivatively, or in any other capacity, ever had,

now have or hereafter can, shall or may have, arising out of or relating in any way
to any of the legal, factual, or other allegations made in Plaintiffs' Actions, or any
legal theories that could have been raised on the allegations in Plaintiffs' Actions.

*Id.* at 11–12 (citation omitted); *see also id.* at 11 nn.48–49. The *Alston* Settlement Agreement

"permanently barred and enjoined [the class members] from instituting or prosecuting any of the

Released Claims," and stated that the judgment embodying the settlement was "binding on and

ha[d] *res judicata* and preclusive effect in all pending and future lawsuits or other proceedings

encompassed by the Released Claims maintained by or on behalf of the [classes]." *Id.* at 12.

The released claims, however, did not include ones "solely for prospective injunctive

relief." *Id.* Those were tried during a 10-day bench trial, after which Judge Wilken entered

partial judgment for plaintiffs. *Alston*, 958 F.3d at 1248. She held that the NCAA's limits on

education-related benefits were an unreasonable restraint on trade in violation of Section 1 of the

Sherman Act, but that its limits on compensation unrelated to education were not. *Id.* The Ninth

Circuit affirmed, *id.* at 1244, as did the Supreme Court, *Alston*, 594 U.S. at 107. In a widely

noted concurring opinion, Justice Kavanaugh wrote that "the NCAA's remaining compensation

rules also raise serious questions under the antitrust laws." *Id.* at 108 (Kavanaugh, J.,

concurring).

    *c.*  *Ongoing Litigation Including* House

Several other antitrust suits against the NCAA are pending. Relevant here is a putative

class action brought on June 15, 2020 by Grant House, a former Arizona State swimmer, who

sued the NCAA on behalf of himself and other student-athletes, seeking damages for the use of

their NIL and an injunction against NCAA rules limiting such compensation. *House v. NCAA*,

No. 20 Civ. 3919 (N.D. Cal. June 15, 2020), Dkt. 1 (Class Action Compl.). In May 2024, the

*House* parties reached a settlement which would also resolve several other cases in which

student-athletes were challenging NCAA limits on their compensation. *Id.*, Dkt. 421 (stipulation

and order staying action pending settlement approval).  These included *Hubbard v. NCAA*, 23

Civ. 1593 (N.D. Cal. Apr. 4, 2023) (antitrust suit by student-athletes claiming they were denied

education-related benefits and financial rewards), and *Carter v. NCAA*, 23 Civ. 6325 (N.D. Cal.

Dec. 7, 2023) (antitrust suit by student-athletes challenging amateur compensation limits).  *Id.*

In October 2024, Judge Wilken, to whom *House* was also assigned, granted preliminary

approval of the *House* settlement, and certified four settlement classes.  Salient here, one was a

football and men's basketball class, defined as:

> All student-athletes who have received or will receive full [grant-in-aid]
> scholarships and compete on, competed on, or will compete on a Division I men's
> basketball team or an FBS football team, at a college or university that is a member
> of one of the Power Five Conferences (including Notre Dame), and who have been
> or will be declared initially eligible for competition in Division I at any time from
> June 15, 2016 through September 15, 2024.  This Class excludes the officers,
> directors, and employees of Defendants, and all judicial officers presiding over this
> action and their immediate family members and staff.

*Id.*, Dkt. 544.  The settlement agreement states that it may be filed "in any action for any

purpose, including . . . to support a defense or counterclaim based on principles of *res judicata*,

collateral estoppel, release . . . or any other theory of claim preclusion or issue preclusion[.]"  *Id.*,

Dkt. 535, Ex. 1.  On April 7, 2025, Judge Wilken held a final approval hearing of the proposed

*House* settlement.  *See id.*, Dkt. 723.  As of this decision, Judge Wilken has not yet granted final

approval of that settlement.

### B.    This Litigation

Plaintiffs in this putative class action are 16 former collegiate student-athletes.  Each

played for an NCAA Football Bowl Subdivision ("SBF") or a DI men's basketball team before

June 15, 2016.  That date, which is the end date of the proposed class period, corresponds to the

start date of the settlement class as defined in the prospective *House* settlement, which covers

college athletes who played on or after June 15, 2016.  AC ¶ 149 n.7; *see supra* note 1.  Five of

the 16 played in the 1990s. *Id.* ¶¶ 17, 24–26, 30. Some played professional sports after college. *See, e.g.*, *id.* ¶¶ 15–17.

The 16 plaintiffs are: Mario Chalmers, a basketball player at the University of Kansas between 2006 and 2008 and a member of its 2008 championship team; Sherron Collins, a basketball player at the University of Kansas between 2006 and 2010 and also a member of its 2008 championship team; Jason Terry, a basketball player at the University of Arizona between 1995 and 1999 and a member of its 1997 championship team; Ryan Boatright, a basketball player at the University of Connecticut between 2011 and 2015 and a member of its 2014 championship team; DeAndre Daniels, a basketball player at the University of Connecticut between 2011 and 2014 and a member of its 2014 championship team; Alex Oriakhi, a basketball player at the University of Connecticut and the University of Missouri between 2009 and 2013 and a member of the University of Connecticut's 2011 championship team; Vincent Council, a basketball player at Providence College between 2009 and 2013; Matt Pressey, a basketball player at the University of Missouri between 2010 and 2012; Roscoe Smith, a basketball player at the University of Connecticut and the University of Nevada between 2010 and 2014, and a member of the University of Connecticut's 2011 championship team; Eugene Edgerson, a basketball player at the University of Arizona between 1996 and 2001 and a member of its 1997 championship team; Aaron Bramlett, a basketball player at the University of Arizona between 1995 and 1999 and a member of its 1997 championship team; Jason Stewart, a basketball player at the University of Arizona between 1995 and 1999 and a member of its 1997 championship team; Gerard Coleman, a basketball player at Providence College and Gonzaga University between 2010 and 2014; Justin Greene, a basketball player at Kent State University between 2008 and 2012; Ron Giplaye, a basketball player at Providence College and East

Tennessee State between 2010 and 2015; and James Cunningham, a basketball player at Arizona State and the University of Tulsa between 1994 and 1998. *Id.* ¶¶ 15–30.

Of the 16, one, Chalmers, was a member of the *Keller* settlement class. *See Keller* Settlement ¶ 19; Defs. Br. at 4 n.3. Ten—Boatright, Coleman, Collins, Council, Daniels, Giplaye, Greene, Oriakhi, Pressey, and Smith—were members of the *Alston* settlement class. *See Alston* Settlement, at 2; Defs. Br. at 16 & n.8 (plaintiffs Bramlett, Chalmers, Cunningham, Edgerson, Stewart, and Terry played basketball before 2010, the *Alston* settlement cutoff date); Pls. Opp. at 23. And all named plaintiffs were members of the *O'Bannon* injunctive class. *See O'Bannon*, 7 F. Supp. 3d at 965. Plaintiffs here seek to represent a class of "[a]ll individual persons who were NCAA student-athletes prior to June 15, 2016, whose image, likeness, or footage has been used or licensed for commercial purposes by the NCAA, the Conferences, or Veritone;[5] or their agents, distributers, contractors, licensees, subsidiaries, affiliates, or partners; or anyone acting in concert with any of the foregoing entities or persons." *Id.* ¶ 153.

Plaintiffs' AC broadly alleges that the NCAA, and member schools and conferences, exploited their NIL rights and footage, during college and thereafter, without compensating them. *See id.* ¶¶ 1, 15–30. Specifically, the AC alleges that, pursuant to the then-effective NCAA bylaws,[6] plaintiffs were required to sign Student-Athlete Statements each academic year, which "authorize[d] the NCAA [or a third party acting on behalf of the NCAA] to use [thei]r name or picture to generally promote NCAA championships or other NCAA events, activities or

---

[5] Veritone is the NCAA's "official global archive of record and exclusive, worldwide footage agent for all NCAA championship content, including content featuring all of the putative class members." *Id.* ¶ 86.

[6] The AC notes that the provision concerning NIL use has been eliminated in recent versions of the Student-Athlete Statements. *Id.* ¶ 123.

programs" in perpetuity. *Id.* ¶¶ 120–24. The bylaws otherwise forbade the use of student-athletes' NIL for any commercial purpose. *Id.* ¶¶ 117–18. As alleged, the bylaws state that "[f]ailure to complete and sign the [Student-Athlete] statement shall result in the student-athlete's ineligibility for participation in all intercollegiate competition." *Id.* ¶ 122. Their AC alleges that the NCAA "exploit[ed] its monopsony power to force student-athletes to give up exceedingly valuable rights related to their names, images, and likenesses, including publicity and broadcasting rights, as well as ownership rights related to images and footage of their athletic performances." *Id.* ¶ 1.

Important to the motions here, plaintiffs plead continuing injuries—that each time the NCAA uses footage or images of their college-era performances for commercial purposes, such constitutes a new and independent overt act, in furtherance of a continuing antitrust conspiracy. *Id.* ¶¶ 66–82. Plaintiffs allege the NCAA, in this manner, has injured each plaintiff within the last four years. *Id.*

Plaintiffs filed their initial Complaint on July 1, 2016. Dkt. 1. On October 18, 2024, the NCAA moved to dismiss under Rule 12(b)(6). Dkts. 94–95. On October 21, 2024, the Court directed plaintiffs to file any amended complaint or opposition by November 8, 2024. Dkt. 99. On November 14, 2024, after correcting a filing error, plaintiffs filed the AC. Dkt. 104. On December 2, 2024, the NCAA moved to dismiss the AC under Rule 12(b)(6). Dkts. 107–08. On December 17, 2024, plaintiffs opposed. Dkt. 114. On December 23, 2024, the NCAA replied. Dkt. 116. On January 27, 2025, the Court heard argument. Dkt. 125 ("Tr.").

## II.    Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  Although the court must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor, *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014), that tenet "is inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

## III.    Discussion

Plaintiffs' AC brings four claims.  Counts One and Two claim violations of § 1 of the Sherman Act, alleging a conspiracy in restraint of trade, aimed at suppressing the market for plaintiffs' NILs (Count One), AC ¶¶ 173–76, and a group boycott to the same effect (Count Two), *id.* ¶¶ 178–80; Count Three claims a violation of § 2 of the Sherman Act, alleging monopolization of the markets for student-athlete labor, images and footage, *id.* ¶¶ 182–86; and Count Four claims unjust enrichment, in violation of state law, *id.* ¶¶ 188–93.[7]

The NCAA moves to dismiss all claims.  It makes three principal arguments: that (1) the claims, which all turn on actions by the plaintiffs to relinquish their NIL rights to the NCAA and alleged co-conspirators before June 15, 2016, are untimely; (2) the claims are precluded by prior judgments, including those in *O'Bannon* and *Alston*; and (3) the AC does not viably plead injury. The NCAA further argues that the AC's unjust enrichment claim is redundant and otherwise defective.

Plaintiffs resist these arguments.  Opposing defendants' untimeliness argument, plaintiffs principally contend that their claims involve continuing violations of the antitrust laws.  And,

---

[7] The AC does not identify the states whose laws against unjust enrichment it claims were violated.

opposing defendants' preclusion arguments, plaintiffs contend that their claims are materially different from those in—and are not precluded by—the earlier lawsuits.

### B.    Statute of Limitations

The NCAA first argues that the AC's Sherman Act claims fall outside the Act's four-year statute of limitations.  It argues that defendants' collusive and monopolistic conduct, and plaintiffs' entry into agreements renouncing their NIL rights, as alleged, occurred before (and as to much of it, many years before) June 15, 2016, thus nearly a decade ago, and not within four years of the date when this lawsuit was filed (July 1, 2024).

Plaintiffs counter that their claims survive, invoking several legal theories.  Principally, plaintiffs invoke the "continuing violation" doctrine.  They argue that although the conduct by the defendants that violated the antitrust laws—agreements with the student-athlete plaintiffs pursuant to that conspiracy that resulted in the student-athletes ceding ownership of their NIL rights—occurred long ago, each ensuing use by a defendant of a plaintiff's name, image or likeness is an outgrowth of the antitrust conspiracy and restarts the limitations period on the Sherman Act § 1 claims.[8]  They argue that even though the ownership of their NILs was acquired more than four years before the filing of the Complaint, each use of a NIL constitutes a new antitrust injury.  Alternatively, plaintiffs argue that, under the "speculative damages" doctrine, the accrual date for their claims of damages from the commercial use by defendants of their NILs should be treated as the date the NILs were used, thus making timely claims based on defendants' use of their NILs within four years of the filing date of this lawsuit.  As another alternative argument, plaintiffs invoke the doctrine of equitable estoppel.  It, they claim, tolled

---

[8] Although plaintiffs are less explicit on these points, they appear to make similar arguments in defense of their § 2 monopolization and unjust enrichment claims, under which each use of NILs acquired in violation of § 2 or that unjustly enriched the NCAA started the limitations period anew on that claim, respectively.

the running of the statute of limitations of their claims.  Finally, as to their claim for injunctive relief, plaintiffs argue that the statute of limitations does not apply.

For the reasons that follow, none of these theories is persuasive.  None makes plaintiffs' claims, based on conduct one to three decades ago, timely.

### 1.    Continuing Violation Doctrine

Plaintiffs' Sherman Act claims are subject to a four-year statute of limitations.  15 U.S.C. § 15b.  Generally, "the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971).  However, "[i]n the context of a continuing conspiracy to violate the antitrust laws," "each time a plaintiff is injured by an act of the defendants[,] a cause of action accrues to him to recover the damages caused by that act and . . . the statute of limitations runs from the commission of the act." *Id.* (collecting cases).

Examples of continuing conspiracies include "price-fixing conspirac[ies] that bring[] about a series of unlawfully high priced sales," *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997), or "leases," *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 495 (1968).  Although *Klehr* principally concerned the limitations period under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, the Supreme Court compared the last predicate act rule— under which a RICO action accrues when the plaintiff knew or reasonably should have known of the last predicate act of the pattern of racketeering activity—to the overt-act requirement under a price-fixing conspiracy in violation of the federal antitrust laws.  521 U.S. at 186–90 ("Congress consciously patterned civil RICO after the Clayton Act.").  Under the continuing violation doctrine, "'each overt act that is part of the violation and that injures the plaintiff,' *e.g.*, each sale to the plaintiff," restarts the limitations period, but it "generally does not permit the plaintiff to

recover for the injury caused by old overt acts outside the limitations period," unlike the disputed (and overturned) application of the last predicate act rule, which allowed recovery for all harm caused by the RICO pattern. *Id.* at 189–90 (citation omitted). In *Hanover Shoe*, the plaintiff alleged the defendant had monopolized the shoe-making machinery market in violation of § 2 of the Sherman Act. 392 U.S. at 483–84. The defendant refused to sell certain types of machinery to the plaintiff, demanding instead that it lease them, which, the Supreme Court held, "constituted a continuing violation," and permitted plaintiff to recover damages pre-dating the limitations period. *Id.* at 502 n.15. Each refusal to sell, it held, was a separate and new actionable event. *Id.*

The continuing violation doctrine, however, is "heavily disfavored in the Second Circuit and courts have been loath to apply it absent a showing of compelling circumstances." *Stouter v. Smithtown Cent. Sch. Dist.*, 687 F. Supp. 2d 224, 230 (E.D.N.Y. 2010) (citation omitted) (collecting cases). That is because lengthening the statute of limitations "conflicts with a basic objective—repose—the underlies limitations periods." *Klehr*, 521 U.S. at 187 (collecting cases). Such would also "permit plaintiffs who know of the defendant's pattern of activity simply to wait, 'sleeping on their rights,' as the pattern continues and treble damages accumulate." *Id.* (citation omitted). The continuing violation doctrine also can create uncertainty, for parties and courts. *See Madison Square Garden, L.P. v. Nat'l Hockey League*, No. 7 Civ. 8455, 2008 WL 4547518, at *10 (S.D.N.Y. Oct. 10, 2008) ("Pinpointing what qualifies as a 'mere affirmation' of a previous act has been the source of some difficulty for the courts."); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 227 (E.D.N.Y. 2003) ("*Cipro II*") ("[T]he law regarding the continuing violation exception in the civil context is not as clear as plaintiffs' argument suggests."). The doctrine thus seeks to strike a balance between protecting plaintiffs'

interest in compensation for violations of their rights and encouraging diligent investigation and prompt litigation.  *See Klehr*, 521 U.S. at 187.

Salient here, the mere "commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." *Id.* at 189.  Instead, for an overt act to restart the statute of limitations, it must (1) "be a new and independent act that is not merely a reaffirmation of a previous act," and (2) "inflict new and accumulating injury on the plaintiff." *US Airways Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 68 (2d Cir. 2019) (citation omitted).  In the context of alleged antitrust conspiracies that result in aggrieved parties entering into contracts with conspirator(s), the Second Circuit has offered the following cautionary guidance in evaluating the timeliness of a plaintiff's claim:  A "contract is a vehicle for determining at the time of contracting what should happen thereafter"; thus, the "performance of a contract [i]s a manifestation of the 'overt act,' [namely] the decision to enter the contract, rather than an independent overt act of its own." *Id.* at 69.

These principles inform the Court's assessment of the AC's continuing violation theory, which is as follows.  When plaintiffs were student-athletes—a period that, considering all 16 plaintiffs, spanned 1994 through mid-2016, *see* AC ¶¶ 30, 149—the NCAA (1) forced them to assign away their perpetual NIL rights through Student-Athlete Statement contracts and (2) recorded images and footage of them, including while competing, *id.* ¶¶ 1–2.  The AC alleges that each time thereafter that NCAA used for commercial purposes a plaintiff's name, image, or license that it had acquired, that plaintiff suffered monetary harm, because, "[b]ut for the [horizontal price-fixing agreement], the student-athletes would have received royalties or other compensation for the ongoing advertising and other commercial use of the images and footage featuring them and their athletic performances." *Id.* ¶ 6.  Plaintiffs argue that such injuries

flowing from the continued use of their NILs from 1994–2016 bespeak a continuing price-fixing conspiracy.

Plaintiffs' theory, however, does not withstand the case law.  Under it, the NCAA's use today of a NIL acquired decades ago as the fruit of an antitrust violation does not constitute a new overt act restarting the limitations clock.  Instead, as the NCAA argues, the contemporary use of a NIL reflects performance of an aged agreement: a contract between the student-athlete and the NCAA under which it acquired footage and images of the plaintiff.  Such a use is, in fact, a textbook example of the "performance of a contract" that is "a manifestation of the 'overt act,' [specifically] the decision to enter the contract, rather than an independent overt act of its own." *US Airways*, 938 F.3d at 69; *see SL-x IP S.a.r.l. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 21-2697-CV, 2023 WL 2620041, at *3 (2d Cir. Mar. 24, 2023) (collecting cases).  The use by the NCAA or a conference defendant of a plaintiff's NIL acquired in the 1990s or early 2000s is a continuing *effect*—a consequence—an outgrowth of the alleged anticompetitive conduct.  It is not a part of it.  *See, e.g.*, AC ¶¶ 17, 24–26, 30; *see also Simmons v. Reich*, No. 20-4114-CV, 2021 WL 5023354, at *3 (2d Cir. Oct. 29, 2021) (limitations period does not restart when events are "derivative," or "direct consequences" of earlier wrongdoing).

Much apposite case law in this Circuit has applied these principles.  It uniformly defeats plaintiffs' continuing violation theory.

In *Choh v. Brown University*, an antitrust plaintiff claimed antitrust injury arose from his decision, upon enrolling in Brown University, to enter into an Ivy League Agreement, which prohibited athletic scholarships.  753 F. Supp. 3d 117 (D. Conn. 2024).  The arrangement requiring students to enter into that agreement, Choh alleged, was a product of an antitrust conspiracy among Ivy League universities.  *Id.* at 123–25.  The district court, however, rejected

Choh's claim that each injury he experienced pursuant to that agreement reflected a continuing violation. *Id.* at 136. Rather, it held, Choh's execution of that agreement started the statute of limitations clock, and that clock was not reset each time thereafter when Brown denied him "an athletic scholarship or compensation for athletic services during the remainder of his time at Brown." *Id.* Each such injurious act instead was "simply a manifestation of the overt act." *Id.* The district court accordingly dismissed Cho's Sherman Act § 1 claim as untimely. *Id.* at 136–37.

Similarly, in *Madison Square Garden*, *supra*, the plaintiff's alleged antitrust injuries arose from "the 2006 *extension* of the licensing agreement" with the National Hockey League ("NHL") "that had been in place since 1994, which *reaffirmed*" the respective assignments. 2008 WL 4547518, at *6 (emphasis in original). The NHL rules requiring clubs to grant exclusive licensing and marketing rights to the NHL, plaintiff Madison Square Garden ("MSG") alleged, created unreasonable restraints of trade in violation of § 1 of the Sherman Act. *Id.* at *2–3. Although MSG characterized the NHL's exploitation of these rights as post-agreement conduct that extended the applicable limitations period, the district court found that the allegations stemmed from the "*continued* . . . enforcement of pre-existing policies" and agreements. *Id.* at *6 (emphasis in original). It found the continuing violation doctrine inapplicable, because the complaint did not allege any "substantive change[s]" in any licensing rights, but rather "confirmed" that those rights belonged to the NHL. *Id.* at *10. The district court thus dismissed as untimely plaintiff's antitrust claims arising from the licensing agreements. *Id.* at *11.

The same is true of *Cipro II*, *supra*. There, the antitrust plaintiffs challenged agreements that defendants had entered into in 1997 that allegedly prevented competition in the market for

an antibiotic. *Cipro II*, 261 F. Supp. 2d at 191–92. Under the 1997 agreements, defendants acknowledged defendant Bayer's valid patent of the antibiotic's active ingredient and restricted regulatory approval of generic versions upon expiration of Bayer's patent. *Id.* at 195–96. Plaintiffs asserted that the statute of limitations had thereafter been extended by continued violations of the antitrust laws, including by later payments made pursuant to these agreements. *Id.* at 227. The district court, however, found the continuing violation doctrine inapplicable. It held that the payments were not acts "sufficient to extend or restart the limitations period because the performance of an allegedly anticompetitive, pre-existing contract is not a new predicate act," and that plaintiffs' allegations "are not so compelling as to justify an exception to the statute of limitations." *Id.* at 229. Accordingly, it dismissed plaintiffs' claims as untimely. *Id.* at 230.

Other cases are in accord. *See, e.g.*, *SL-x IP S.a.r.l*, 2023 WL 2620041, at *3 (sale of intellectual property did not constitute continuing violation, but rather was a "manifestation" of defendants' alleged anticompetitive agreement "to freeze [plaintiff] out of the market"); *US Airways*, 938 F.3d at 69 (each price charged pursuant to 2006 contract was "not an overt act of its own, but a manifestation of the prior overt act of entering into the 2006 contract," and claims based on these later price charges were thus untimely); *In re Google Digital Advertising Antitrust Litig.*, 721 F. Supp. 3d 230, 272–73 (S.D.N.Y. 2024) ("[The] Complaint describe[d] a repeated manifestation of the same overt act—enforcement o[f] a limit on the number of line items permitted in header bidding—and not new and independent acts. The claim directed to line-item caps does not describe a continuing violation."); *Giordano v. Saks Inc.*, 654 F. Supp. 3d 174, 192 (E.D.N.Y. 2023) (alleged refusal to hire plaintiffs and artificial suppression of wages constituted manifestations of no-hire agreement and did not constitute continuing violation), *aff'd sub nom.*

*Giordano v. Saks & Co. LLC*, No. 23-600-CV, 2025 WL 799270 (2d Cir. Mar. 13, 2025); *Cipro II*, 261 F. Supp. 2d at 227–29 (collecting cases).

In light of this body of case authority and the principles informing it, the AC's theory of a continuing violation fails. The AC alleges that each of the 16 plaintiffs, during his college career, entered into an agreement to relinquish his NIL rights, with all such agreements occurring between 1994 and mid-2016, specifically, during the academic year, before the athletic season began. *See* AC ¶ 153 (plaintiffs were "student-athletes prior to June 15, 2016"); *see also id.* ¶¶ 30, 149 (each named plaintiff played from 1994 to mid-2016); *id.* ¶ 120 (each named plaintiff relinquished his NIL rights each academic year). The agreements authorized the NCAA to use student-athletes' NILs and prevented plaintiffs from using the same for their own "promotional activities." *Id.* ¶¶ 117, 123. Plaintiffs' claims are not salvaged by defendants' alleged continued exploitation of the NIL rights acquired pursuant to these agreements. That is because, under the caselaw above, the commercial usage of their NILs was merely a manifestation of these long-ago agreements, entered into while plaintiffs were in college. The AC does not allege that any agreement between a plaintiff and defendants to surrender plaintiff's NIL rights occurred within, or anywhere close to, the four-year period before the filing of this lawsuit. Their claims are thus time-barred.

### 2.    Speculative Damages

Plaintiffs next argue that the antitrust damages they experienced were "speculative" or "unprovable" at the time they agreed to relinquish their NIL rights to the NCAA and its co-conspirators. They argue that, under a narrow exception for certain speculative damages, their claims should be viewed as accruing later: each time a resulting injury occurred. On this theory, they argue, each action—within four years of the filing date of the Complaint (July 1, 2024)—by

a defendant to commercially exploit the unlawfully obtained NIL rights supplies a timely basis for recovery in antitrust.

As reviewed above, an antitrust claim generally "accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith*, 401 U.S. at 338. There is, however, an exception to the date-of-injury rule for "the rare case in which the damages caused by an antitrust injury are so speculative that the court is unwilling to estimate them." *Higgins v. N.Y. Stock Exch., Inc.*, 942 F.2d 829, 832 (2d Cir. 1991). In such a case, a plaintiff may recover for damages when the injuries cease to become speculative, even if the conduct violating the antitrust laws occurred more than four years earlier. *Klehr*, 521 U.S. at 190–91 (citing *Zenith*, 401 U.S. at 339–40). The Supreme Court adopted this doctrine in response to antitrust and treble-damage actions in which courts had declined to award future profits because they were too speculative, in effect "holding that no cause of action ha[d] yet accrued for any but those damages already suffered." *Zenith*, 401 U.S. at 339. Without an exception for such circumstances, the Court explained, damages for such misconduct would be "forever incapable of recovery, contrary to the congressional purpose that private actions serve 'as a bulwark of antitrust enforcement,' and that the antitrust laws fully 'protect the victims of the forbidden practices as well as the public.'" *Id.* at 340 (citation omitted). However, even if the damages are "uncertain," so long as they are "calculable," the exception does not apply. *SL-x IP S.a.r.l.*, 2023 WL 2620041, at *3.

Plaintiffs' attempt to invoke the speculative damages doctrine here does not save their claims. Plaintiffs' premise is plausible that, at the time they surrendered their NILs as entering college freshmen dreaming of athletic success, they could not have predicted whether they would play in games in college or whether recordings of their footage would have commercial value.

21

Pls. Opp. at 12–13.  But by the time plaintiffs graduated, the answers to those questions were

known.  The body of the name, injury, and likeness material for each student-plaintiff, and the

NIL rights that each had relinquished to the NCAA, was complete.  It was a closed set.  And

each plaintiff's collegiate playing career, whether storied or prosaic, was also a matter of known

history.  Lead plaintiff Mario Chalmers, for example, knew that he had a successful three-year

college career playing basketball for the Kansas Jayhawks, culminating in his sinking the game-

tying 3-pointer with 2.1 seconds to go in the 2008 national championship game, which the

Jayhawks won in overtime.  AC ¶ 68 ("Mario Chalmers' CLUTCH 3-pointer, from every

angle").  By the time he graduated, Chalmers' damages from the NCAA's control of his NILs

from his collegiate tenure, although uncertain, were calculable within the meaning of the

caselaw.  The same can be said for the other named plaintiffs, including, for example, Sherron

Collins, a member of the same Kansas championship team as Chalmers whose collegiate career

ended in 2010, *see id.* ¶¶ 16, 69 ("13 best clutch March Madness shots since 2008"), and Ryan

Boatright, a member of the all-Final-Four team in 2014 and whose playing career at the

University of Connecticut ended in 2015, *id.* ¶¶ 18, 72, 134.

For each plaintiff, therefore assuming that their damages qualified as speculative at the

moment they, as incoming freshmen, ceded their NIL rights to the NCAA, that was decidedly no

longer so by the time their college careers ended.  Even assuming each plaintiff thereafter had

the full four years to bring suit, *see Zenith*, 401 U.S. at 339, none did so.  Rather, each plaintiffs'

college career ended between 1998 and mid-2016, *see* AC ¶¶ 17, 24–26, 30—way more than

four years before plaintiffs filed this lawsuit.

The limited exception for speculative damages thus does not salvage plaintiffs' claims.

*See, e.g.*, *Klehr*, 521 U.S. at 191 (rejecting bid to save untimely antitrust claims based on

speculative injury doctrine); *SL-x IP S.a.r.l.*, 2023 WL 2620041, at *3 (similar); *Higgins*, 942 F.2d at 832–34 (similar).

### 3.    Equitable Tolling

In opposing defendants' untimeliness argument, plaintiffs alternatively invoke the doctrine of equitable tolling.

Equitable tolling is "an extraordinary measure that applies only when plaintiff is prevented from filing despite exercising that level of diligence which could reasonably be expected in the circumstances." *Veltri v. Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318, 322 (2d Cir. 2004).  It empowers courts "to extend the statute of limitations beyond the time of expiration as necessary to avoid inequitable circumstances," but requires the party seeking tolling to have "pass[ed] with reasonable diligence through the period it seeks to have tolled." *Johnson v. Nyack Hosp.*, 86 F.3d 8, 12 (2d Cir. 1996).  "[T]he burden of proving that tolling is appropriate rests on the plaintiff." *Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, 512 (2d Cir. 2002).  A plaintiff "must show that: (1) the defendant made a definite misrepresentation of fact, and had reason to believe that the plaintiff would rely on it; and (2) the plaintiff reasonably relied on that misrepresentation to his detriment." *Buttry v. Gen. Signal Corp.*, 68 F.3d 1488, 1493 (2d Cir. 1995).

Plaintiffs have not made any such showing here.  They claim that the NCAA falsely cast its amateurism rules, including requiring the relinquishment of NILs, as designed to protect student-athletes from "exploitation by professional and commercial enterprises." AC ¶ 112.  But even assuming that that spin misleadingly concealed the NCAA's profit motive for acquiring the NILs, more is required of plaintiffs.  As the Second Circuit has held, equitable tolling is available only where a plaintiff can "show that it would have been *impossible* for a reasonably prudent

person to learn" of the cause of action. *Pearl v. City of Long Beach*, 296 F.3d 76, 85 (2d Cir. 2002) (emphasis in original) (citation omitted). Plaintiffs' pleadings do not permit such a finding. On the contrary, as pled, plaintiffs knowingly signed the agreements at issue, on notice of what they were relinquishing. They do not claim to have been unaware that the NCAA had a practice of commercially using student-athletes' NILs. They do not claim to have been unaware of the earlier litigations—which date to 2009—in which other student-athletes sued the NCAA about substantively the same practices. Plaintiffs' AC also notably does not allege "that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing." *SL-x IP S.a.r.l.*, 2023 WL 2620041, at *3 (citation omitted).

In these circumstances, central ingredients of equitable tolling are lacking. Plaintiffs have not pled facts that during the many years between agreeing to relinquish their NILs and filing this lawsuit, they were unaware, and that it was impossible for them reasonably to have learned, that they had a potential antitrust claim.

The Court therefore denies plaintiffs' bid to rescue their claims on this basis. *See id.*; *Smith v. McGinnis*, 208 F.3d 13, 17–18 (2d Cir. 2000) (denying "rare and exceptional" remedy of equitably tolling, where plaintiff failed to "act[] with reasonable diligence throughout the period he seeks to toll"); *Johnson*, 86 F.3d at 12 (similar).

### 4.    Injunctive Relief

In a final argument as to timeliness, plaintiffs argue that the AC's bid for injunctive relief survives, because the statute of limitations does not apply to it. That is nominally true, but it does not avail plaintiffs. That is because, although "strictly speaking the statute of limitations does not apply to claims for injunctive relief, where the conduct forming the basis for the

Complaint occurs outside of the analogous statute of limitations period, the doctrine of laches presumptively bars a plaintiff's claims absent a showing that delay was excusable and caused no prejudice to the defendant." *Madison Square Garden*, 2008 WL 4547518, at *10; *see Blue Cross & Blue Shield of Vermont v. Teva Pharm. Indus., Ltd.*, 712 F. Supp. 3d 499, 536 (D. Vt. 2024) ("[C]ourts in this circuit have held that a four-year period of laches applies to" claims for equitable relief under the Clayton Act). And, here, the doctrine of laches here is fatal to plaintiffs' claims.

With plaintiffs having filed the original complaint on July 1, 2024, the doctrine of laches presumptively bars claims arising before July 1, 2020. *Madison Square Garden*, 2008 WL 4547518, at *10. And for the reasons reviewed above, plaintiffs have not shown a good excuse for delaying filing their suit until last July. They cannot fairly term their claims as continuing violations of the antitrust laws; such would have overcome the presumption of laches. *Id.* Nor have they otherwise met their burden "to aver and prove the circumstances making it inequitable to apply laches to his case." *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir. 1996) (citation omitted). Quite the contrary, as noted, although plaintiffs in antitrust suits that significantly paralleled this one (and indeed included plaintiffs common to this action) brought claims against the NCAA years ago, the plaintiffs here sat on their hands for more than a decade before bringing this lawsuit. And plaintiffs' attempt to rationalize this lawsuit as being unavailable to them until *Alston* was decided, Pls. Opp. at 14, is unpersuasive, for multiple reasons. The pendency of *Alston* did not prevent other litigants, like those in *House*, from earlier pursuing (and obtaining a settlement of) similar such claims. And even after *Alston* was decided, in 2021, *see* 594 U.S. at 73, plaintiffs here waited approximately another three years to bring this action.

Accordingly, the AC's injunctive relief claims, too, are time-barred.  *See id.*; *Madison Square Garden*, 2008 WL 4547518, at *10.

### C.    Preclusion

Independently, doctrines of preclusion bar much of the AC's claims.  Defendants argue that *res judicata*, or claim preclusion, based on *O'Bannon* bars the claims for injunctive relief, and that the *Alston* settlement release, by its terms, bars the damages claims of 10 plaintiffs. Plaintiffs counter that their AC alleges broader price-fixing allegations than those adjudicated in *O'Bannon*, and that the *Alston* settlement alleged a § 1 horizontal conspiracy that differs from that alleged here.  On both points, defendants have by far the better argument.

### 1.    *O'Bannon*: Claim Preclusion

Under the doctrine of *res judicata*, a "final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."  *Allen v. McCurry*, 449 U.S. 90, 94 (1980).  A court may "consider a *res judicata* defense on a Rule 12(b)(6) motion to dismiss when the court's inquiry is limited to the plaintiff's complaint, documents attached or incorporated therein, and materials appropriate for judicial notice."  *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 498 (2d Cir. 2014).  In evaluating an earlier action to determine whether claims are barred by *res judicata*, "courts routinely take judicial notice of documents filed in other courts, . . . not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related findings."  *Day v. Distinctive Pers., Inc.*, 656 F. Supp. 2d 331, 336 (E.D.N.Y. 2009) (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).  The party moving to dismiss under Rule 12(b)(6) on *res judicata* grounds must show that "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; and (3) the claims asserted in the subsequent action were, *or could have been*, raised in the

prior action." *Monahan v. N.Y. City Dep't of Corr.*, 214 F.3d 275, 285 (2d Cir. 2000) (citing *Allen*, 449 U.S. at 94) (emphasis added). "[O]nce a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy." *Giannone v. York Tape & Label, Inc.*, 548 F.3d 191, 194 (2d Cir. 2008) (citation omitted).

Under these principles, the *O'Bannon* judgment forecloses plaintiffs' bid for injunctive relief. All plaintiffs fall within the *O'Bannon* class as defined, AC ¶¶ 14–30; Tr. at 31, and the claims in the two cases derive from the same conduct allegedly violating the antitrust laws: the NCAA's rules denying student-athletes compensation from use of their NILs. *See O'Bannon*, 802 F.3d at 1055 ("The gravamen of O'Bannon's complaint was that the NCAA's amateurism rules, insofar as they prevented student-athletes from being compensated for the use of their NILs, were an illegal restraint of trade under Section 1 of the Sherman Act, 15 U.S.C. § 1.").

Plaintiffs resist claim preclusion here on four grounds.

First, they argue that there is a lack of privity between the parties in the two cases. They argue that the parties in *O'Bannon* differ from those here. The *O'Bannon* judgment, however, refutes that claim. The *O'Bannon* class, with the features salient here highlighted, consists of:

> all current and *former* student-athletes residing in the United States who compete on, or competed on, an NCAA [DI] men's basketball team . . . and whose images, likenesses and/or names *may be*, *or have been*, included *or could have been included* (by virtue of their appearance in a team roster) *in game footage* or in videogames licensed or sold by *Defendants, their co-conspirators, or their licensees.*

7 F. Supp. 3d at 965 (emphasis added). The *O'Bannon* class thus includes all plaintiffs here. All 16 plaintiffs were, at the time the *O'Bannon* injunctive class was certified, either current or former student-athletes. *See* AC ¶¶ 14–30. And the *O'Bannon* defendants included the NCAA and its "co-conspirators" or "licensees," terms which (particularly the first) squarely embrace the

conferences and schools which are alleged here to be its co-conspirators. *See id.* ¶¶ 31–41; *see also Lacy v. Principi*, 317 F. Supp. 2d 444, 447 (S.D.N.Y. 2004) ("When a party has litigated a claim to final judgment, that party cannot avoid the *res judicata* effect of that judgment by bringing suit against a new defendant that is in privity with the original defendant."). In these circumstances, *res judicata* squarely applies, as it is black letter law that a "judgment in favor of either side is conclusive in a subsequent action between them on any issue actually litigated and determined, if its determination was essential to that judgment." *Cooper v. Fed. Rsrv. Bank of Richmond*, 467 U.S. 867, 874 (1984).

Plaintiffs' second argument against claim preclusion is that the two cases derive from different factual events. That argument fails both because the factual bases (here, defendants' collusion to compel student-athletes to agree to cede their NIL rights; in *O'Bannon*, defendants' commercial exploitation of those rights) are substantively all but identical; and because, even if their subtle shadings distinguished them, the claims here could have been raised in *O'Bannon*. The *O'Bannon* plaintiffs, claiming a violation of § 1 of the Sherman Act, challenged the actual or potential use—by the NCAA and its purported co-conspirators and licensees—of their NIL rights in game footage. *See O'Bannon*, 7 F. Supp. 3d at 965. Plaintiffs here seek the same relief, namely compensation for the exploitation of their NIL rights and a declaration that commercial usage of their NILs violates antitrust laws. *See O'Bannon*, 802 F.3d at 1076 (reversing district court's ruling that it was "a viable alternative to allow students to receive NIL cash payments untethered to their education expenses"). Plaintiffs here conceded as much at argument. Tr. at 82–83 (Q: "How is the injunctive relief you're seeking here any different from that which was sought in *O'Bannon*?" A: "I don't know the answer to that question, your Honor.").

Contrary to plaintiffs' contention, there is also no consequential difference between the antitrust theory pursued in *O'Bannon* and that pursued here. The *O'Bannon* plaintiffs' claim cast its conspiracy as a monopsony, rather than monopoly, portraying the conspiring member schools as buyers, rather than as sellers. But as Judge Wilken recognized, and as the *O'Bannon* plaintiffs noted in a post-trial brief, the facts support either characterization, and the Supreme Court has indicated that similar legal standards apply to both such forms of a § 1 horizontal conspiracy. *See O'Bannon*, 7 F. Supp. 3d at 991 (citing *Weyerhaeuser Co. v. Ross–Simmons Hardwood Lumber Co., Inc.*, 549 U.S. 312, 322 (2007)); *see also Alston*, 375 F. Supp. 3d at 1067 ("In *O'Bannon I*, the Court had found that the plaintiffs' antitrust claims could be analyzed as a monopoly or, alternatively, as a monopsony."). The AC's theory here is in accord, and indeed, as in *O'Bannon*, characterizes terming the § 1 horizontal conspiracy in alternative terms that mirror those in *O'Bannon*, alleging both a conspiracy in restraint of trade and a group boycott to the same effect, AC ¶¶ 173–80, while also claiming monopolization in violation of § 2, *id.* ¶¶ 182–86. Notwithstanding semantic nuances, the two cases challenge fundamentally the same horizontal conspiracy among the NCAA and its members. And even were this not so, because *O'Bannon* could have brought the claims, *res judicata* bars them being brought here.

Plaintiffs' third and fourth arguments—that enforcing claim preclusion is at odds with the *O'Bannon* judgment and would breach due process—are easily put down. The *O'Bannon* judgment by its terms covers the plaintiffs here. It applies to the NILs of current and former student-athletes, inclusive of those here, that "may [have] be[en]," "have been," or, salient here, "could have been included . . . in game footage." *O'Bannon*, 7 F. Supp. 3d at 965. Far from offending the *O'Bannon* settlement, barring the claims of plaintiffs to the effect that the NCAA unlawfully profited from use of their student-athlete NILs in images and game footage, *see, e.g.*,

AC ¶¶ 5–6, respects that settlement and the closure it was intended to achieve. And contrary to plaintiffs' rhetoric, no due process claim lies here. Plaintiffs have not contended that the *O'Bannon* class lacked notice of the settlement, *see* Tr. at 37 ("[T]here was notice under [Rule] 23(b)(2) of the *O'Bannon* injunctive class."), or identified a different basis why precluding this litigation based on *O'Bannon* would offend due process, *see Cooper*, 467 U.S. at 874; *Smith v. Bayer Corp.*, 564 U.S. 299, 315 (2011) ("[A] class action approved under Rule 23" binds all class members).

### 2.    *Alston*: Preclusion Pursuant to the Settlement Agreement

Separately, the *Alston* settlement agreement bars the damages claims of 10 of the 16 plaintiffs: Boatwright, Coleman, Collins, Council, Daniels, Giplaye, Greene, Oriakhi, Pressey, and Smith. Each was a class member in *Alston*, as plaintiffs concede. *See* Pls. Opp. at 14; Defs. Br. at 16. Plaintiffs resist this outcome on the ground of asserted differences between the cases in the legal theories and factual claims that were pursued. Pls. Opp. at 20–23. But the *Alston* Settlement Agreement, by its terms, embraces the claims here. It released the NCAA and certain member conferences from:

> *any and all past, present and future claims, demands, rights, actions, suits, or causes of action, for monetary damages of any kind* (including but not limited to actual damages, statutory damages, and exemplary or punitive damages), whether class, individual or otherwise in nature, known or unknown, foreseen or unforeseen, suspected or unsuspected, asserted or unasserted, contingent or non-contingent, under the laws of any jurisdiction, which Releasors or any of them, whether directly, representatively, derivatively, or in any other capacity, ever had, now have or hereafter can, shall or may have, *arising out of or relating in any way to any of the legal, factual, or other allegations made in Plaintiffs' Actions, or any legal theories that could have been raised on the allegations in Plaintiffs' Actions*.

*Alston* Settlement, at 11–12; *see id.* at 11 n.49. This broad language easily embraces the claims brought by the 10 *Alston* class members who sue here. *See, e.g.*, *Dodd v. City Univ. of New York*, 489 F. Supp. 3d 219, 253 n.5 (S.D.N.Y. 2020) (settlement precluded claims as to pre-

agreement conduct); *Holland v. JPMorgan Chase Bank, N.A.*, No. 19 Civ. 233 (PAE), 2019 WL 4054834, at *11 (S.D.N.Y. Aug. 28, 2019) (dismissing barred claims as a result of settlement); *Perkins v. Bronx Lebanon Hosp.*, No. 14 Civ. 1681 (PAE), 2015 WL 3649330, at *6 (S.D.N.Y. June 11, 2015) (same).

Even if this were not the case, these claims would be barred under the principles of claim preclusion reviewed above. As the Ninth Circuit explained, the *Alston* plaintiffs "sought to dismantle the NCAA's entire compensation framework," including "challeng[ing the] rules prohibiting NIL compensation." *Alston*, 958 F.3d at 1247. These plaintiffs "broadly target[ed] the 'interconnected set of NCAA rules that limit the compensation [student-athletes] may receive in exchange for their athletic services.'" *Id.* at 1254. The claims brought in this lawsuit clearly could have been raised in that litigation. *See Wal-Mart Stores, Inc., v. Visa U.S.A., Inc.*, 396 F.3d 96, 107 (2d Cir. 2005) ("The law is well established in this Circuit and others that class action releases may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct.") (citation omitted).

Accordingly, *res judicata* separately bars monetary relief as to the 10 *Alston* plaintiffs. *See, e.g.*, *Giannone*, 548 F.3d at 194 (*res judicata* barred monetary relief); *Robertson v. Nat'l Basketball Ass'n*, 622 F.2d 34, 35 (2d Cir. 1980) (similar); *Nampiaparampil v. N.Y.C. Campaign Fin. Bd.*, No. 23 Civ. 6391, 2024 WL 2058382, at *6 (S.D.N.Y. May 8, 2024) (similar).

### D.    Unjust Enrichment

Defendants, finally, move to dismiss the AC's unjust enrichment claim. For several reasons, dismissal is warranted.

First, the claim duplicates the antitrust claims, which have been dismissed.  Under New York law,[9] an unjust enrichment claim lies when "the defendant has obtained a benefit which in equity and good conscience should be paid to the plaintiff."  *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012).  A plaintiff must show that the "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover."  *Die sel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 55 (2d Cir. 2011).  Where the basis for an unjust enrichment claim is a violation of a separate statute, dismissal of the claim based on that statute requires dismissal of the unjust enrichment claim.  *See Nachman v. Tesla, Inc.*, No. 22 Civ. 5976, 2023 WL 6385772, at *5 (E.D.N.Y. Sept. 30, 2023) (dismissing unjust enrichment claim duplicative of dismissed statutory claim); *Bermudez v. Colgate-Palmolive Co.*, 667 F. Supp. 3d 24, 46 (S.D.N.Y. 2023) (collecting cases); *Barton v. Pret A Manger (USA) Ltd.*, 535 F. Supp. 3d 225, 249 (S.D.N.Y. 2021) (same).[10] Such is the case here, because the AC does not identify any basis on which to find "equity and

---

[9] Plaintiffs' AC does not identify the state law or laws on which the unjust enrichment claim is based.  To the limited degree the parties have briefed the issue, they have cited to New York law, and neither party has argued that the motion to dismiss turns on a proposition of law on which New York law differs from that of other states.  The Court accordingly here applies New York law.  *See Pilon v. Discovery Commc'ns, LLC*, No. 24 Civ. 4760, 2025 WL 752244, at *4 (S.D.N.Y. Mar. 10, 2025) ("[B]ecause the parties have not briefed the issue, and because the Court is confident that any other choice will make no difference in the ultimate outcome of the case, the Court is content to apply New York" law.); *Grabe v. Ziff Davis Publ'g Co.*, No. 91 Civ. 6275, 1995 WL 688912, at *6 (S.D.N.Y. Nov. 20, 1995) (similar); *see also Oechsner v. Connell Ltd. P'ship*, 283 F. Supp. 2d 926, 935 n.3 (S.D.N.Y. 2003), *aff'd*, 101 F. App'x 849 (2d Cir. 2004) ("This Court does not need to consider the choice of law issue—which is not briefed by the parties—because all claims are untimely in both jurisdictions.").

[10] To the extent the unjust enrichment claims have been found derivative of a plaintiff's other claims, courts have declined to permit litigants "to repackage their [failed] antitrust claims as unjust enrichment actions" because it would thereby render the antitrust laws superfluous.  *Yong Ki Hong v. KBS Am., Inc.*, 951 F. Supp. 2d 402, 425 (E.D.N.Y. 2013) (collecting cases); *see also Kramer v. Pollock–Krasner*, 890 F. Supp. 250, 254–57 (S.D.N.Y. 1995).

good conscience" to require defendants to pay NIL proceeds to plaintiffs other than defendants' alleged violations of antitrust law.  *See, e.g.*, *Cohen v. BMW Invs. L.P.*, 144 F. Supp. 3d 492, 502 (S.D.N.Y. 2015), *aff'd*, 668 F. App'x 373 (2d Cir. 2016) (dismissing unjust enrichment claim where equity and good conscience weighed in defendant's favor); *Banco Indus. de Venezuela, C.A. v. CDW Direct, L.L.C.*, 888 F. Supp. 2d 508, 517 (S.D.N.Y. 2012) (similar); *Tasini v. AOL, Inc.*, 851 F. Supp. 2d 734, 741 (S.D.N.Y.), *aff'd*, 505 F. App'x 45 (2d Cir. 2012) (similar).

Second, the unjust enrichment claim is untimely.  Where an unjust enrichment claim seeks restitution, the limitations period is six years, *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509 (2d Cir. 2001); otherwise, it is three years, *Ruzhinskaya v. Healthport Techs., LLC*, 311 F.R.D. 87, 109 (S.D.N.Y. 2015).  As pled, defendants' allegedly inequitable conduct in wresting from the 16 plaintiffs the rights to their NILs occurred a decade (or much more) ago.  Plaintiffs have not made any argument why defendants' commercial use of the NILs many years later is separately actionable as unjust enrichment.  *See, e.g.*, *Pricaspian Dev. Corp. (Texas) v. Royal Dutch Shell, PLC*, 382 F. App'x 100, 103 (2d Cir. 2010) (affirming dismissal of untimely unjust enrichment claim where, despite delay in knowing value of restitution, date of injury still served as accrual date); *Dolmetta v. Uintah Nat. Corp.*, 712 F.2d 15, 20 (2d Cir. 1983) (similar); *Pirri v. Cheek*, No. 19 Civ. 180 (PAE), 2019 WL 2472438, at *5 (S.D.N.Y. June 13, 2019) (dismissing untimely unjust enrichment claim); *City of Almaty, Kazakhstan v. Ablyazov*, No. 15 Civ. 5345, 2018 WL 1583293, at *5 (S.D.N.Y. Mar. 27, 2018) (same).

Third, as to the 10 Alston plaintiffs, the unjust enrichment claim is separately foreclosed by the *Alston* Settlement Agreement and principles of claim preclusion.  The language in the *Alston* release reviewed above—barring "any and all past, present and future claims, demands, rights, actions, suits, or causes of action, for monetary damages of any kind . . . under the laws of

any jurisdiction"—reaches the unjust enrichment claim. And, for the same reasons that *res judicata* bars these plaintiffs from bringing antitrust claims today based on the same conduct, it bars them from bringing unjust enrichment claims.

The Court thus grants the motion to dismiss the AC's unjust enrichment claim. *See, e.g.*, *Nachman*, 2023 WL 6385772, at *5–6 (dismissing unjust enrichment claim); *Bermudez*, 667 F. Supp. 3d at 46 (same); *Kramer*, 890 F. Supp. at 257 (same); *see also Yong Ki Hong*, 951 F. Supp. 2d at 425 (granting defendants summary judgment on duplicative unjust enrichment claim).

## CONCLUSION

For the foregoing reasons, the Court grants the NCAA's motion to dismiss the AC. The dismissal is with prejudice.[11] The Clerk of Court is respectfully directed to terminate the motions pending at Dockets 94 and 107, and to close this case.

SO ORDERED.

_Paul A. Engelmayer_
PAUL A. ENGELMAYER
United States District Judge

Dated: April 28, 2025
       New York, New York

---

[11] Plaintiffs were given and took the opportunity to amend their original Complaint while being warned that further opportunities would not ordinarily be granted. *See Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) (affirming dismissal with prejudice where plaintiff had an opportunity to amend, rendering further amendment "futile"); *United States ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C.*, 319 F. Supp. 3d 747, 751 (S.D.N.Y. 2018) (collecting cases).